1

```
1                      UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEW JERSEY
2       _____

3       ATLAS DATA PRIVACY CORPORATION,        CIVIL ACTION NUMBER:
        et al.,
4                 Plaintiffs,                   1:24-cv-04037-HB
        vs.
5
        WE INFORM, LLC,                         Motion Hearing
6                 Defendants.
        _____
7

8       ATLAS DATA PRIVACY CORPORATION,        CIVIL ACTION NUMBER:
        et al.,
                  Plaintiffs,                   1:24-cv-04041-HB
9       vs.

10      INFOMATICS, LLC, et al.,
                  Defendants.
11      _____

12      ATLAS DATA PRIVACY CORPORATION,        CIVIL ACTION NUMBER:
        et al.,
13                Plaintiffs,                   1:24-cv-04045-HB
        vs.
14
        THE PEOPLE SEARCHERS, LLC, et al.,
15                Defendants.
        _____
16
                 (Additional captions continued onto next page.)
17
        Mitchell H. Cohen Building & U.S. Courthouse
18      4th and Cooper Streets
        Camden, New Jersey 08101
19      Monday, August 11, 2025
        Commencing at 9:58 a.m.
20
        B E F O R E:              THE HONORABLE HARVEY BARTLE, III,
21                                UNITED STATES DISTRICT JUDGE (EDPA)

22
                 John J. Kurz, Federal Official Court Reporter
23                    John_Kurz@njd.uscourts.gov
                           (856)576-7094
24
        Proceedings recorded by mechanical stenography; transcript
25             produced by computer-aided transcription.
```

```
1  ─────────────────────────────

2  ATLAS DATA PRIVACY CORPORATION,      CIVIL ACTION NUMBER:
   et al.,
3              Plaintiffs,             1:24-cv-04141-HB
   vs.
4
   DIGITAL SAFETY PRODUCTS, LLC,
5  et al.,
               Defendants.
6  ─────────────────────────────

7  ATLAS DATA PRIVACY CORPORATION,      CIVIL ACTION NUMBER:
   et al.,
8              Plaintiffs,             1:24-cv-04143-HB
   vs.
9
   CIVIL DATA RESEARCH,
10             Defendants.
   ─────────────────────────────
11
   ATLAS DATA PRIVACY CORPORATION,      CIVIL ACTION NUMBER:
12 et al.,
               Plaintiffs,             1:24-cv-04160-HB
13 vs.

14 SCALABLE COMMERCE, LLC, et al.,
               Defendants.
15 ─────────────────────────────

16 ATLAS DATA PRIVACY CORPORATION,      CIVIL ACTION NUMBER:
   et al.,
17             Plaintiffs,             1:24-cv-04176-HB
   vs.
18
   INNOVIS DATA SOLUTIONS INC.,
19 et al.,
               Defendants.
20 ─────────────────────────────

21 ATLAS DATA PRIVACY CORPORATION,      CIVIL ACTION NUMBER:
   et al.,
22             Plaintiffs,             1:24-cv-04324-HB
   vs.
23
   RESTORATION OF AMERICA, et al.,
24             Defendants.
   ─────────────────────────────
25          (CAPTION CONTINUED ONTO NEXT PAGES)
```

3

```
1    _____

2    ATLAS DATA PRIVACY CORPORATION,        CIVIL ACTION NUMBER:
     et al.,
3                    Plaintiffs,            1:24-cv-04385-HB
     vs.
4
     SYNAPTIX TECHNOLOGY, LLC, et al.,
5                    Defendants.
     _____
6
     ATLAS DATA PRIVACY CORPORATION,        CIVIL ACTION NUMBER:
7    et al.,
                     Plaintiffs,            1:24-cv-08075-HB
8    vs.

9    SMARTY, LLC, et al.,
                     Defendants.
10   _____

11

12   A P P E A R A N C E S:

13         BOIES SCHILLER FLEXNER LLP
           BY: ADAM R. SHAW, ESQUIRE
14         30 South Pearl Street, 12th Floor
           Albany, New York 12207
15         For the Plaintiffs

16         BOIES SCHILLER FLEXNER LLP
           BY:  ERIC M. PALMER, ESQUIRE
17         401 East Las Olas Boulevard, Suite 1200
           Fort Lauderdale, Florida 33301
18         For the Plaintiffs

19         PEM LAW LLP
           BY:  RAJIV D. PARIKH, ESQUIRE
20         1 Boland Drive, Suite 101
           West Orange, New Jersey 07052
21         For the Plaintiffs

22         TROUTMAN PEPPER LOCKE
           BY:  ANGELO A. STIO, III, ESQUIRE
23         104 Carnegie Center Drive, Suite 203
           Princeton, New Jersey 08540
24         For the Defendants Innovis Data Solutions, Inc.

25
                   (Appearances continued onto next page.)
```

4

**A P P E A R A N C E S:** (Continued)

        SEYFARTH SHAW LLP
        BY:  ROBERT T. SZYBA, Esquire
        620 Eighth Avenue, 32nd Floor
        New York, New York 10018
        For the Defendants Infomatics, LLC; The People
        Searchers, LLC; and We Inform, LLC, et al.

        LEWIS BRISBOIS BISGAARD & SMITH
        BY:  BRIAN DEENEY, ESQUIRE
        One Riverfront Plaza, Suite 800
        Newark, New Jersey 07102
        For the Defendant Synaptix Technology, LLC

        LOMURRO LAW
        BY:  ANDREW BLAKE BROOME, ESQUIRE
        4 Paragon Way, Suite 100
        Freehold, New Jersey 07728
        For the Defendant Civil Data Research, LLC, et al.

        MANATT, PHELPS & PHILLIPS, LLP
        BY:  MATTHEW F. BRUNO, ESQUIRE
        7 Times Square
        New York, New York 10036
        For the Defendants Smarty, LLC

        CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
        BY:  JOHN E. MACDONALD, ESQUIRE
             DAVID A. YUDELSON, ESQUIRE (*pro hac vice*)
        3120 Princeton Pike, Suite 301
        Lawrenceville, New Jersey 08648
        For the Defendants Restoration of America and Voter
        Reference Foundation, LLC

        GRAVES GARRETT GREIM, LLC
        BY:  MATTHEW R. MUELLER, ESQUIRE (*pro hac vice*)
        1100 Main Street, Suite 2700
        Kansas City, Missouri 64105
        For the Defendants Restoration of America and Voter
        Reference Foundation, LLC

**Intervenor:**

        NEW JERSEY OFFICE OF THE ATTORNEY GENERAL - DIVISION OF
        LAW
        BY:  KASHIF TARAZ CHAND, ASSISTANT ATTORNEY GENERAL
        124 Halsey Street, 5th Floor
        Newark, New Jersey 07101
        For the Intervenor, Attorney General of New Jersey

5

1   **A P P E A R A N C E S:** **(Continued)**

2       NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
        BY:  LIZA B. FLEMING, DEPUTY ATTORNEY GENERAL
3       R.J. Hughes Justice Complex
        25 Market Street, PO Box 080
4       Trenton, New Jersey 08625
        For the Intervenor, Attorney General of New Jersey

5

6   **Also Present:**

7   Larry MacStravic, The Courtroom Deputy

8   Ryan Rose, Judicial Law Clerk

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

**INDEX**

**ARGUMENT**

| **ATTORNEYS:** | **PAGE** |
|---|---|
| By Mr. Szyba | 7, 26 |
| By Mr. Palmer | 16 |
| By Mr. Chand | 21 |
| By Mr. Bruno | 27 |
| By Mr. Stio | 34, 61 |
| By Mr. Shaw | 47 |
| By Ms. Fleming | 59, 86 |
| By Mr. Mueller | 68, 88 |
| By Mr. Parikh | 82 |

1    (PROCEEDINGS held in open court before The Honorable

2    Harvey Bartle, III, United States District Judge, at

3    9:58 a.m. as follows:)

4    THE COURTROOM DEPUTY:  All rise.

5    THE COURT:  Good morning.  You may be seated.

6    Now, the Court is holding oral argument this morning

7    on the remaining 12(b)(6) motions in the Atlas cases.

8    We have several different defendants and several

9    different issues.  So I think the orderly way to begin would be

10   to start with the Communications Decency Act defense.

11   Good morning.

12   MR. SZYBA:  Good morning, Your Honor.  Hope you had a

13   nice weekend.  My name is Rob Szyba from Seyfarth Shaw.  I

14   represent We Inform, Informatics, and People Searchers in three

15   different cases before Your Honor.

16   The Communications Decency Act has a three-element

17   test that provides for immunity for publishers of information

18   on the Internet.

19   First and foremost, the defendant must be a provider

20   or a user of an interactive computer service.  This entire

21   litigation is predicated on the fact that my clients are

22   operators of websites that distribute information.  It's beyond

23   dispute that that element is satisfied.

24   The asserted claims must treat the defendant as a

25   publisher or speaker of information.  This whole litigation is

8

1  predicated on disclosure of information and that my clients are

2  doing that disclosure supposedly.  There's really no dispute

3  about that element being satisfied.

4          And the challenged communication must -- excuse me.

5  The challenged communication must be information provided by

6  another information content provider, meaning it is not my

7  client's original content.

8          At issue in this --

9          THE COURT:  Well, doesn't that third prong require

10  more?  For example, if your client just goes out and finds the

11  information --

12          MR. SZYBA:  Right.

13          THE COURT:  -- and then puts it on the Internet,

14  that's different than having third parties post information on

15  your platform, isn't it?

16          MR. SZYBA:  Yes, it's different than having third

17  parties post; but for CDA purposes, there is not a distinction.

18          THE COURT:  Now, on any of your platforms from your

19  clients, do third parties post information, or is the

20  information that you provide all information that your

21  client -- clients have gathered from various sources?

22          MR. SZYBA:  That's not really a distinction under the

23  Communications Decency Act.

24          THE COURT:  But I'm just asking, because --

25          MR. SZYBA:  I'll answer that.

9

```
 1              THE COURT:  Okay.

 2              MR. SZYBA:  The information is obtained from third

 3    parties for the purpose of the publishing on the website.

 4              THE COURT:  All right.  So, in other words, you may

 5    get information, say, from the voter registration authorities

 6    in New Jersey.

 7              MR. SZYBA:  Right.

 8              THE COURT:  They're not initiating any posting on

 9    your websites?

10              MR. SZYBA:  You're correct.  The same way that Google

11    looks up other information and other --

12              THE COURT:  Isn't that a significant difference here?

13              MR. SZYBA:  No.  That's never been a difference under

14    the Communications Decency Act, because Google, who's been sued

15    numerous times under the same theory, has never encountered

16    that argument or that distinction when they look at other

17    people's information and make that available to third parties.

18    There's countless cases with Google and with other search

19    providers.

20              MyLife -- Dennis vs. MyLife decided in this district

21    just a couple of years ago had nearly identical facts to this

22    case, in fact it was a little bit more complex than this case,

23    and yet Judge Cecchi had no issue finding that the

24    Communications Decency Act applied.

25              So the idea of there being a distinction whether
```

1    somebody is posting or the website is obtaining information
2    from third parties is not a meaningful distinction under the
3    Communications Decency Act in any of the case law, especially
4    the case law in this district.
5              THE COURT:  Doesn't the Third Circuit use the word
6    "posting" in the *Hepp* case as one of the criteria?  It talks
7    about posting, somebody has to post something on a defendant's
8    website before immunity kicks in.
9              MR. SZYBA:  That's part of the analysis of it coming
10   from a third party, meaning we're not creating that content and
11   making it available.  We are taking someone else's content and
12   posting it on a website in some fashion.
13             THE COURT:  All right.  Go ahead.
14             MR. SZYBA:  So as far as the third prong is
15   concerned, my point really is, none of the information
16   originates with any of my clients.
17             THE COURT:  All right.  Now, how do we know that at
18   this point?
19             MR. SZYBA:  Because --
20             THE COURT:  I mean, you may be perfectly correct, but
21   we're at a motion to dismiss under 12(b)(6).
22             MR. SZYBA:  It is a "common sense," Your Honor.  My
23   client does not create phone numbers.
24             THE COURT:  But how do we know that?
25             MR. SZYBA:  Because my --

11

1          THE COURT:  Well, all right, they don't create the

2    phone numbers.  I agree with that.

3          MR. SZYBA:  They don't create street addresses

4    either.

5          THE COURT:  It's what they do with it.

6          MR. SZYBA:  Again --

7          THE COURT:  So you're saying just -- all right.  Go

8    ahead.

9          MR. SZYBA:  Right.  There's argument being made by

10   the attorney general's brief and some other places as this idea

11   of collecting information from various points.  Here's the

12   issue:

13          A phone number is a finite, discrete set of

14   information, and that is the only thing that's subject to

15   Daniel's Law and implicated by Daniel's Law.  It is a specific

16   collection of ten digits.  There's no common-sense argument to

17   be made that my client is taking ten digits from various

18   sources and assembling them magically into a phone number that

19   matches with a particular person.  There is no editorial

20   function.  There is no -- there is no change, revision.

21   There's none of that happening.  It is a finite, discrete piece

22   of information.  And they present it in a specific way that is

23   obtained from another party, a phone company or whoever creates

24   that phone number, and distributed by my client -- the same

25   with a street address.

1          My client is not obtaining the state from one place

2     and the ZIP code from another place and the house address from

3     one and the street address from another.  It is a finite,

4     specific piece of information.

5          To the extent there's any confusion, in *MyLife*, for

6     example, those two datapoints were implicated, and they were

7     assembled with other pieces of information; for example,

8     financial histories and education histories and all kinds of

9     things.  Even there, Judge Cecchi had no issue finding that all

10    of the information, albeit was brought in from different

11    sources, was being passed forward without really any revision,

12    without any editorializing, without any additional changes to

13    the information.  It defies common sense to say that my client

14    is somehow editing phone numbers.

15         THE COURT:  Let's look at -- I understand the

16    language of the statute is of course paramount.

17         MR. SZYBA:  Right.

18         THE COURT:  In terms of a policy discussion here,

19    it's quite different, it seems to me, that if your client is

20    going out and searching and bringing the information onto the

21    Internet, then it is, if you permit people to post information,

22    I can see the policy argument that if you're providing a

23    platform for public information, so to speak --

24         MR. SZYBA:  Right.

25         THE COURT:  -- that you shouldn't be liable for what

1    other people say.  I mean, you can argue that, but I understand
2    the argument about that.
3              But it seems to me it's another thing if you're going
4    out and gathering it yourself and posting it.  For example, if
5    the newspaper goes out and does an investigation and prints an
6    article that somebody is a murderer and that's not true, that
7    newspaper is subject to a defamation lawsuit.  And I understand
8    about malice and all the rest of it.
9              MR. SZYBA:  Sure.
10             THE COURT:  But they would be subject to a defamation
11   suit.
12             But if your client posted information, went out and
13   did an investigation and posted information that somebody was a
14   murderer and the person wasn't a murderer, you could not be
15   held liable for that; is that correct?
16             MR. SZYBA:  There's two distinctions that I want to
17   draw your attention to, Your Honor.  Number one, when the
18   Communications Decency Act was passed, Congress made an
19   explicit and intentional departure from the way that newspapers
20   and other media are treated in order to foster the development
21   of the Internet and to promote freedom of speech on the
22   Internet.
23             THE COURT:  Right.
24             MR. SZYBA:  So there are distinctions because this is
25   an Internet case as opposed to a newspaper case.  So that's

```
 1    number one.
 2              THE COURT:  Right.  So what you're saying is that if
 3    you posted that X was a murderer, going out and making the
 4    investigation yourself, similar to what a newspaper reporter
 5    might do --
 6              MR. SZYBA:  Right.
 7              THE COURT:  -- and you posted it, there would be
 8    immunity from suit?
 9              MR. SZYBA:  Yes, if that information came from a
10    third party.  If that information came from, let's say, the
11    police blotter, the crime watch websites, like we have in the
12    Third Circuit case, there would be immunity from suit because
13    that information originated from a third party.
14              But the other distinction I wanted to draw here is
15    your hypothetical, Your Honor, presupposes that my client is
16    going out and obtaining various bits and pieces of information
17    and creating some sort of narrative, creating a story.  That
18    might not be exempt from the Communications Decency Act because
19    that might cross the line into original content.
20              Here, that's not an issue because the data that's
21    being disclosed is not mixed in with any original content.
22    It's simply being passed through.
23              And just for context, my client is not going wildly
24    all over the world trying to find information.  They contract
25    with a specific company that provides the data to them.  So it
```

15

```
 1    is data that is contracted specifically for this purpose.  It

 2    is obtained from a third party.

 3              THE COURT:  But of course, that's not part of the

 4    record.  You may be absolutely right.

 5              MR. SZYBA:  It's just for Your Honor's context.  It's

 6    just to kind of give some color to behind the scene what's

 7    going on.

 8              THE COURT:  Right.  You may be right, but that may be

 9    an argument to be made in summary judgment at a later point in

10    the case.

11              MR. SZYBA:  I don't think we need to really even go

12    there because on its face, just like happened in *Dennis vs.*

13    *MyLife*, there is enough factual development here on its face

14    for the Court to rule on this motion.

15              THE COURT:  Where?  In the complaint?

16              MR. SZYBA:  I'm sorry?

17              THE COURT:  In the complaint?

18              MR. SZYBA:  The complaint is based on the fact that

19    we operated a website, is based on the fact that there is a

20    disclosure.  And common sense dictates that my clients do not

21    create phone numbers and addresses.

22              THE COURT:  All right.

23              MR. SZYBA:  They get third-party information from

24    somewhere else.  This is a very easy and straightforward

25    analysis.
```

1          THE COURT:  Right.

2          MR. SZYBA:  I feel like I've made my point.

3          THE COURT:  All right.

4          MR. SZYBA:  If the Court has any other question, I'm

5     more than happy to address them.  I assume that we'll have more

6     questions --

7          THE COURT:  Not at this point.  We'll hear from the

8     plaintiff --

9          MR. SZYBA:  Sure.

10         THE COURT:  -- and the New Jersey Attorney General.

11         MR. SZYBA:  Thank you.

12         THE COURT:  Start with the plaintiff.

13         Good morning.

14         MR. PALMER:  Good morning, Your Honor.  Eric Palmer

15    for the plaintiffs.

16         So I think to begin with the Communications Decency

17    Act, the most fundamental thing here is that, as the Third

18    Circuit explained in *Anderson vs. TikTok*, Section 230 immunizes

19    information-content providers only to the extent that they are

20    sued for information provided by another information-content

21    provider.

22         The Third Circuit goes on to explain that that means

23    they are immunized only if they are sued for someone else's

24    expressive activity or content, but they are not immunized if

25    they are sued for their own expressive activity or content;

1    i.e., first-party speech.

2        The defendants here have continuously taken the

3    position that the First Amendment protects their content

4    because it is their own.  They cannot have it both ways and go

5    back on that and say, oh, it's our own for purposes of the

6    First Amendment but it is not our own for purposes of the

7    Communications Decency Act and Section 230.  The fact that

8    they've already taken that position rules out their Section 230

9    defense entirely.  The same is shown just by an examination of

10   the Section 230 case law.

11       They are operating with the assumption that because

12   this information is, in some sense, gathered from a third

13   party, they do not create it for purposes of the statute.  But

14   the fact that some fact exists out in the world is not what's

15   relevant under the statute for the creation of the information.

16   It's the processing of that information into a new

17   representational format.

18       And all of these defendants take information that

19   exists out there in the world and really isn't really created

20   by anyone other than, you know, who set up the system of

21   addresses that exist in the first place, but then they convert

22   it into their own expressive product, their own speech, which

23   makes it theirs for purposes of Section 230.

24       THE COURT:  Well, how is it changed from what existed

25   before?

18

1              MR. PALMER:  So I think the fact that that -- the

2    fact of somebody's phone number or address is taken up into a

3    website and they put it into a new format by processing it and

4    making it available in a report of some type.  It varies by

5    which defendant, but this is the point, say, for example, the

6    Northern District of Illinois made in the *Lukis vs. Whitepages*

7    case, that gathering information, reprocessing it, and putting

8    it forward in a report is not the same as being a passive

9    conduit of information that is actually the expressive content

10   created by a third party qua expressive product.  And, you

11   know, these defendants have always said these are our own

12   expressive products.  Given that position, they can't --

13             THE COURT:  So you're saying there is a difference

14   between someone, a third party coming to the platform and

15   saying post my information and the defendant going out,

16   gathering information in the world, and then placing it on the

17   platform?

18             MR. PALMER:  Absolutely, Your Honor.

19             THE COURT:  So you're agreeing there is a distinction

20   to that?

21             MR. PALMER:  I think that's the fundamental

22   distinction for Section 230 is between --

23             THE COURT:  Well, how about the Google cases he's

24   referred to, opposing counsel?

25             MR. PALMER:  I -- I am not sure exactly which Google

1  cases he was referring to.  But I think the correct analysis of

2  this in this circuit would be more on the lines of what's done

3  in *Anderson vs. TikTok* where the Court says there's a clear

4  tradeoff between First Amendment protections and Section 230

5  protections.

6          So if they are saying this is our expressive product,

7  they're no longer in a world where they can claim we are merely

8  passively hosting third-party content.

9          And I think to the extent that the Google cases

10  they're referencing come out of, say, the Northern District of

11  California, the -- I believe it's the *Calise* case versus *Meta*

12  out of the Ninth Circuit from 2024, I think does a lot to sort

13  of reel back the Ninth Circuit's Section 230 case law that had

14  maybe gone a little too far in terms of extending these

15  protections in a direction where they cover claims that

16  Congress never intended to cover.  Because all really Congress

17  really wanted to do here was to ensure that you would not be

18  held liable as a publisher when all you were doing is passively

19  hosting information that somebody else conveys nor be liable

20  for trying to prevent, when you are a passive host, someone

21  from posting indecent content.  Indeed that was the whole

22  reason why Congress enacted the statute was because they were

23  concerned about "crushing liability" for Internet providers in

24  the 1990s who --

25          THE COURT:  Was the -- I'm sure I don't remember the

1    details of it, the case that precipitated the federal statute,

2    was that one where the information was just placed on the

3    Internet by a third party?

4              MR. PALMER:  Yes.  That case, it's the *Prodigy* case.

5              THE COURT:  Yes.

6              MR. PALMER:  And, yes, *Prodigy* essentially allowed

7    anybody to post whatever, but they adopted a kind of policy

8    where they were going to clean up the content that was

9    available to people, and that was integral to their business

10   model because they wanted to say to parents, look, your kids

11   will be safe online.

12             THE COURT:  Right.

13             MR. PALMER:  And years later we know that didn't

14   work.  But Congress's idea was, okay, if *Prodigy* is going to do

15   that, we want them to be immune.  But that doesn't mean that

16   you're immune if you're literally just taking information and

17   posting it yourself on a website.  And that was never

18   Congress's intention in the statute.

19             THE COURT:  Right.

20             MR. PALMER:  But unless you have any further

21   questions, that's all I got.

22             THE COURT:  No, I don't.

23             MR. PALMER:  Thank you very much.

24             THE COURT:  Okay.  We'll hear from the Attorney

25   General's Office.

```
1              Good morning.
2              MR. CHAND:  Good morning, Your Honor.  Kashif Chand
3    from the New Jersey Attorney General's Office.
4              THE COURT:  Yes.
5              MR. CHAND:  I'd like to touch upon three important
6    pieces of information that should guide your decision here
7    today.
8              First, Dennis v. MyLife is not the controlling case
9    here.  It is, as plaintiffs' counsel just advised, it's
10   Anderson v. TikTok.
11             Second, this law is consistent with the
12   Communications Decency Act and should not be preempted because
13   it just follows what that act is saying, and we can see that
14   from the laws that Congress enacted after the Communications
15   Decency Act.
16             The third point I'm going to make is that this
17   information was not information that anyone intended to be
18   posted broadly on the Internet.  It was created well before
19   that time.
20             So to my first point, Dennis v. MyLife is not the
21   controlling case here.  It's Anderson v. TikTok.  And in that
22   case you did have another third-party content provider go to
23   TikTok, post a video of this "blackout challenge," which sort
24   of indicated that you're trying to asphyxiate yourselves.
25   Other children started participating.  It resulted in numerous
```

1    deaths.  And the Third Circuit in *Anderson v. TikTok* looked at

2    that.  They said, well, you're not changing the actual videos

3    that are being posted.  You're not changing what the blackout

4    videos are, but you're deciding whether to include or exclude

5    that from other users' "For You" pages, and then you decided,

6    because that information was bringing in new users onto your

7    website, that you were going to promote that, those videos onto

8    your platform.

9            That is not the case -- that is absolutely the case

10   that is current here.  Defendants are going out to various

11   sources, deciding what they want to collect, what they want to

12   post on their websites, what they want to include or exclude.

13   They're not changing the telephone numbers.  They are posting

14   the telephone numbers.  They are also posting the home address

15   numbers, and they're not changing that content.  But they are

16   putting it in these background reports that are cited in

17   plaintiffs' complaint at paragraphs 40, 41.  It depends on the

18   complaint that you're looking at.  But they're posting it onto

19   those websites and deciding what we want to prioritize to give

20   individuals an idea of what the background of this person looks

21   like.  So they are engaging in their own expressive content

22   saying this is the information you need to look at to determine

23   this individual's background.

24           In that vein, defendants also cite to footnote 13 in

25   *Anderson* to somehow indicate that this stands for the position

1    that you're immune from CDA liability because you are posting

2    this information and getting it from others.  But the actual

3    citation that they are citing to in footnote 13, they take the

4    citation -- in that citation, they give a parenthetical about

5    *Force v. Facebook*, but they use that parenthetical to indicate

6    that we are departing from this case law.  We are departing

7    from the case law by our holding in *Green v. America Online*.

8    We are departing from our pre-*NetChoice* cases.

9              THE COURT:  Right.

10             MR. CHAND:  And because of that*, Dennis v. MyLife*

11   also suffers the same consequence.  The Court is essentially

12   indicating that those pre-*NetChoice* cases, which would include

13   the *Dennis v. MyLife* fact pattern, would not be included within

14   the immunity brought about by Congress under CDA 230.

15             The second point I'd like to make is that this law is

16   consistent with the Communications Decency Act.  You need to

17   look no further than the enactment of federal Daniel's Law.

18   Federal Daniel's Law is very similar to New Jersey's Daniel's

19   Law.  It says that data brokers cannot share this information;

20   that you're liable for doing so.  It also indicates that if you

21   are a business or private entity --

22             THE COURT:  But you can't really compare that,

23   because the Communications Decency Act talks about inconsistent

24   state statutes.

25             MR. CHAND:  That is true.

1           THE COURT:  The federal statute may clearly be

2    constitutional, or not preempted obviously, but the state law

3    may be.

4           MR. CHAND:  That is correct, Your Honor.  But if the

5    federal state law that was -- federal law, Daniel's Law, was

6    enacted after the Communications Decency Act and is saying what

7    you can share and what you can't share.  It's indicative of the

8    fact that they saw the federal Daniel's Law as being consistent

9    with the CDA.  And Daniel's Law in New Jersey does nothing more

10   than what the federal statute does.

11          THE COURT:  Yeah.  But that doesn't -- that doesn't

12   solve your preemption issue.

13          MR. CHAND:  Understood, Your Honor.

14          Even with that case, you still have to look at

15   *Anderson v. TikTok* to see that this information would still not

16   be preempted simply because the Court decided that this same

17   sort of conduct, the decision to compile and cull together

18   information and put it in a format that provides an expressive

19   view, that that is not shielded by CDA 230 immunity.

20          Lastly, I'd like to touch upon the fact that none of

21   this information was provided with the intent that it would be

22   disseminated on the Internet.  Street addresses and unpublished

23   telephone numbers were developed well before the Internet.

24   That information, when it was created, was not created with the

25   intent that it would be put on the Internet.

1    THE COURT:  You can make that argument about any

2    information that existed before the Internet.

3    MR. CHAND:  Yes, Your Honor.

4    I think if you look at *Batzel v. Smith* in the Ninth

5    Circuit and you look at *Elliot v. Donegan* in the Eastern

6    District of New York, both of those cases fell on the fact that

7    there's no understanding at that point, at the

8    motion-to-dismiss stage, as to whether this information, there

9    was an intent for it to be provided on the Internet.  We just

10   don't have that information at this stage in the litigation.

11   And because of that, we can't determine whether the information

12   and where it was posted from was intended to be put on other

13   sources.

14   Again, if you look at the state court --

15   THE COURT:  Well, we do have a concession from

16   defense counsel that the postings are not by third parties on

17   any of the four defendants.

18   MR. CHAND:  That is correct.

19   THE COURT:  I mean, he's candid with us, and I

20   appreciate that.  But it all comes from information that they

21   actively obtain and then post, right, on the Internet as

22   opposed to just opening it up for anybody who wants to put home

23   addresses and addresses on the Internet.

24   MR. CHAND:  That is correct.  And that's why you need

25   to look at their own conduct in line with *Anderson* as to what

1    they decided they were going to collect, what they were going

2    to compile, and the formatting for which they were going to

3    post it on the Internet.  We're looking at their conduct there.

4                 THE COURT:  All right.

5                 MR. CHAND:  We're not looking at the conduct of third

6    parties because there's no indication, as they concede, that

7    any third party went onto the website to post this information.

8                 And in that vein, we're in a position where we, at

9    the motion-to-dismiss stage, need more information as to where

10   this information came from.

11                With that, we request that you deny defendants'

12   motion to dismiss here.  And to the extent that any additional

13   discovery is needed, we recommend that that discovery be

14   ordered.

15                Thank you, Your Honor.

16                THE COURT:  Thank you.

17                Defense counsel gets the last word here.

18                MR. SZYBA:  Thank you, Your Honor.

19                THE COURT:  Now, you are representing all four of

20   these defendants?

21                MR. SZYBA:  No; just three.  Just three defendants.

22                THE COURT:  Who's representing the --

23                MR. SZYBA:  The fourth defendant has their own

24   counsel.

25                THE COURT:  I'm sorry.  I should have given you an

```
 1    opportunity to speak.
 2                MR. BRUNO:  We join with defense counsel, Your Honor.
 3                THE COURT:  All right.  So you agree with his --
 4    counsel's statement that your client actively obtains the
 5    information.  You don't have a website where people post
 6    information; am I correct about that?
 7                MR. BRUNO:  You want me to approach, Your Honor?
 8                THE COURT:  Go ahead, please.  Give us your name.
 9                MR. BRUNO:  Matthew Bruno from Manatt, Phelps &
10    Phillips, on behalf of the Smarty defendants.
11            Your Honor, that's right.  And if you look at
12    Exhibits B and D to the Friedman declaration, those are to
13    provide Your Honor with some more guidance and understanding --
14                THE COURT:  Yes.  I just wanted to be sure about it,
15    because we're in a motion-to-dismiss stage.
16                MR. BRUNO:  Yes.
17                THE COURT:  Thank you very much.  Appreciate your
18    candor.
19                MR. BRUNO:  Thank you, Your Honor.
20                MR. SZYBA:  Thank you, Your Honor.
21            I want to draw one very important and fundamental
22    distinction between the *MyLife* case and the *TikTok* case.
23                Fundamentally, there's a difference in how those two
24    companies operated in those two cases.
25                THE COURT:  All right.  Go ahead.
```

1          MR. SZYBA:  In *TikTok*, TikTok is a social media

2   provider.  They have millions and millions and millions of

3   content.

4          THE COURT:  Right.

5          MR. SZYBA:  If Your Honor were to go on TikTok and

6   start liking cat videos, TikTok's algorithm will send Your

7   Honor more cat videos.

8          It will exclude dog videos, car videos, apple pie

9   videos.  It will send you cat videos.  That is the

10  functionality that was at issue in TikTok.  It was not the

11  content that was being disclosed, that got Section 230

12  immunity.  It was that functionality specifically, them feeding

13  content, feeding specific pieces of information to the user in

14  question in that case.

15         Contrast that with *MyLife*.  In *MyLife*, *MyLife*

16  operated a website where a person, such as me, could go onto

17  *MyLife* and say I want all the information about Rob Szyba.

18  That functionality then said here's all the information that we

19  have about Rob Szyba.  Here's his phone number, here's his

20  address, here's where he went to college, here's where he went

21  to law school, he's where he works, here's his credit score,

22  here's some other stuff from somewhere that we obtained.  They

23  also created a reputation score which said, we looked at all

24  this data and he's like a solid 7 and a half out of 10.

25         All of that obtained Section 230 immunity by Judge

1    Cecchi.  Judge Cecchi found no issue finding each of those

2    pieces of information because each of those pieces of

3    information came from a third source, including the basis for

4    that reputation score.

5         This case is very much like *MyLife*, much simpler than

6    *MyLife*, because here we have a phone number and an address.

7    I'm not really sure what we're talking about when we say

8    processing that information.  A different font?  A different

9    color?  It's the same ten numbers that are pertinent, that are

10   given to a buyer of that information.  If Your Honor goes on

11   that website and --

12        THE COURT:  But I think the distinction, if it's

13   valid, is that your clients and Smarty marshal the information

14   themselves and they place it on the Internet as opposed to

15   opening it up and letting anybody who wants to post.

16        In other words, if the state of New Jersey --

17        MR. SZYBA:  Right.

18        THE COURT:  -- decided it wanted to get -- they want

19   all this information to be out there for the public, presumably

20   it could post this information: home addresses, phone numbers,

21   unlisted phone numbers.

22        MR. SZYBA:  Right.

23        THE COURT:  Now, that would be a different thing than

24   your going out and gathering it from the various county

25   courthouses, for example, and then putting it on the Internet.

1    I think that's the distinction that the plaintiffs are making
2    and the attorney general is making.
3              MR. SZYBA:  Right.  But that's where Google comes
4    in --
5              THE COURT:  And that's an issue I'm going to have to
6    grapple with here.
7              MR. SZYBA:  But that's where the Google cases are
8    instructive.  And *Metroka* from the Third Circuit is a very
9    instructive case.  In that case the Google search engine picked
10   up information from a police crime watch website and reported
11   it.
12             THE COURT:  Right.
13             MR. SZYBA:  Didn't do anything to it.  It said here's
14   the information.  The police department didn't go to Google and
15   say, hey, can you please publish this.  The police department
16   didn't ask for that to be published.
17             THE COURT:  Right.  Okay.
18             MR. SZYBA:  When we start talking about whether the
19   information was intended to be published, I think we're asking
20   a little bit of the wrong question, and it's very easy to kind
21   of go down that slippery slope.  Because all these cases that
22   talk about whether the information was intended to be published
23   are really looking for the opposite.  Was that information
24   intended to be kept private?
25             In other words, was it a trade secret?

1          If Coca-Cola gives me their trade secret and says

2     thou shalt not disclose, that would be the type of information.

3     But information that's posted on the Internet, the information

4     that's made publicly available, information that's historically

5     publicized like addresses and home phone numbers, that can't be

6     argued that that information was intended to be kept private

7     because the government makes it public itself.  It uses it

8     publicly.  So that argument fails.

9          And that line of reasoning really, really looks at

10     whether that type of information was kept -- was intended to be

11     kept private.  Because, as I said, that crime watch website

12     didn't say, hey, everybody, republish this information.  They

13     just posted it, passively posted it and said here it is.

14          As to the point earlier that plaintiffs made

15     regarding the speech not being our own, I disagree again.  If I

16     stand here and I read a book, it's not my words, but that is my

17     speech.  I might be making a political statement.  I might be

18     making any type of statement, religious statement.  If I'm

19     making that kind of statement, I am taking somebody else's word

20     and incorporating it into my own speech, that does not lose

21     First Amendment protection.

22          THE COURT:  Right.

23          MR. SZYBA:  Same here.  Just because my clients were

24     doing the actual disclosing, as it's being argued, it does not

25     lose the protection of the First Amendment just because the

1    information belongs to someone else or it really is in the

2    public domain.  I can make any kind of argument of information

3    that's not copy written and still be eligible for First

4    Amendment protections.

5         There was also commentary about indecent content, and

6    it's troubling, especially in these times.  One man's freedom

7    fighter.  That information, when we start deciding as to which

8    information is decent and indecent, that is a policy decision

9    that Congress tolerated when they passed the Communications

10   Decency Act.  The purpose of the Communications Decency Act was

11   to foster freedom of speech and development of the Internet as

12   a communications device.

13        Congress was not sitting there saying, well, only the

14   stuff we like or only the things that everybody considers

15   decent.  That's a separate issue.  As far as the communication

16   is concerned, the communication itself by the website that is

17   making that disclosure, there is no judgment on whether we like

18   it or we don't or it's decent or is it pornography?  That's not

19   part of the analysis.

20        So, so long as that information originates from a

21   third party, and as I said, this is not part of the record on

22   the motion to dismiss, but just for Your Honor's context, we

23   obtained that information from a third party in a business

24   transaction.  We are a website that sells information upon

25   which this litigation is predicated.  No one is arguing

```
 1   otherwise.  It's plain as day that our intention is to make
 2   that information available to users of our website.
 3              THE COURT:  It may not be in the record, and maybe
 4   you don't know, do you pay for any of this information, or do
 5   you just go out and gather it?  In other words, you don't pay
 6   the state of New Jersey, I assume, for the information?
 7              MR. SZYBA:  No.  We obtain -- and we've disclosed
 8   this to plaintiffs' counsel in discovery already.  We hire --
 9   we contract with a private entity that has the information and
10   we obtain it from them.
11              THE COURT:  Oh, I see, provides the information for
12   you.  That's correct.  Okay.
13              MR. SZYBA:  So when we start talking about the
14   intention to publish, we've been open with everybody from day
15   one --
16              THE COURT:  I understand.
17              MR. SZYBA:  -- that we are intending to publish this
18   information, and there's no dispute about that.
19              I will say, Your Honor kind of made the comment about
20   preemption of state law, this was a congressional policy
21   decision in passing the Communications Decency Act.  And if
22   Congress decides to pass a federal Daniel's Law and whatever
23   the parameters of that are or however it works, it's fully
24   within its purview.  No one's debating that.
25              But as far as this case here is concerned --
```

```
 1              THE COURT:  Right.  This involves a state statute.
 2              MR. SZYBA:  It involves a state statute.  And maybe
 3    this is a little editorializing or commentary on my part, the
 4    statute may have gone too far.  Daniel's Law does a lot of
 5    things.  This portion of liability is just one thing.  Daniel's
 6    Law imposes obligations on the state.  Daniel's Law imposes
 7    obligations on state agencies.  None of that is at issue here.
 8    That portion of Daniel's Law survives.
 9              We got here into this litigation and into this
10    argument and this dynamic when Daniel's Law was amended
11    multiple times to create a cause of action and private actors
12    and now we're here.  That's really the only discrete part of
13    Daniel's Law that's subject to this argument.
14              THE COURT:  All right.  Thank you very much.
15              MR. SZYBA:  Unless Your Honor has any other
16    questions.
17              THE COURT:  Very good.
18              MR. SZYBA:  Thank you.
19              THE COURT:  We'll turn now to the federal Fair Credit
20    Reporting Act defense.  And that's Innovis.
21              Mr. Stio, we'll start with you.
22              MR. STIO:  Good morning.  Thank you, Your Honor.
23              I just want -- I represent Defendant Innovis Data
24    Solutions, Incorporated.  I am not here to try to confuse the
25    Court.  Jason Spak came over to our firm.  He was -- he
```

```
 1    appeared before the Court.

 2              THE COURT:  Right.

 3              MR. STIO:  He filed briefs on behalf of Innovis.

 4              Your Honor, before I get into the substance of the

 5    argument, I want to try to clarify what is in dispute, because

 6    when reading these briefs, it seems like they're ships passing

 7    in the night.  And what I mean by that, Judge, is I'm trying

 8    to, you know, and the Court always calls on us to advance the

 9    Federal Rule of Civil Procedure, one's purpose of a just,

10    speedy, and inexpensive resolution of litigation.

11              THE COURT:  Right.

12              MR. STIO:  Now, Innovis has argued that, to the

13    extent Atlas is taking the position that covered persons' name

14    and home address or a covered person's name and unpublished

15    telephone number are contained in a consumer report, the claim

16    is preempted under 1681c.  And it appears, from my reading of

17    the briefs, that with respect to a consumer report, the AG

18    doesn't disagree with that.  In fact, in footnote 17, they seem

19    to acknowledge that if the state law is seeking to regulate

20    information contained within a consumer report, it would be

21    preempted.

22              Atlas, likewise, I think also does not disagree with

23    that principle that the FCRA would preempt a state law that

24    sought to regulate the content of a consumer report.

25              THE COURT:  But don't they argue that this
```

1    information is not considered part of the consumer report?

2                MR. STIO:  They argue --

3                THE COURT:  That you determine --

4                MR. STIO:  They argue it out of the consumer report

5    context.

6                THE COURT:  Yeah, right, right.

7                MR. STIO:  And what I'm trying to get at, Your Honor,

8    is on this motion to dismiss, at least partial dismissal is

9    required as to the consumer reports.

10               And I say that because Atlas, at a minimum, says we

11   are not challenging FCRA regulated information obtained in a

12   consumer report.  The attorney general acknowledges that.

13               THE COURT:  Right.

14               MR. STIO:  And if it goes to discovery, they can have

15   discovery as to, do we publish it on the website?  We don't.

16   But they could try to get discovery on that.  Outside of the

17   Fair Credit Reporting Act, they could try to get discovery on

18   that.  But they shouldn't and can't get discovery as to "give

19   us all of your consumer reports," or "give us all your consumer

20   files related to the FCRA."  So that's one point that I just

21   wanted to clarify for the Court, and I'd ask the Court to focus

22   on --

23               THE COURT:  Well, we're not at that point yet, are

24   we?

25               MR. STIO:  I think that dismissal is appropriate as

1    to the FCRA claims.

2              THE COURT:  No.  But in terms of discovery, you don't

3    think there's -- in other words, you say there should be

4    dismissal without any discovery.  That's what you're saying.

5              MR. STIO:  At a minimum, as to information contained

6    in a consumer report.

7              THE COURT:  Okay.

8              MR. STIO:  And I believe that when I read the briefs,

9    that's not disputed.

10             Now, Your Honor, the basis of Innovis' motion is

11   Daniel's Law stands as an obstacle to the purpose and the

12   objectives of the FCRA.  And there's two provisions that we

13   rely upon.  But I want to take a step back, because the FCRA

14   has been around since 1970, and it is the oldest privacy

15   statute in the United States.  And when you look at its purpose

16   and its objectives, which are important here for preemption,

17   its purpose is to promote accuracy, promote fairness in credit

18   decisions, and the privacy of consumer information that is in

19   the possession of consumer reporting agencies, those three

20   purposes and objectives.

21             There's no dispute that Innovis is a credit reporting

22   agency.  We've cited federal cases that have found it.  If you

23   look on our website, which is incorporated in Atlas' complaint,

24   and the Court can look at that, it serves in the capacity as a

25   consumer reporting agency.

1          Now, as a consumer reporting agency, no one disputes

2     that in order for Innovis to disclose information through a

3     consumer report, there would need to be a permissible purpose,

4     some sort of credit decision.

5          Federal government has outlined what the specific

6     permissible purposes are in 1681b.  And we would say that, to

7     the extent Daniel's Law is going to impede the permissible

8     purpose, it's preempted.

9          Now, I believe that Atlas has danced around that

10    issue.  I believe the AG has danced around that issue.  One of

11    the things that is required under the Fair Credit Reporting

12    Act, again, to promote accuracy, is that a credit reporting

13    agency have reasonable procedures to assure maximum possible

14    accuracy.

15         Atlas' position in its briefing and in the complaint

16    is that it's not enough to just redact the name and home

17    address or the name and unpublished phone number.  You have to

18    remove it from the database.

19         Now, we've briefed for the Court, and it hasn't

20    really been responded to, that names and home addresses, names

21    and phone numbers, are personal identifiers that consumer

22    reporting agencies utilize to assure maximum accuracy.  So I

23    get -- Angelo Stio wants a credit report.  In order for the

24    FCRA -- or a CRA to give a consumer report, they have to go in

25    their database and they have to match this Angelo Stio to the

39

```
1    information in the database, and they do it by data elements.
2    They do it by phone number.  They do it by name.  They do it by
3    home address.
4         If Daniel's Law -- and we disagree with this -- is
5    interpreted as you, credit reporting agency, have to wipe clean
6    from any database names, home addresses and unpublished home
7    phone numbers, they are taking away reasonable identifiers that
8    are necessary to promote maximum accuracy.  That inhibits or
9    does not promote the objectives and the purpose of the Fair
10   Credit Reporting Act.
11        So on that basis alone --
12        THE COURT:  Well, in terms of accuracy, I understand
13   you need to make sure there's not another Angelo Stio or, you
14   know, somebody's name is John Smith, there are a lot of John
15   Smiths out there and you want to make sure you have the right
16   one.  And one way of doing it is to determine the address and
17   maybe even a phone number.
18        But is it necessary to publish that information in
19   order to ensure accuracy to report it?  In other words, you can
20   go out and get that information, but you're not publishing it.
21        MR. STIO:  Your Honor, we can't get that information
22   reasonably without having identifiers.  And the issue here is
23   not so much publishing it.
24        THE COURT:  No.  But doesn't Daniel's Law, it says,
25   "Do not disclose or make available."  It's one thing if you
```

40

1    have the information and are not making it available.  And

2    that's a different thing.  You can obtain information, but the

3    question is whether you publish it.

4            MR. STIO:  Well, we publish it for a permissible

5    purpose.

6            THE COURT:  I understand.  So I think in terms of

7    accuracy, aren't you still able to use the information, you can

8    go out and make sure you have the right John Smith.  There are

9    thousands of them in New Jersey, I assume, make sure you have

10   the right John Smith.  But in terms of giving the credit

11   report, the question is, do you have to include the home

12   address?  You can give the purchaser of it, this is the John

13   Smith that you're interested in.

14           In other words, I assume that when someone comes to

15   you for a credit report on John Smith, that person has to give

16   you certain information, because you would say what John Smith

17   are you talking about.

18           MR. STIO:  Right.

19           THE COURT:  And so it's the third party that's

20   supplying you with information, correct?

21           MR. STIO:  Correct.

22           THE COURT:  Now, that's not against the Daniel's Law.

23           MR. STIO:  It is if they sent the Daniel's Law

24   request --

25           THE COURT:  No, no, no.  If you get the information,

```
 1   I don't think Daniel's Law says you can't acquire information.
 2   It just says you can't disclose it.
 3             MR. STIO:  Well, that's not what Atlas argues.
 4             THE COURT:  Okay.  Well, would you agree --
 5             MR. STIO:  Atlas says --
 6             THE COURT:  Would you agree with me that there's a
 7   distinction between acquiring information and disclosing it?
 8             MR. STIO:  I agree with you a hundred percent.
 9             THE COURT:  I mean, lawyers acquire information all
10   the time about their clients.  It doesn't mean you -- you know,
11   you have an ethical obligation not to disclose under certain
12   circumstances, correct?  I mean, there's attorney-client
13   privilege.
14             MR. STIO:  I agree with Your Honor.
15             THE COURT:  So acquiring and disclosing are two
16   different things.
17             MR. STIO:  Atlas argues you have to wipe it clean
18   from the database.
19             THE COURT:  All right.
20             MR. STIO:  That's their position.  So it's -- Judge,
21   if I got a report for --
22             THE COURT:  All right.  So you're saying that you're
23   permitted under Daniel's Law to retain all the information so
24   long as you don't disclose it.  Upon request -- in other words,
25   you're free to, under Daniel's Law, anybody who has information
```

1    is free to disclose it unless the covered person affirmatively

2    asks you to take it down or not to disclose it.

3            I don't think the statute goes so far as to say

4    you've got to erase it from your website.

5            MR. STIO:  I hope that's what your ruling is, because

6    on --

7            THE COURT:  Well, I'm interested in hearing argument.

8            MR. STIO:  -- pages 27 and 48 of their brief, they

9    argue that you need to wipe it clean from the database.

10           So that would be one area where it's a conflict.

11           THE COURT:  But if you didn't have to wipe it clean,

12   then you would still be able to use the information to

13   determine whether the report that's being requested is the

14   report on the John Smith for whom it's being requested.

15           MR. STIO:  We could do that, Your Honor.

16           THE COURT:  Yeah.

17           MR. STIO:  The other area where there is preemption

18   here is 1681c.  We briefed this.  And this is a statute that

19   outlines what the government said what may not be disclosed in

20   a consumer report.  And it has a list of what may not be

21   disclosed in a consumer report.

22           THE COURT:  Right.

23           MR. STIO:  It doesn't mention addresses.  It doesn't

24   mention phone numbers.

25           Now, Daniel's Law is seeking to impose an additional

1    restriction on a category of information that can go in a

2    consumer report that the federal government has regulated.  And

3    under --

4            THE COURT:  But the statute doesn't say it must be

5    disclosed, does it?

6            MR. STIO:  No.  It's what cannot be disclosed.  So

7    they have regulated --

8            THE COURT:  There are certain things you can't

9    disclose.

10           MR. STIO:  Right.

11           THE COURT:  But it doesn't say what is required to be

12   disclosed.

13           MR. STIO:  It doesn't say what is required to be

14   disclosed.  But they're adding another category of

15   information --

16           THE COURT:  Right.

17           MR. STIO:  -- to an area where the federal government

18   said, "This is what cannot be disclosed."

19           And if you look at the language of 1681t, it's "t"

20   subsection (b)(1)(E), it prohibits a state from imposing a law

21   regulating a subject matter regulated under 1681c.  And the

22   subject matter here is what can't be disclosed.  The FCRA

23   provides for that under 1681c.  Daniel's Law is saying, yeah,

24   but you have to add this to it.

25           THE COURT:  Okay.

```
 1              MR. STIO:  There's preemption there.

 2              The other thing, Your Honor, is I would ask the Court

 3    to look at the Aldaco v. RentGrow case, Seventh Circuit,

 4    because they in that case took the same position that we're

 5    arguing here.  And we've also advised the Court there's a

 6    contrary decision in the First Circuit that the AG relies upon.

 7              THE COURT:  Right, yeah.

 8              MR. STIO:  But I would caution the Court to at least

 9    read the Seventh Circuit and the analysis.

10              Your Honor, the second basis, 1681b.  And I talked a

11    little bit about permissible purpose, but 1681b also allows and

12    governs consumer reports to -- it's actually not consumer

13    reports.  It's information to insurers and creditors that allow

14    limited information of consumers so that they can gain access

15    to insurance and credit.  And what they talk about is the

16    statute says a firm offer of credit or a firm offer of

17    insurance.

18              And the best way to explain this, Your Honor, I have

19    a daughter who just graduated college -- is off the payroll;

20    yes.  She's starting to get notices for a credit card.

21              THE COURT:  Right.

22              MR. STIO:  And of course, dad is saying, "You go for

23    that, Sofia, you go for that, you get it."

24              The way they get this is they're allowed to get the

25    name and address of a consumer from a consumer reporting agency
```

1    for the sole purpose of making a firm offer of credit or

2    insurance.

3              THE COURT:  Right.  True.

4              MR. STIO:  Now, the FCRA has a specific opt-out

5    provision that allows consumers to opt out.

6              THE COURT:  Right.

7              MR. STIO:  And it's a little bit different than

8    Daniel's Law.  It allows a consumer to fill out a form and say

9    I've elected not to have my name and address and have it

10   excluded for such -- from offers of credit or insurance.

11             Now, Atlas and I think the attorney general argue,

12   well, Daniel's Law isn't duplicative of the opt-out

13   notification system.  It is.  It actually not only wants an

14   opt-out, but allows ways to opt out that are far different than

15   the Fair Credit Reporting Act, and imposes obligations that the

16   federal government chose not to impose.

17             One, we talked about, take it down from your

18   database.  Two, the opt-out has to be in the form of a certain

19   form submitted to the credit reporting agency, not a mass email

20   sent with 19,000 other requests by Atlas, a third party, and

21   the statutory damages for a private right of action.

22             Again, if you look at 1681t subsection (b)(1)(A),

23   that, too, recognizes that a state cannot impose requirements

24   or prohibitions with respect to the subject matter regulated

25   under subsection 1681b related to prescreening of consumer

1    reports.  Prescreening are these firm offers of credit.  We

2    think it's preempted under that section.

3         And, Your Honor, I also want to just point out, it's

4    something that the attorney general argued, which is federal

5    Daniel's Law.  And federal Daniel's Law recognizes that there's

6    inconsistency here because it excludes CRAs from its reach,

7    specifically.  And I think they did that because they

8    recognize, A, CRAs have a very important function.  B, they

9    can't disclose information to the public.  They need to do it

10   through a permissible purpose.

11        And, C, there would be a conflict if we started

12   imposing additional state law -- or additional restrictions on

13   the CRAs that are different than what the federal Fair Credit

14   Reporting Act statute has in place.

15        Now, I know that Atlas and the attorney general are

16   going to argue, yeah, but outside of the consumer reports, we

17   can't disclose information.

18        We disagree with that.  But in terms of this motion

19   here, Your Honor, A, we think the Court should dismiss as to

20   any consumer reports that contain a name and address, because

21   the only way that happens is permissible purpose.  And both

22   Atlas, I believe, and the attorney general from their briefs

23   agree with that.

24        And, B, as to preemption, if Atlas is going to argue

25   you have to remove everything from your database, even your

1    consumer reporting agency files, they're conflicting with

2    permissible purpose, not allowing the --

3                THE COURT:  I understand.

4                MR. STIO:  Okay.  Thank you.  If you have any

5    questions, I'll answer them.

6                THE COURT:  All right.  Thank you.

7                I'll give you the last word.  We'll hear from the

8    plaintiff.

9                MR. SHAW:  Good morning, Your Honor.  Adam Shaw --

10               THE COURT:  Yes, Mr. Shaw.

11               MR. SHAW:  -- for the plaintiffs.  How are you?

12               Your Honor, I think they're asking preemption to do

13   too much here.  But let me try to address two specific things

14   he said.

15               He said that we're telling them that they have to

16   delete all of the information from all of their records

17   internally.  That's not what we're saying.  We didn't say that.

18   That's not what Daniel's Law requires.  It's --

19               THE COURT:  All right.  So you agree that you don't

20   have to remove -- they don't have to remove it from their

21   database?

22               MR. SHAW:  Correct.  There is a -- Daniel's Law

23   prohibits disclosure, and there is kind of one part of that

24   definition that says "even if it's not searched."  So I think

25   maybe the rub is that if they have a database that's exposed to

```
 1   being searched --
 2              THE COURT:  I see.
 3              MR. SHAW:  -- then it's disclosed.  But if they want
 4   to use it internally, if they have some kind of records
 5   internally, that's not what we're pressing or think Daniel's
 6   Law requires.
 7              THE COURT:  All right.
 8              MR. SHAW:  So that, I think, makes that easier.
 9              The other thing is, he's asked this Court for a
10   ruling somehow limiting discovery.  It's deemed like that we
11   are not able to get information about credit reports.  I think
12   he's putting the cart before the horse a little bit here.
13              But credit reports have a part of it that has
14   identifying information, biographical information, then it has
15   other information in it that's called essentially "tradelines,"
16   information about your credit transactions.
17              THE COURT:  So you're making the argument that the
18   name and home address and telephone numbers are not part of the
19   credit reports?
20              MR. SHAW:  Correct.  However, it --
21              THE COURT:  Of course, you do have to have the name.
22   The credit report is meaningless if it doesn't have a name.
23   Would you agree with that?
24              MR. SHAW:  Yes.  It's not the name.  It's the address
25   and home telephone numbers.
```

1          THE COURT:  Okay.  Now, how about there are -- we

2     took the hypothetical John Smiths in New Jersey.  I mean, I'm

3     sure there are hundreds if not thousands.  How is it going to

4     be identified that it's the right John Smith?

5          MR. SHAW:  Again, they could use the information

6     internally to make those determinations that they have the

7     right one.

8          THE COURT:  No, I understand.  But then you are

9     selling the credit report to a third party, to an insurance

10    company or a mortgage company or whatever.

11         MR. SHAW:  Correct.

12         THE COURT:  So don't you have to -- you have to

13    identify who it is.  You're sending a credit report to some --

14    the agency, the mortgage company gets it.  Well, who's it for?

15    You have to have the name.  You would agree with that?

16         MR. SHAW:  I'd agree you have the name, and then

17    there's other types of identifiers that they use, like Social

18    Security numbers.

19         THE COURT:  All right.  So what you're saying is that

20    there would be no -- the report would be provided, John Smith,

21    and it would be assumed by the mortgage company that it was the

22    John Smith about whom they inquired, because the mortgage

23    company presumably has the John Smith address, because John

24    Smith has come to the mortgage company for a mortgage, and

25    you're going to have to give the mortgage company your address,

1    I'm sure.  You can't just say I'm John Smith, but I'm not going

2    to tell you where I live or what my phone number is.  That

3    person is not going to get a mortgage.

4            MR. SHAW:  Correct.  So --

5            THE COURT:  So you have to do that.  And so the

6    mortgage company sends to the credit reporting agency John

7    Smith such and such, a street in Newark or Cape May or

8    whatever, and then the credit reporting agency prepares the

9    report.

10           MR. SHAW:  Correct.  So two things, Your Honor.  One

11   is, those reports can be issued without the specific address or

12   phone number.  There is other ways to identify a person such as

13   Social Security number or other things that are not covered by

14   Daniel's Law that would still allow that.  That's one.

15           THE COURT:  So presumably, the mortgage company then

16   would have John Smith's Social Security number, and the credit

17   reporting agency would have to say give us his Social Security

18   number to help ensure that we have the right John Smith for the

19   credit report; is that right?

20           MR. SHAW:  Yes.  Although if someone's applying for a

21   mortgage, then that person is asking for that information to be

22   disclosed about them.  So if they've previously made a Daniel's

23   Law takedown request and then subsequently are specifically

24   asking a creditor to give -- to apply --

25           THE COURT:  Right.  So that person --

1          MR. SHAW:  -- to apply for credit, that person is

2    essentially allowing that information to be --

3          THE COURT:  Okay.  So that person is not making a

4    request that the name and address, the address and home phone

5    number not be disclosed?

6          MR. SHAW:  Correct.  Although also, the report that

7    comes out from the defendants doesn't have to have that part on

8    it.  Certainly if you apply for a mortgage, you could give all

9    of that identifying information to the lender.

10         THE COURT:  Okay.  So let's assume a covered person

11   has written in to say don't disclose it and then that person

12   wants to buy a house, goes to the mortgage company, obviously

13   provides the mortgage company with her name, where she lives,

14   and I'm sure the home phone number so the mortgage company can

15   give a call, talk to the person.

16         MR. SHAW:  Right.

17         THE COURT:  Now -- so then the mortgage company goes

18   to Innovis for information, so is that nondisclosure form still

19   in effect?  Is there --

20         MR. SHAW:  I think --

21         THE COURT:  I don't know.

22         MR. SHAW:  I think it is still in effect.

23         THE COURT:  Unless you have to -- unless you rescind

24   it in writing, I guess.

25         MR. SHAW:  What the credit -- what Innovis is going

1    to do is issue a credit report back, and that credit report

2    doesn't have to have the name.  Doesn't have to have the

3    addresses.

4         THE COURT:  So it would be assumed then because the

5    mortgage company has already supplied the address to the credit

6    reporting agency that the reporting agency would then say this

7    is the report on John Smith that you requested on such and such

8    a date?

9         MR. SHAW:  Correct.

10        THE COURT:  And with a Social Security X, and not set

11   forth in the report the home address or the phone number, which

12   presumably the mortgage company already has.

13        MR. SHAW:  Correct.  And the person has asked --

14   specifically asked for it.  And that's different than just

15   general reporting out there.

16        Now, again, I kind of took it in reverse.

17        THE COURT:  Of course, that would be different,

18   though, in the case of a situation where you're sending a

19   person, what is it, a firm offer of credit and so forth?

20   Because there, the person is not taking the initiative, I

21   assume, to receive that mailer about the insurance.

22        MR. SHAW:  Correct.

23        THE COURT:  Correct.

24        MR. SHAW:  But I don't think -- but that's right.

25   And in that circumstance, we think Daniel's Law would prevent

1    the disclosure of --

2            THE COURT:  Well, how's the person -- how's the

3    person going to get that offer of insurance without the offer

4    being sent to the home address?

5            MR. SHAW:  If they apply for insurance, they'll get

6    it.  What it's preventing, first of all --

7            THE COURT:  I thought these --

8            MR. SHAW:  -- they could also use it to verify

9    someone.

10            THE COURT:  As Mr. Stio was saying, you have a child

11    that's graduated from college or entering the workforce and

12    somehow the word's out on the street, and these credit card

13    companies want to offer credit cards.

14            Now, maybe the college graduate hasn't said it to

15    anybody, do they have to initiate that or can the credit card

16    companies send it without it?  They can without having the

17    student or the graduate initiate the contact, correct?

18            MR. SHAW:  Correct.  And then that could also be

19    prohibited.  Somebody could write a request to not allow that

20    to happen.

21            THE COURT:  But of course it would have to be -- this

22    only comes into play if the graduate had already written, and I

23    guess the graduate would have to be in law enforcement, would

24    have to say "don't disclose."

25            MR. SHAW:  Right.

1          THE COURT:  And so if that happens, then that person

2     doesn't get an offer of a credit report, which they can do

3     under the statute.  They can remove their name from that.

4          MR. SHAW:  Exactly.

5          THE COURT:  Okay.  Now I understand.

6          MR. SHAW:  Exactly.

7          So, again, I think they're asking -- so to get back

8     to the beginning, I think they're asking preemption to do too

9     much.

10          But, first of all, there are certain facts here that

11     I think prevents this from being dealt with on a motion to

12     dismiss.  It's not even clear that Innovis is actually a credit

13     reporting agency.  I mean, there's no --

14          THE COURT:  Well, see, that's another question.

15     You're disputing whether they are a credit reporting agency.

16          MR. SHAW:  Right; mostly because they offer other

17     services on their website that are unrelated to let's say

18     credit reports.

19          So there is other -- it's not even clear that --

20          THE COURT:  Well, how about --

21          MR. SHAW:  It's not even clear that --

22          THE COURT:  -- you concede that they are a credit

23     reporting agency in addition to other activities.  So would it

24     be permissible to, if they're correct about the law, dismiss it

25     to the extent you are seeking to regulate or prohibit their

1   activities as a credit reporting agency?  But the case would

2   then move forward with respect to any other activities that

3   they're involved in.

4         MR. SHAW:  No, we're not conceding that.  What we're

5   saying is there's certain aspects that would not be dismissed

6   under their motion in any event because they're not related to

7   credit reporting.  But then --

8         THE COURT:  You're saying the whole thing should be

9   denied now pending discovery?

10        MR. SHAW:  Right.  But even if they are a credit

11   reporting agency for credit reports, we get back to our

12   argument that preemption only applies to very specific items

13   under the federal Fair Credit Reporting Act.

14        And number one, it has to at least relate to credit

15   reports.  And our argument is this header information is not

16   the credit report information.

17        For decades, these credit reporting agencies have

18   argued -- when people come to court and say you got my address

19   wrong, therefore, you violated the FCRA regarding accurate

20   credit reports, for decades they've come into court and said

21   the address is not part of the credit reports, we can't be

22   responsible for it.  So --

23        THE COURT:  Well, isn't someone's home address

24   relevant to one's credit?  You would say "no," I take it?

25        MR. SHAW:  I would say no in the abstract.  There are

1   a few cases out there where there is some kind of denoting next

2   to the address.  I think the example of one of the cases we

3   both cited was a Social Security number that was so old that it

4   seemed to be wrong and the credit report had some kind of flag

5   on it, and it was that extra flag, it's the extra information

6   about either the address or the phone number that made it

7   something related to credit or creditworthiness.

8           So in the sense of just an address or phone number,

9   no, it's not a credit report.

10          THE COURT:  But I'm just wondering whether it doesn't

11  have -- I'm asking whether it wouldn't have some relevance.  It

12  may not tell you a lot.  Somebody could live in a, you know, a

13  multi-million-dollar property and be a deadbeat, you know, that

14  they just aren't paying their bills and they're living high on

15  the hog.  Or on the other hand, somebody may be living in a,

16  you know, poverty area or a state institution, wouldn't that be

17  relevant to your credit?  I'm not saying it's definitive

18  because there are a lot of other factors that may be involved.

19          MR. SHAW:  We don't think so.  You have to have other

20  things in a credit report.  But, again, for decades they've

21  argued no, they've argued and avoided liability on that

22  example.  But plaintiffs have made that argument.  Plaintiffs

23  have said you have my wrong address and this address is credit

24  related because it says something about me or my phone number

25  because it says something about me, and they've come in for

1    decades, and the FTC supports this, that that is not related to
2    a credit report.  It's outside of it.
3                    THE COURT:  All right.
4                    MR. SHAW:  So, again, we wouldn't -- we don't think
5    it even fits within the specific subsection that could be
6    regulated.
7                    But, again, taking a step back, the FCRA says that
8    generally it does not preempt state laws that deal with
9    disclosures of consumer information.  That's the general
10   premise.  It doesn't preempt anything except for very specific
11   things.  And then when you get into those very specific things,
12   there's further limitations -- those specific things that has
13   to relate to the subject matter of those specific things and
14   also relate to the specific information.
15                   So they said -- they've said in this case that it's
16   preempted by -- related to the section of the statute that
17   deals with information in credit reports.  But this Court, the
18   District of New Jersey, has said that that narrow allowance for
19   preemption is only when it relates specifically to the items
20   that are prohibited under that section, which is 15 U.S.C.,
21   1681t(b)(1)(E).
22                   And Your Honor might recall, the types of things that
23   are limited in credit reports mostly relate to the age of debt
24   or certain kinds of medical things.
25                   THE COURT:  Right.

1          MR. SHAW:  So there's preemption if a state tries to

2     regulate those specific items.  Daniel's Law is not trying to

3     regulate those specific items.  The preemption statute doesn't

4     say it's covering the field.  You can't talk about anything

5     else in credit reports or states aren't allowed to prohibit

6     other things from being in credit reports.  It's saying only as

7     to those very specific items can states not regulate.

8          And I think Your Honor went through this when we had

9     the security freeze statute and we looked at it, and it was the

10     fact that the security freeze statute was almost, you know,

11     exactly covered the same subject matter and details of the

12     FCRA, that Your Honor said that the state law was preempted in

13     that circumstance.  Daniel's Law doesn't match up in the same

14     kind of way as the security statute did.

15          And for similar reasons, they're saying that this

16     notion of giving debt, and they described it as firm offers of

17     credit or firm offers related to insurance, and we talked about

18     that a little bit, Your Honor, that's the subject matter.  The

19     preemption statute says you're only preempted if a state law is

20     dealing with that subject matter.  But Daniel's Law is not

21     dealing with that subject matter.  Daniel's Law is not

22     addressed to prescreening.  It's not addressed generally to

23     firm offers of credit.  So I don't even think -- if Your Honor

24     goes through the preemption analysis and focuses on kind of the

25     narrow aspect of what's preempted, I don't think you even find

59

1    an inconsistency in these laws.

2              THE COURT:  All right.

3              MR. SHAW:  Unless Your Honor has any further

4    questions.

5              THE COURT:  Thank you.

6              Anything from the attorney general?

7              Good morning.

8              MS. FLEMING:  Good morning, Your Honor.  Liza Fleming

9    from the New Jersey Attorney General's Office.

10             I'll try not to repeat anything that's already been

11   said, but I just wanted to make a few points.  I think what a

12   lot of the questions this morning have demonstrated is that,

13   you know, it's entirely premature to decide any sort of FCRA

14   preemption issues.

15             I think I heard my friend, defense counsel say that

16   the complaint should be dismissed as to any information

17   contained in consumer reports.  But in the complaint itself,

18   there is no allegations as to disclosures made as part of

19   consumer reports, the manner in which any consumer reports were

20   made, why they were requested, any of those factual

21   allegations.  None of those appear in the complaint.  And so I

22   don't think that the Court is in a position to make any sort of

23   preemption holdings at this stage when we just don't have any

24   facts about the disclosures that are alleged here.

25             And I think when you break down what the FCRA

```
 1    actually would apply to, it just shows why this issue is

 2    something that you'd have to go disclosure by disclosure and

 3    determine whether Innovis was acting as a credit reporting

 4    agency, whether the disclosure was a credit report, why the

 5    credit report was requested.  Because I think Your Honor noted

 6    that there could be a factual issue as to whether the covered

 7    person had, you know, waived their invocation of Daniel's Law

 8    for that specific credit report, like if they're trying to get

 9    a mortgage or if they're applying to get a job and they

10    authorize the credit report to be obtained.

11              And so all of these factual issues really show that

12    this warrants discovery and going disclosure by disclosure and

13    determining, you know, whether, if any, preemption based on

14    FCRA would apply.

15              The other thing I would note is that it has never

16    been the attorney general's position that disclose means like

17    internal records.  There's no requirement that Innovis delete

18    its files internally.  If they have a database that the public

19    can access, that would be different.  But, yeah, internal,

20    yeah --

21              THE COURT:  I understand.

22              MS. FLEMING:  -- is not what we mean here.  So they

23    would have no problem checking for accuracy or anything like

24    that.

25              And then we would also note that any disclosures that
```

1    are not consumer reports, like we have no idea what disclosures

2    they are alleged to have made.  I mean, they could be sharing

3    address and name, information for marketing purposes.  Our

4    position would be that that's not a credit report.  Just

5    address alone doesn't bear on the creditworthiness of a person.

6    And so those disclosures would clearly not be preempted, and

7    that's just information that we don't have at this stage.

8            I'm happy to answer any questions.

9            THE COURT:  Thank you very much.

10           MS. FLEMING:  Thank you.

11           THE COURT:  Mr. Stio, you get the last word on this.

12           MR. STIO:  Sure.

13           Your Honor, as to the consumer reports, I would

14   direct the Court to both the AG's brief and Atlas's brief about

15   preemption as to information in a consumer report.  Page 23 of

16   the AG's brief, "The FCRA does not regulate disclosure of home

17   addresses and phone numbers apart from consumer reports."

18           Page 25, "The FCRA preempts only application of state

19   laws that relate to information contained in consumer reports."

20           Page 26 of the AG's brief, "The FCRA's scope of

21   regulation is limited to information contained in consumer

22   reports about creditworthiness and the like."

23           And footnote 17, "The FCRA applies to home addresses

24   and phone numbers when they are within a consumer report."

25           They should be preempted if their -- partial motion

1    to dismiss on preemption as to what's in the consumer report.

2         Atlas's brief page 41, "Daniel's Law does not impose

3    restrictions on the categories, home address, unpublished phone

4    numbers, as it only deals with information 'outside of the

5    consumer credit report'."

6         Your Honor, they've also said that numerous courts

7    have found that addresses are not part of a credit report.

8    They haven't cited cases for that.  We cited two cases that

9    they haven't addressed.  The one is *Sweet vs. LinkedIn*, 2015

10   Westlaw 1744254, which found that a home address could be part

11   of a credit report.  *Adams vs. LexisNexis Risk*, 210, U.S.

12   District Lexis 47123 at 17.

13        And, Your Honor, on that point, when you go for

14   credit, one of the questions that everyone is asked is how long

15   have you -- do you own or rent?  And how long have you resided

16   at that location?  That information can be relevant to credit

17   decisions.

18        And if we are giving information back to a company

19   that is making a credit or insurance decision, which is the

20   home address, and we redact out the address that they give to

21   us, by giving them a consumer report, we're admitting that the

22   person lives there because we would have to notify of an

23   inaccuracy.

24        THE COURT:  Right.

25        MR. STIO:  In addition, Your Honor, there are --

1    THE COURT:  I assume they would say, well, you can --

2    I don't know whether you could say, well, you lived at the

3    current address for 14 years without saying what the current

4    address is.

5    MR. STIO:  You can't do that.

6    The other thing I would just direct the Court to,

7    there's multiple provisions in the Fair Credit Reporting Act

8    that require consumer reporting agencies to keep, to use, and

9    to disclose home address and phone numbers.  I would ask the

10   Court to look at 15 U.S.C., Section 1681c(h).  It requires CRAs

11   to notify creditors of address discrepancies.

12   So, you know, Bank of America, you gave Mr. Stio's

13   name and you said he resides at, you know, 165 Main Street.

14   Our records say he resides at 2 Elm Street.  Obligation to

15   advise of an address discrepancy.

16   15 U.S.C., 1681c-1(h)(2)(A)(ii) requires CRAs to

17   provide the phone number designated by the consumer who

18   requested an identity theft alert.

19   THE COURT:  But see, that's where somebody requests

20   it.  So that would be inconsistent with a notice under Daniel's

21   Law not to disclose, wouldn't it?

22   MR. STIO:  Well, if you get a Daniel's Law notice and

23   you make a request for an identity theft alert, if it doesn't

24   mention Daniel's Law, are we allowed to implicitly say it

25   revokes it?

1    1681i, subsection (a)(6)(A), requiring agents to

2    provide notice of reinvestigation results by mail.  So if

3    someone has a dispute over what's in a credit report, there has

4    to be an investigation, you have to provide notice by mail.

5         And then I already mentioned this, 1681e subsection

6    (b), which requires maximum possible accuracy, and addresses

7    promote that.

8         In addition, Your Honor, as I said, federal courts

9    have found that home addresses are related to a consumer

10   report.  I've given you those two cases.  And there are

11   regulations that indicate consumer reporting agencies can and

12   should use home addresses to ensure a consumer's identity, and

13   that one person's home address is a common part of a credit

14   report.  The citations are 12 CFR Section 1022.123(b)(1).

15        THE COURT:  What's that cite again?  12 what?

16        MR. STIO:  12 CFR Section 1022.123(b)(1).

17        And then the CFPB and Federal Reserve guidance that

18   Atlas relies upon in its opposition brief at page 60, note 23,

19   it says credit reports often contain current and former home

20   addresses and phone numbers, and that a credit report is a

21   record of credit history that includes information about your

22   name and address.

23        So to say that we could just eliminate that from

24   credit reports is not supported.  I think that, at minimum, the

25   Court should dismiss any claim related to information contained

1    in a consumer report.  It would promote Federal Rules of Civil

2    Procedure, one, and allow us to focus on what I think everyone

3    thinks is the real issue.  If Innovis does work outside of a

4    CRA, they can try to say that --

5              THE COURT:  But plaintiffs at this point do not

6    concede that your client is a credit reporting agency.

7              MR. STIO:  Correct.

8              THE COURT:  That's sort of -- that's the fundamental

9    issue here.  That's the --

10             MR. STIO:  But they can't have it both ways, Your

11   Honor.  They can't say look at this website, they disclose

12   information on this website and then say, but you can't look at

13   the website when it helps the defendant.

14             THE COURT:  Well, I agree.

15             MR. STIO:  They opened up the can by putting that

16   website in there.  You could look inside that can and you'll

17   see we're a consumer reporting agency.

18             But even leaving that aside, multiple courts have

19   found Innovis is a CRA.

20             THE COURT:  Well, the courts can take that into

21   account, yeah.

22             MR. STIO:  And you can take judicial notice of that.

23             Thank you for your time; appreciate it.

24             THE COURT:  Yeah.  What about that point, Mr. Shaw,

25   that you are not conceding that it is a consumer reporting

1    agency?  And the Court has to be reluctant from going outside

2    the four corners of the complaint unless there is an admission

3    that would be contrary to -- that would be helpful to you by

4    the other side.

5             But what about the fact that other courts have

6    identified it as a consumer reporting agency?  And there are

7    cases which say if a lot of cases have identified that company

8    in a certain way, that that can be taken into consideration on

9    a motion to dismiss under 12(b)(6).

10            MR. SHAW:  I think what we're trying to say is that

11   they have two different roles at least.  One is a non-CRA role

12   where they issue products and --

13            THE COURT:  I understand.  But I understood you to

14   say that you haven't conceded that they are a consumer

15   reporting agency, at least that's part of their business.

16   You're not even conceding that, or are you conceding that?

17            MR. SHAW:  I think we'd have to concede that part.

18            THE COURT:  Oh, you are conceding that?

19            MR. SHAW:  Yes.

20            THE COURT:  Because it was a little unclear before.

21            So you agree that part of their business or one of

22   their businesses is being a consumer reporting agency?

23            MR. SHAW:  Correct.

24            THE COURT:  And they do other things also.

25            MR. SHAW:  Yes.

1           THE COURT:  And I think what Mr. Stio was saying is

2      you can grant us relief here today with respect to their

3      activities as a consumer reporting agency but not with respect

4      to other activities, at least at this time, until there's

5      discovery.

6           MR. SHAW:  Right.  And what we're saying is even if

7      they're acting as a consumer reporting agency, they --

8           THE COURT:  It still shouldn't be dismissed?

9           MR. SHAW:  Correct, correct, for the various reasons

10     in our brief that they --

11          THE COURT:  I understand.

12          MR. SHAW:  Right.  And he came up and said a whole

13     litany of things that says, you know, the statute says use

14     addresses for these purposes.  We're not preventing them from

15     using addresses internally for those purposes.

16          THE COURT:  I understand.  I understand that point.

17          All right.  Thank you very much.

18          Now, Mr. Stio, you also have an applied challenge,

19     constitutional challenge.  Is that something you want to argue

20     today?

21          MR. STIO:  Your Honor, we'll rely on our brief for

22     that.  Thank you.

23          THE COURT:  All right.  Thank you.

24          All right.  We now have argument with respect to the

25     National Voter Registration Act.  And that's Restoration of

1    America.

2              Yes, sir.

3              MR. MUELLER:  Yes.  Good morning, Your Honor.

4    Matthew Mueller, Graves Garrett Greim, on behalf of Restoration

5    of America and Voter Reference Foundation.

6              I'm going to refer to both of those as "VRF."

7    Restoration of America is VRF's parent company here.  VRF runs

8    the website that is at issue --

9              THE COURT:  Right.

10             MR. MUELLER:  -- that discloses the information that

11   they've been sued over.

12             So VRF is uniquely situated amongst the defendants in

13   these various cases for a multitude of reasons, but primarily

14   because they are -- they're both nonprofit 501(c)(4)

15   organizations.  They essentially exist for election integrity

16   purposes, social welfare purposes as permitted by the Internal

17   Revenue Code.

18             As it does in I think 32 other states right now, VRF

19   requested a copy of the voter list from New Jersey back in

20   2022.  They subsequently posted that on the website VoteRef.com

21   for the purpose of allowing the public to essentially

22   crowdsource, searching for and correcting --

23             THE COURT:  Well, I think everybody agrees that you

24   certainly have a right to obtain --

25             MR. MUELLER:  Sure.

1          THE COURT:  -- the information from the state of New

2    Jersey.

3          MR. MUELLER:  Sure.

4          THE COURT:  The federal statute seems to allow that,

5    at least to photocopy it, but then the crucial issue is whether

6    you have a right to publish it.

7          MR. MUELLER:  Sure.

8          THE COURT:  All right.

9          MR. MUELLER:  Yes.  And I do want to clarify, it

10   doesn't seem like there is much of a contest from the

11   plaintiffs or from the Attorney General's Office that VRF is

12   entitled to get the voter list from the state.  There's a

13   plethora of precedent in that realm now saying that voter lists

14   are one of the records that must be made available under the

15   public disclosure provision of the NVRA.  That's 20507(i)(1).

16         Your question about dissemination, I guess I want to

17   start by saying we do take the voter list exactly as it's been

18   produced by the state and we publish that online without any

19   changes, editorializing.  We don't collect data elsewhere and

20   combine that with the voter list to create some, you know,

21   superset of data.

22         I guess there's two primary cases that specifically

23   address your question about the distinction between our right

24   to access this data and the subsequent right to disseminate

25   that with other people.  From the getgo, I would note that

1    Daniel's Law prohibits dissemination essentially in any context

2    regardless of whether it's, you know, on the Internet, in a

3    database.

4             THE COURT:  But only when someone requests --

5             MR. MUELLER:  Sure.

6             THE COURT:  -- that the information not be disclosed.

7             MR. MUELLER:  Sure.  Only following a request and ten

8    business days after that.

9             THE COURT:  Right.

10            MR. MUELLER:  There are two cases, the *Bellows* case

11   that's cited heavily from the First Circuit, and the *VRF v.*

12   *Torrez* case where VRF actually was a party out in District of

13   New Mexico challenging restrictions on disseminating voter data

14   that are a little different.  But nevertheless, both of those

15   cases found that there's essentially an implied right under

16   20507(i)(1), the public disclosure provision, to not only

17   access that data but then to subsequently share it with other

18   people, so long as you're sharing it for purposes that are

19   consistent with the NVRA.

20            THE COURT:  The *Bellows* case says that?

21            MR. MUELLER:  The *Bellows* case, yes.

22            The *Bellows* case struck down a criminal statute that

23   said that you couldn't share the voter data that PILF obtained

24   in that case.

25            THE COURT:  That the state couldn't share it or the

```
 1    private company couldn't share it?
 2            MR. MUELLER:  That the recipient of the voter list
 3    could not share that data subsequently, including via online
 4    dissemination.
 5            The Department of Justice, who's charged with
 6    enforcing the NVRA, filed an amicus brief in favor of PILF in
 7    that case, reiterated the same points and saying essentially
 8    restrictions on the subsequent dissemination of records that
 9    have to be made available under the NVRA are obstacle preempted
10    because they restrict the very purpose that Congress is trying
11    to advance by making these records available.  And the NVRA
12    tells us it has four purposes.
13            It says -- two of which kind of overlap -- increasing
14    voter participation.  It also says ensuring election integrity
15    and maintaining accurate and current voter rolls.
16            And so even though those purposes are sometimes
17    viewed as intentional with one another, Bellows and the
18    district court out in New Mexico, essentially along the same
19    line of reasoning and the same reasoning that the DOJ advocated
20    for, said that restrictions on disseminating records that you
21    obtain as a third-party requester under the NVRA are preempted
22    under obstacle preemption.
23            THE COURT:  But even when someone makes a request
24    that the information not be disclosed?  In other words --
25            MR. MUELLER:  That wasn't at issue in either of those
```

1    cases.

2              THE COURT:  Well, that's a pretty critical factor,

3    isn't it, in the Daniel's Law?

4              MR. MUELLER:  Well, sure.  In --

5              THE COURT:  In other words, I think even New Jersey,

6    my understanding is under the state law that if you're a voter

7    in New Jersey and you write to them, voter agencies or

8    registration commissions, whatever, and ask that the

9    information not be disclosed, the state will honor that.  Am I

10   correct?

11             MR. MUELLER:  Yes.  That is written in the law.  I

12   don't think there's an allegation that any of the plaintiffs

13   did that here, but --

14             THE COURT:  So -- right.

15             MR. MUELLER:  First off, one of the critical

16   distinctions is --

17             THE COURT:  So the lawsuit here involves your refusal

18   to remove this information by people -- covered persons who

19   made the request.

20             MR. MUELLER:  Yes.

21             THE COURT:  It's not a -- Daniel's Law doesn't say

22   under no circumstances publish any information about voters.

23             MR. MUELLER:  Correct.  But we're looking here at

24   a -- you know, essentially a supremacy clause, an elections

25   clause issue where Congress's word on the running of elections,

```
 1   including voter registration and access to voter lists,
 2   preempts any kind of contrary state law.
 3             THE COURT:  So it would have to be -- so -- well,
 4   it's not before me.  It would be the New Jersey statute which
 5   permits you to remove your name from being publicized as to
 6   where you're registered to vote.  That would be preempted by
 7   federal law.  Your statute would preempt the state statute that
 8   permits you to write to the voter registration people and say
 9   don't disclose my information.
10             MR. MUELLER:  I think that would present a different
11   issue about, you know, what is the scope of the record that
12   must be made available under 20507(i) and whether that presents
13   its own conflict.  You're right, that's not before the Court
14   here, which is looking at the more limited do we have to take
15   the data down, the data that's made publicly available as
16   required by federal law, which preempts contrary state law?  Do
17   we have to take that down when it appears in the voter record
18   that we got under federal law?
19             THE COURT:  Right.
20             MR. MUELLER:  Notably, the NVRA has --
21             THE COURT:  But currently there's no case that has
22   that fact pattern as far as you know.
23             MR. MUELLER:  To my knowledge, there are no NVRA
24   preemption challenges to these kind of redaction --
25             THE COURT:  To opt out.
```

1          MR. MUELLER:  -- statutes, yeah, or opt-out statutes.

2          THE COURT:  Yeah.

3          MR. MUELLER:  But the cases that I am referencing

4    here, *Torrez* and *Bellows*, they struck down, you know, generally

5    broader restrictions that said you can't share this data or

6    these records for any purpose whatsoever.

7          But notably, the NVRA has two different or I guess

8    two subsections to its public disclosure provision.

9    20507(i)(1) is the broader, more general provision that says

10   states must make available for public inspection and

11   photocopying all records related to list maintenance, programs

12   and activities, meant to ensure the accuracy and currency of

13   the list.

14         THE COURT:  Right.

15         MR. MUELLER:  Subsection (i)(2) includes in that the

16   names and address of any individuals that receive a particular

17   change of address notice under a different subsection of

18   20507(i) -- or 20507(d)(2), I believe.

19         So one of the primary ways that the NVRA stepped in

20   in 1993 when it was passed was to say, yes, you have to, you

21   know, essentially, engage in motor voter registration when

22   folks sign up for licenses.  It also says that you can satisfy

23   your general list maintenance obligations by participating in

24   the National Change of Address program.  There's notices that

25   go out.  Folks had the opportunity to respond to those and say,

1    yes, I've moved to a new address, you need to update my

2    registration, or they don't respond.  And if they don't vote

3    for two subsequent elections, then you can remove them from the

4    rolls.

5            But tellingly, Congress in that section said that

6    there are situations in which names and addresses must be made

7    available.  And a state law that says anything to the contrary

8    directly conflicts with what the NVRA is saying.

9            So at least as to that subset of folks that are

10   covered persons that also received a notice as required under

11   the NVRA, their names and addresses must be disclosed by the

12   state under the NVRA.

13           That is where the *Bellows* line of reasoning, the

14   *Torrez* line of reasoning then kicks in and the DOJ recently

15   that says, well, if we're looking at why Congress did this, why

16   did Congress want this to be disclosed in the first place?

17   They wanted to bring, you know, transparency, just as we see in

18   the FOIA context and other context that have public disclosure

19   provisions, and they wanted there to be public oversight where

20   folks could make a request for records about a state's voter

21   rolls and see if there are issues with it.

22           Together with that, there is a private right of

23   action under the NVRA, in 20510(b), so that if, you know, an

24   individual or an organization like VoteRef does identify errors

25   or voter fraud, what have you, there is a method to remedy

1    that.

2         So you're correct that the explicit text of the

3    statute itself only talks about access and there doesn't seem

4    to be a dispute that we have a right to access those materials.

5    And in fact, I don't think there's a dispute that is actually

6    how we got it, directly from the Department of Elections, and

7    subsequently published that same exact data.  The only dispute

8    here is does that private right access or public right of

9    access under the public disclosure provision come with the

10   right to subsequently disseminate that to other people, so long

11   as you're doing it for purposes that are consistent with the

12   NVRA.  And the --

13        THE COURT:  See, the issue here is whether you have a

14   right to disseminate it when a voter has affirmatively

15   requested that it not be disseminated.

16        MR. MUELLER:  Yes.

17        THE COURT:  So that's the issue.  I think you can

18   make the argument that if the voter doesn't say anything about

19   it, then it's free game, publish it.

20        MR. MUELLER:  And I think the --

21        THE COURT:  But at least in New Jersey, if a voter

22   has an opportunity to tell the state not to give us the

23   information, I mean, that's one way, give you the information,

24   that's one way to sort of prevent it from being disclosed.  Or

25   if you're a covered person, you can do it through Daniel's Law.

1          So if you can do it under the state statute, one

2     that's not Daniel's Law, why can't you do it under Daniel's

3     Law?

4          MR. MUELLER:  Well, I would say that --

5          THE COURT:  I mean, Daniel's Law is much narrower

6     because it only covers what we call "Covered Persons."

7          The other New Jersey statute permits any voter to

8     tell the state of New Jersey please don't disclose my voter

9     information.

10         MR. MUELLER:  I'm unaware of that specific state law

11    provision.

12         THE COURT:  And if the state law other than Daniel's

13    Law permits you to do it, then the information you get will not

14    include that voter.  So maybe there are a hundred voters in a

15    specific precinct and a specific county, you're only going to

16    get 99 of them if one of them opts out.  And I guess you're

17    never going to know whether they've opted out.  New Jersey will

18    just give you what they're going to give you, because you don't

19    check the accuracy of it, I assume.  You're just -- whatever

20    the state gives you, they give you.

21         MR. MUELLER:  Well, you're right, that if they

22    redacted from what is given to VRF when it makes the request,

23    then there's essentially no way for us to know that that

24    person's redacted --

25         THE COURT:  Yes.

1          MR. MUELLER:  -- because there's not a process by

2    which we can figure out who got redacted, because that would

3    essentially defeat the whole point.

4          THE COURT:  No; I understand.  All right.

5          MR. MUELLER:  But it does bring about the point that

6    the New Jersey Legislature did include this provision to

7    essentially avoid the situation that we find VRF in, which is

8    we got a public record that must be made publicly available

9    under federal law and under state law.  We posted that

10   essentially in reliance on, you know, thinking that if folks

11   didn't want their information disclosed, and they're covered

12   persons under Daniel's Law, they could have availed themselves

13   of the procedure to have their names redacted from the voter

14   rolls.  They didn't do that.  We published the roll as we got

15   it and now we're being sued for, you know, $1,000-per-violation

16   penalties for doing that.

17         But to get back to the heart of the matter, you are

18   correct that state law is presuming to give covered persons a

19   right to demand that their information not be disseminated.  I

20   would say that that's contrary to the NVRA's public disclosure

21   provision as it's been construed in the few cases that have

22   handled this, admittedly not in a redaction context, but just

23   recognizing the congressional purpose that they weighed,

24   Congress weighed the privacy rights.  They knew that when you

25   sign up to register to vote, two of the key things that you

1   need are your name and address.

2          THE COURT:  Right.

3          MR. MUELLER:  And when folks are trying to determine

4   if a voter list is accurate and current, you essentially can't

5   do that without having a name and address.

6          THE COURT:  All right.

7          MR. MUELLER:  Which is why (i)(2) specifically

8   includes that when you're talking about changes to those

9   particular datapoints.

10         So another reason where, you know, it's somewhat

11  different than your queries about the FCRA context potentially

12  is that essentially we need, at the very least, the name and

13  address to conduct this type of oversight that Congress was

14  contemplating.

15         THE COURT:  Right; I understand.

16         MR. MUELLER:  I do want to note just one sort of I'll

17  call it a limitation to our theory and why I think obstacle

18  preemption has been kind of the preferred route to handle these

19  cases.

20         As I noted from the beginning, we are nonprofits.  We

21  seem to be situated differently than essentially all the other

22  defendants here.  We don't sell data.  In fact, we pay for data

23  and then make it available online for free because some states

24  charge astronomical prices such that if I wanted to request the

25  same stuff, I'm never going to do it --

1          THE COURT:  So your funding comes from just

2    contributions; is that right?  That's what keeps you going?

3          MR. MUELLER:  Yes.  It's a nonprofit organization

4    that receives contributions.

5          THE COURT:  Right.

6          MR. MUELLER:  But in the obstacle preemption context,

7    it's important to note that, you know, our theory only goes so

8    far as folks that are using specifically voter records covered

9    by the NVRA for purposes that advance the NVRA's purposes.  So

10   if we requested this stuff under the NVRA, got it from the

11   Department of Elections and then we're using it to send

12   solicitations for our power washing business --

13         THE COURT:  Yeah.  But the question is not whether

14   you're collecting it for legitimate purposes.  Daniel's Law is

15   designed to protect covered persons from nefarious

16   individuals --

17         MR. MUELLER:  Sure.

18         THE COURT:  -- who don't have, you know, the civic

19   interest.

20         MR. MUELLER:  And, again, I would say that --

21         THE COURT:  So we're not faulting what your

22   organization does.  It's just a question about whether

23   individuals have a right who are covered by Daniel's Law to

24   remove that information for purposes of their own safety and

25   security.

1            MR. MUELLER:  And we would have to say here that

2    federal law speaks on this issue; that Congress already weighed

3    those interests, including when it said that names and

4    addresses had to be made available for certain people, knowing

5    full well that that could cover all kinds of persons that have

6    privacy interests, including the folks that are covered by

7    Daniel's Law itself.

8            Obviously they weren't contemplating Daniel's Law

9    back in 1993, but we were certainly -- Congress was aware of

10   the general sense that, you know, folks might view that as

11   private information.  But they weighed that against the

12   interest in public transparency in elections which are, you

13   know, the essence of our self-government and said transparency

14   has to win out here, and I think so too with this law.

15           Until the NVRA includes some general privacy right or

16   says, you know, states have breathing room to impose

17   restrictions in this space, then the finding of preemption is

18   inevitable.

19           THE COURT:  All right.  I understand.  Thank you.

20           We'll take a ten-minute recess at this time.

21           THE COURTROOM DEPUTY:  All rise.

22           (Recess was taken at 11:42 a.m. until 11:51 a.m.)

23           THE COURTROOM DEPUTY:  All rise.

24           THE COURT:  You may be seated.

25           All right.  We'll hear from plaintiffs' counsel.

1          MR. PARIKH:  It's nice to see you, Your Honor.

2          THE COURT:  Nice to see you.

3          MR. PARIKH:  Raj Parikh on behalf of plaintiffs.

4          Your Honor, there's lots of political organizations

5   that get voter information such as the defendants.  They still

6   nonetheless have obligations.  And I think Your Honor hit the

7   nail on the head.  This is not an issue of whether the state

8   has complied with its obligations under the Motor Voter law or

9   not, whether or not the defendant was able to access the

10  information or not, which is what the Motor Voter law says.

11  It's simply about after receipt of nondisclosure requests from

12  covered persons, whether they were able to remove the

13  information or not.

14          And the bottom line is, the *Bellows* case actually

15  addresses this head on.  At page 56 it says, nothing in the

16  text of the NVRA prohibits the appropriate redaction of

17  uniquely or highly sensitive personal information in the voter

18  file.  And it references a bunch of other cases.  And it goes

19  on with several references all the way to near the end of the

20  opinion.

21          That is exactly the issue that we have here.  And

22  it's actually distinct because in that case the court was

23  saying that even the government could redact that information

24  in limited circumstances.  Right here --

25          THE COURT:  Which is what New Jersey does.

1          MR. PARIKH:  That is exactly right, Your Honor.

2          THE COURT:  Maybe it's a little -- the statute may be

3     a little broader in New Jersey.

4          MR. PARIKH:  That's right, Judge.

5          And, you know, there's 9.5 million residents in New

6     Jersey.  There's about 6.7 million voters.  We're talking about

7     here with the assignors less than two-tenths of 1 percent of

8     the registered voters in the state that are at issue.

9          The defendants actually concede this point I think on

10    page 7 of their brief where they essentially say that -- or

11    they actually say that in talking about the Address

12    Confidentiality Program, which is the other state statute that

13    allows anyone to redact their information, they say, the ACP

14    statute is not at issue, nor does defendant argue that it is

15    preempted.

16         So if there's no argument that that statute is

17    preempted, there really is no preemption argument that could

18    follow here with respect to Daniel's Law.

19         The other piece, Judge, that's I think critically

20    important, and Your Honor highlighted this earlier, there is

21    nothing under the Motor Voter law that obligates or

22    necessitates or requires that a defendant publish voter

23    information, right?  And that's the issue here.  It's not about

24    them receiving it from the state.  It's not about them

25    processing it.  It's not about them utilizing it internally to

1    do an analysis or to do a check.  It's when they decided to

2    publicly disclose that information or make it otherwise

3    available and then continue to do so.

4        THE COURT:  But they argue it's implied because the

5    federal government wants transparency.  So to say you can get

6    the information but then you just have to keep it to yourself,

7    one could argue is inconsistent with the spirit of the statute.

8        MR. PARIKH:  That -- that is an argument, Your Honor.

9    But I think it's belied by what we see in *Bellows* and some of

10   the other cases, which is that that transparency --

11       THE COURT:  I don't know that we even have to reach

12   that at this point because the issue here is not whether

13   somebody is trying to prevent the disclosure of all of the

14   information.

15       MR. PARIKH:  Correct.

16       THE COURT:  We're talking about an individual who's

17   making a request that his or her information not be published

18   and disseminated.  And in the case of Daniel's Law, it's

19   clearly for security reasons.

20       MR. PARIKH:  That's exactly right, Your Honor.

21       And with respect to the allegation in the complaint,

22   right, we make very clear within the complaint how it is that

23   individual covered persons here, the plaintiffs, the assignors,

24   all have threats; that it's for security and privacy purposes.

25   So I think within this posture, I think we've more than

1    satisfied kind of overcoming this argument there is no

2    preemption here in terms of broad preemption.  And, again, as

3    Your Honor said, this isn't -- the other cases and the statutes

4    are about restricting the entire lists, right.  Here we are

5    talking again two-tenths of 1 percent of registered voters in

6    New Jersey which is so narrowly tailored.  And I think that's

7    all supported by case law.

8            THE COURT:  And this isn't done by statute.  Nobody's

9    requiring them to remove it.

10            MR. PARIKH:  That's right.

11            THE COURT:  The state law doesn't say you have to

12    remove it.  It's when the individual makes the request.

13            MR. PARIKH:  That is right, Your Honor.  That's

14    exactly right.

15            And the same thing happens within the other

16    components of Daniel's Law that are not at issue in the court,

17    which is the individual has to make the request to the Office

18    of Information Privacy to then have that information redacted

19    from voter rolls but also then perhaps gives up the ability to

20    vote in person at a polling location on Election Day or other

21    things like that.

22            So the state law here is kind of comprehensive in

23    terms of looking at specifically the issues of voters and voter

24    registration and people's ability to be able to exercise the

25    access to the franchise while also balancing privacy and

1    security interests of public officials.

2            Here, because the defendant did not remove the

3    information after the individual covered persons made the

4    request, they have responsibility, they're liable, and there's

5    no preemption under the Motor Voter law.

6            Thanks, Judge.

7            THE COURT:  Thank you.

8            State of New Jersey.

9            MS. FLEMING:  Yes.

10           THE COURT:  The Attorney General's Office.

11           MS. FLEMING:  Thank you, Your Honor.

12           So I would say on just two things, I think the NVRA

13   does not preempt Section 166.1 of Daniel's Law for two

14   independent reasons.  So, first, the NVRA only regulates access

15   and use of state-maintained voter records.  It has no bearing

16   on records that are in the possession of private entities.  So

17   here, it seems that the defendants obtained unredacted records

18   from the state presumably because these covered persons either

19   weren't covered persons at the time or hadn't, you know,

20   invoked Daniel's Law's protections at the time, which they

21   could do from the state through a provision that's not at issue

22   in this case.

23           And so it's only after these records were in the

24   possession of a private party that these covered persons then

25   either became covered persons or determined that it was in

1    their interest to invoke their Daniel's Law protections.  And

2    the NVRA says nothing about what a private party can do with

3    the possession of the records that it has that are not

4    maintained by the state itself.

5            But even setting that aside, I think it's important

6    to note what's actually at issue here.  And all that's being

7    requested is redaction of the exact address of the covered

8    person.  So not only is it a small subset of the voter records,

9    but within that subset it's just the exact address.  The New

10   Jersey Supreme Court in footnote 2 of the *Kratovil* decision

11   made clear that in interpreting Daniel's Law, it's the exact

12   address.  So it would be 123 Main Street, not that somebody

13   lives in Collingswood, New Jersey.

14           And so I think when you look at how narrow of a

15   subset of information that's actually being prevented from

16   being publicly available, even setting aside the state

17   maintenance issue, which I think on its own resolves this

18   preemption claim, you'll see that it doesn't create an obstacle

19   with NVRA because redacting a specific address has no bearing

20   on the accuracy or the transparency of voter records, because

21   you could still see the county that somebody lived in, the name

22   of the voter.

23           So we'd ask that you deny the motion to dismiss.  But

24   I'm happy to answer any questions.

25           THE COURT:  Thank you very much.

1          All right.  We'll give defense counsel the last word.

2          MR. MUELLER:  Just kind of starting from the end

3   there, as we discussed earlier, the address in terms of voter

4   registration is essentially the -- it is the essential piece of

5   data that you need in connection with a voter's name to know if

6   they're registered in the right place, if they're voting in the

7   right precinct, county, state even.  And so to essentially

8   downplay what's at issue here by saying, well, it's just the

9   address, you could still know if they live in the county or the

10  state, one, it specifically contradicts what Congress said when

11  it said certain addresses and names have to be made available

12  together, nonetheless.

13          But two, it makes that that much harder for

14  organizations like VRF or folks that are just interested in

15  election integrity in general to do the work that Congress

16  wants to be done under the public disclosure provision, which

17  is to identify and rectify errors in voter rolls.  And

18  essentially without the name and address, it's impossible to do

19  that.

20          Also just want to note, telephone numbers aren't at

21  issue in this case.

22          THE COURT:  Right.

23          MR. MUELLER:  I don't think there's any allegation

24  that we disclosed telephone numbers.

25          As for the privacy interest, those have been weighed,

1    including in *Bellows*.   *Bellows* said, you know, we recognize the

2    privacy interest, but it's not our province to strike the

3    proper balance between transparency and voter privacy.

4    Congress already did that.   They cited the Fourth Circuit's

5    decision in *Project Vote* for the same principle there and said

6    it's well within the spirit of Congress to have determined that

7    these records are going to be made available when they're tied

8    with voter records, and the transparency interest there

9    outweighs the privacy interest.

10           As to the redaction of uniquely sensitive personal

11   information which shows up time and again in NVRA litigation,

12   that, to my knowledge, has never been construed to include

13   addresses under any circumstances.   The line of cases there, I

14   believe the line of cases cited in *Bellows*, that includes

15   Social Security numbers, telephone numbers, email address,

16   birth dates, identities of folks that were investigated as

17   potentially being noncitizens that ultimately were found to be

18   citizens, truly uniquely personal, highly sensitive

19   information, not the very information that Congress says has to

20   be made available.

21           THE COURT:  And your organization isn't involved with

22   that?  All you do is publish the information you obtain from

23   the state of New Jersey?

24           MR. MUELLER:  That's correct.

25           THE COURT:  You don't get into whether somebody's an

1    immigrant or there's a question about whether they have legal

2    status or anything, I assume?

3              MR. MUELLER:  No, we don't.  But the point of the

4    VoteRef website is to obtain these records, make them into a

5    useable forum that's for free online.

6              THE COURT:  I understand.  So others can do whatever

7    they wish to do with it.

8              MR. MUELLER:  Well, so that others can help --

9              THE COURT:  Investigate whether the person really

10   lives there or whether the percent is deceased, or --

11             MR. MUELLER:  Yes, correct.  I don't want to concede

12   that they can do whatever they want to do with it.  There are

13   terms of service and whatnot that guide --

14             THE COURT:  No.  Look, I understand.  But you have no

15   control over that.  You publish what you receive from the state

16   of New Jersey, and then what others do, they do.

17             MR. MUELLER:  We --

18             THE COURT:  And you don't take it any step further

19   beyond publishing what you receive from the state of New

20   Jersey.

21             MR. MUELLER:  We publish the information and provide

22   contact information for each particular state.  Say if you see

23   an error, here's the person to contact to remedy that.

24             THE COURT:  Okay.  So you put in your website if this

25   information is incorrect, contact --

```
 1              MR. MUELLER:  Yes.

 2              THE COURT:  -- the Camden County registration office

 3    or whatever.

 4              MR. MUELLER:  Correct.  I believe there's a

 5    screenshot of that in the complaint that essentially has the

 6    instructions under the data.

 7              THE COURT:  Okay.  I understand.  You're right.

 8              MR. MUELLER:  I think, unless you have any other

 9    questions, that's all I had in reply.

10              THE COURT:  Thank you.

11              MR. MUELLER:  Thank you.

12              THE COURT:  Anything further?

13              Thank you very much.  I'll take this matter under

14    advisement, and then I'll try to get this decided as soon as I

15    can.  And then sometime after Labor Day we'll hold a grand

16    status conference on all these cases, and I'll put that in an

17    order.

18              I know I have to deal with the personal jurisdiction

19    issue.  The discovery issue, that I'll be deciding very

20    shortly.  So we're going to move things along, and then we'll

21    get together, as I say, it will be set in September.  Okay?

22              MR. SZYBA:  Your Honor, real quick question.

23              THE COURT:  Yes.

24              MR. SZYBA:  Do you anticipate having oral argument on

25    the personal jurisdiction discovery issue?
```

1          THE COURT:  No, we're not going to have oral argument

2     on the discovery issue, no.  So I'll be deciding that.

3          MR. SZYBA:  Okay.

4          THE COURT:  And then depending how that comes out,

5     that may be on the agenda too for our September meeting.

6          MR. SZYBA:  Got it.

7          THE COURT:  And then where we go on the merits of

8     some of these cases.

9          MR. SZYBA:  Great.  Thank you, Your Honor.

10         THE COURT:  All right.  Thank you very much.

11         MR. PARIKH:  Thank you.

12         THE COURTROOM DEPUTY:  All rise.

13         (Proceedings concluded at 12:04 p.m.)

14     - - - - - - - - - - - - - - - - - - - - - - -

          **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

15     - - - - - - - - - - - - - - - - - - - - - - -

16         I certify that the foregoing is a correct transcript

17     from the record of proceedings in the above-entitled matter.

18

19

20     /S/John J. Kurz, RDR-RMR-CRR-CRC                August 14, 2025

21     Court Reporter/Transcriber

22

23

24

25

1

Index: ...also

| | | | | |
|---|---|---|---|---|
| **MR. BRUNO: [5]** 27/2 27/7 27/9 27/16 27/19 | **-- for [1]** 47/11 | **20507 [6]** 69/15 70/16 73/12 74/9 74/18 74/18 | **account [1]** 65/21 | **AG [3]** 35/17 38/10 44/6 |

MR. BRUNO: ...also

**-- statutes [1]** 74/1
**-- that [3]** 12/25 68/10 70/6
**-- to [1]** 43/17
**-- who [1]** 80/18

**MR. BRUNO: [5]** 27/2 27/7 27/9 27/16 27/19
**MR. CHAND: [10]** 21/2 21/5 23/10 23/25 24/4 24/13 25/3 25/18 25/24 26/5
**MR. MUELLER: [50]** 68/3 68/10 68/25 69/3 69/7 69/9 70/5 70/7 70/10 70/21 71/2 71/25 72/4 72/11 72/15 72/20 72/23 73/10 73/20 73/23 74/1 74/3 74/15 76/16 76/20 77/4 77/10 77/21 78/1 78/5 79/3 79/7 79/16 80/3 80/6 80/17 80/20 81/11 82/8 88/23 89/24 90/3 90/8 90/11 90/17 90/21 91/1 91/4 91/8 91/11
**MR. PALMER: [10]** 16/14 18/1 18/18 18/21 18/25 20/4 20/6 20/13 20/20 20/23
**MR. PARIKH: [10]** 82/1 82/3 83/1 83/4 84/8 84/15 84/20 85/10 85/13 92/11
**MR. SHAW: [46]** 47/9 47/11 47/22 48/3 48/8 48/20 48/24 49/5 49/11 49/16 50/4 50/10 50/20 51/1 51/6 51/16 51/20 51/22 51/25 52/9 52/13 52/22 52/24 53/5 53/8 53/18 53/25 54/4 54/6 54/16 54/21 55/4 55/10 55/25 56/19 57/4 58/1 59/3 66/10 66/17 66/19 66/23 66/25 67/6 67/9 67/12
**MR. STIO: [46]** 34/22 35/3 35/12 36/2 36/4 36/7 36/14 36/25 37/5 37/8 39/21 40/4 40/18 40/21 40/23 41/3 41/5 41/8 41/14 41/17 41/20 42/5 42/8 42/15 42/17 42/23 43/6 43/10 43/13 43/17 44/1 44/8 44/22 45/4 45/7 47/4 61/12 62/25 63/5 63/22 64/16 65/7 65/10 65/15 65/22 67/21
**MR. SZYBA: [57]** 7/12 8/12 8/16 8/22 8/25 9/2 9/7 9/10 9/13 10/9 10/14 10/19 10/22 10/25 11/3 11/6 11/9 12/17 12/24 13/9 13/16 13/24 14/6 14/9 15/5 15/11 15/16 15/18 15/23 16/2 16/4 16/9 16/11 26/18 26/21 26/23 27/20 28/1 28/5 29/17 29/22 30/3 30/7 30/13 30/18 31/23 33/7 33/13 33/17 34/2 34/15 34/18 91/22 91/24 92/3 92/6 92/9
**MS. FLEMING: [5]** 59/8 60/22 61/10 86/9 86/11
**THE COURT: [239]**
**THE COURTROOM DEPUTY: [4]** 7/4 81/21 81/23 92/12

**$**
**$1,000 [1]** 78/15
**$1,000-per-violation [1]** 78/15

**'**
**'outside [1]** 62/4

**-**
**-- and [2]** 8/13 16/10
**-- because [1]** 78/1
**-- decided [1]** 29/18

**/**
**/S/John [1]** 92/20

**0**
**07052 [1]** 3/20
**07101 [1]** 4/25
**07102 [1]** 4/7
**07728 [1]** 4/10
**080 [1]** 5/3
**08101 [1]** 1/18
**08540 [1]** 3/23
**08625 [1]** 5/4
**08648 [1]** 4/16

**1**
**1 percent [1]** 83/7
**10 [1]** 28/24
**100 [1]** 4/9
**10018 [1]** 4/3
**10036 [1]** 4/13
**101 [1]** 3/20
**1022.123 [2]** 64/14 64/16
**104 [1]** 3/23
**11 [1]** 1/19
**1100 [1]** 4/19
**11:42 [1]** 81/22
**11:51 [1]** 81/22
**12 [6]** 7/7 10/21 64/14 64/15 64/16 66/9
**1200 [1]** 3/17
**12207 [1]** 3/14
**123 [1]** 87/12
**124 [1]** 4/24
**12:04 p.m [1]** 92/13
**12th [1]** 3/14
**13 [2]** 22/24 23/3
**14 [2]** 63/3 92/20
**15 [3]** 57/20 63/10 63/16
**16 [1]** 6/6
**165 [1]** 63/13
**166.1 [1]** 86/13
**1681b [4]** 38/6 44/10 44/11 45/25
**1681c [5]** 35/16 42/18 43/21 43/23 63/10
**1681c-1 [1]** 63/16
**1681e [1]** 64/5
**1681i [1]** 64/1
**1681t [3]** 43/19 45/22 57/21
**17 [3]** 35/18 61/23 62/12
**1744254 [1]** 62/10
**19,000 [1]** 45/20
**1970 [1]** 37/14
**1990s [1]** 19/24
**1993 [2]** 74/20 81/9
**1:24-cv-04037-HB [1]** 1/4
**1:24-cv-04041-HB [1]** 1/8
**1:24-cv-04045-HB [1]** 1/13
**1:24-cv-04141-HB [1]** 2/3
**1:24-cv-04143-HB [1]** 2/8
**1:24-cv-04160-HB [1]** 2/12
**1:24-cv-04176-HB [1]** 2/17
**1:24-cv-04324-HB [1]** 2/22
**1:24-cv-04385-HB [1]** 3/3
**1:24-cv-08075-HB [1]** 3/7

**2**
**2015 [1]** 62/9
**2022 [1]** 68/20
**2024 [1]** 19/12
**2025 [1]** 1/19 92/20
**203 [1]** 3/23

**20507 [6]** 69/15 70/16 73/12 74/9 74/18 74/18
**20510 [1]** 75/23
**21 [1]** 6/7
**210 [1]** 62/11
**23 [2]** 61/15 64/18
**230 [12]** 16/18 17/7 17/8 17/10 17/23 18/22 19/4 19/13 23/14 24/19 28/11 28/25
**25 [2]** 5/3 61/18
**26 [2]** 6/5 61/20
**27 [2]** 6/8 42/8
**2700 [1]** 4/19

**3**
**30 [1]** 3/14
**301 [1]** 4/16
**3120 [1]** 4/16
**32 [1]** 68/18
**32nd [1]** 4/3
**33301 [1]** 3/17
**34 [1]** 6/9

**4**
**40 [1]** 22/17
**401 [1]** 3/17
**41 [2]** 22/17 62/2
**47 [1]** 6/10
**47123 [1]** 62/12
**48 [1]** 42/8
**4th [1]** 1/18

**5**
**501 [1]** 68/14
**56 [1]** 82/15
**576-7094 [1]** 1/23
**59 [1]** 6/11
**5th [1]** 4/24

**6**
**6.7 million [1]** 83/6
**60 [1]** 64/18
**61 [1]** 6/9
**620 [1]** 4/3
**64105 [1]** 4/20
**68 [1]** 6/12

**7**
**7094 [1]** 1/23

**8**
**800 [1]** 4/6
**82 [1]** 6/13
**856 [1]** 1/23
**86 [1]** 6/11
**88 [1]** 6/12

**9**
**9.5 [1]** 83/5
**99 [1]** 77/16
**9:58 [1]** 1/19
**9:58 a.m. as [1]** 7/3

**A**
**a.m [3]** 1/19 81/22 81/22
**a.m. [1]** 7/3
**ability [2]** 85/19 85/24
**able [6]** 40/7 42/12 48/11 82/9 82/12 85/24
**above [1]** 92/17
**above-entitled [1]** 92/17
**absolutely [3]** 15/4 18/18 22/9
**abstract [1]** 55/25
**access [12]** 44/14 60/19 69/24 70/17 73/1 76/3 76/4 76/8 76/9 82/9 85/25 86/14

**account [1]** 65/21
**accuracy [13]** 37/17 38/12 38/14 38/22 39/8 39/12 39/19 40/7 60/23 64/6 74/12 77/19 87/20
**accurate [3]** 55/19 71/15 79/4
**acknowledge [1]** 35/19
**acknowledges [1]** 36/12
**ACP [1]** 83/13
**acquire [2]** 41/1 41/9
**acquiring [2]** 41/7 41/15
**act [28]** 7/10 7/16 8/23 9/14 9/24 10/3 13/18 14/18 16/17 17/7 21/12 21/13 21/15 23/16 23/23 24/6 32/10 32/10 33/21 34/20 36/17 38/12 39/10 45/15 46/14 55/13 63/7 67/25
**acting [2]** 60/3 67/7
**action [13]** 1/3 1/7 1/12 2/2 2/7 2/11 2/16 2/21 3/2 3/6 34/11 45/21 75/23
**actively [2]** 25/21 27/4
**activities [6]** 54/23 55/1 55/2 67/3 67/4 74/12
**activity [2]** 16/24 16/25
**actors [1]** 34/11
**actual [3]** 22/22 23/2 31/24
**actually [13]** 18/9 44/12 45/13 54/12 60/7 70/12 76/5 82/14 82/22 83/9 83/11 87/6 87/15
**ADAM [2]** 3/13 47/9
**Adams [1]** 62/11
**add [1]** 43/24
**adding [1]** 43/14
**addition [3]** 54/23 62/25 64/8
**additional [6]** 1/16 12/12 26/12 42/25 46/12 46/12
**address [65]** 11/25 12/2 12/3 16/5 18/22 22/14 28/20 29/6 35/14 38/17 39/3 39/16 40/12 44/25 45/9 46/20 47/13 48/18 48/24 49/23 49/25 50/11 51/4 51/4 52/5 52/11 53/4 55/18 55/21 55/23 56/2 56/6 56/8 56/23 56/23 61/3 61/5 62/3 62/10 62/20 62/20 63/3 63/9 63/11 63/15 64/13 64/22 69/23 74/16 74/17 74/24 75/1 79/1 79/5 79/13 83/11 87/7 87/9 87/12 87/19 88/3 88/9 88/18 89/15
**addressed [3]** 58/22 58/22 62/9
**addresses [27]** 11/3 15/21 17/21 24/22 25/23 25/23 29/20 31/5 38/20 39/6 42/23 52/3 61/17 61/23 62/7 64/6 64/9 64/12 64/20 67/14 67/15 75/6 75/11 81/4 82/15 88/11 89/13
**admission [1]** 66/2
**admittedly [1]** 78/22
**admitting [1]** 62/21
**adopted [1]** 27/8
**advance [3]** 35/8 71/11 80/9
**advise [1]** 63/15
**advised [2]** 21/9 44/5
**advisement [1]** 91/14
**advocated [1]** 71/19
**affirmatively [2]** 42/1 76/14
**after [7]** 21/14 24/6 70/8 82/11 86/3 86/23 91/15

**AG [3]** 35/17 38/10 44/6
**AG's [5]** 61/14 61/16 61/20
**again [16]** 11/6 25/14 31/15 38/12 45/22 49/5 52/16 54/7 56/20 57/4 57/7 64/15 80/20 85/2 85/5 89/11
**against [4]** 40/22 81/11
**age [1]** 57/23
**agencies [7]** 34/7 37/19 38/22 55/17 63/8 64/11 72/7
**agency [28]** 37/22 37/25 38/1 38/13 39/5 44/25 45/19 47/1 49/14 50/6 50/8 50/17 52/6 52/6 54/13 54/15 54/23 55/1 55/11 60/4 65/6 65/17 66/1 66/6 66/15 66/22 67/3 67/8
**agenda [1]** 92/5
**agents [1]** 64/1
**ago [1]** 9/21
**agree [13]** 11/2 27/3 41/4 41/6 41/8 41/14 46/23 47/19 48/23 49/15 49/16 65/14 66/21
**agreeing [1]** 18/19
**agrees [1]** 68/23
**ahead [4]** 10/13 11/8 27/8 27/25
**aided [1]** 1/25
**al [20]** 1/3 1/8 1/10 1/12 1/14 2/2 2/5 2/7 2/12 2/14 2/16 2/19 2/21 2/23 3/2 3/3 3/7 3/9 4/4 4/10
**Albany [1]** 3/14
**albeit [1]** 12/10
**Aldaco [1]** 44/3
**alert [2]** 63/18 63/23
**algorithm [1]** 28/6
**all [71]** 7/4 8/20 9/4 10/13 10/17 11/11 11/17 12/8 12/9 13/8 14/24 15/22 16/3 17/18 19/16 19/18 20/21 25/20 26/4 26/19 27/3 27/25 28/17 28/18 28/23 28/25 29/19 30/21 34/14 36/19 36/19 41/9 41/19 41/22 41/23 47/6 47/16 47/16 47/19 48/7 49/19 51/8 53/6 54/10 57/3 59/2 60/11 67/17 67/23 67/24 69/8 74/11 78/4 79/6 79/21 81/5 81/19 81/21 81/23 81/25 82/19 84/13 84/24 85/7 87/6 88/1 89/22 91/9 91/16 92/10 92/12
**allegation [3]** 72/12 84/21 88/23
**allegations [2]** 59/18 59/21
**alleged [2]** 59/24 61/2
**allow [5]** 44/13 50/14 53/19 65/2 69/4
**allowance [1]** 57/18
**allowed [4]** 20/6 44/24 58/5 63/24
**allowing [3]** 47/2 51/2 68/21
**allows [5]** 44/11 45/5 45/8 45/14 83/13
**almost [1]** 58/10
**alone [2]** 39/11 61/5
**along [2]** 71/18 91/20
**already [9]** 17/3 38/8 52/5 52/12 53/22 59/10 64/5 81/2 89/4
**also [25]** 5/6 22/14 22/24 23/11 23/20 28/23 32/5 35/22 44/5 44/11 46/3 51/6 53/8 53/18 57/14 60/25 62/6 66/24 67/18 71/14 74/22

**A**

also... [1] 75/10 85/19 85/25 88/20
Although [2] 50/20 51/6
always [2] 18/11 35/8
am [6] 18/25 27/6 31/19 34/24 72/9 74/3
amended [1] 34/10
Amendment [6] 17/3 17/6 19/4 31/21 31/25 32/4
AMERICA [8] 2/23 4/17 4/20 23/7 63/12 68/1 68/5 68/7
amicus [1] 71/6
amongst [1] 68/12
analysis [7] 10/9 15/25 19/1 32/19 44/9 58/24 84/1
Anderson [8] 16/18 19/3 21/10 21/21 22/1 22/25 24/15 25/25
ANDREW [1] 4/9
ANGELO [4] 3/22 38/23 38/25 39/13
another [12] 8/6 11/23 12/2 12/3 13/3 16/20 21/22 39/13 43/14 54/14 71/17 79/10
answer [4] 8/25 47/5 61/8 87/24
anticipate [1] 91/24
any [49] 8/18 9/8 10/3 10/16 12/5 12/11 12/12 12/12 14/21 16/4 20/20 25/1 25/17 26/7 26/12 31/18 32/2 33/4 34/15 37/4 39/6 46/20 47/4 55/2 55/6 59/3 59/13 59/16 59/19 59/20 59/22 59/23 60/13 60/25 61/8 64/25 69/18 70/1 72/12 72/22 73/2 74/6 74/16 77/7 87/24 88/23 89/13 90/18 91/8
anybody [5] 20/7 25/22 29/15 41/25 53/15
anyone [3] 17/20 21/17 83/13
anything [10] 30/13 57/10 58/4 59/6 59/10 60/23 75/7 76/18 90/2 91/12
apart [1] 61/17
appear [1] 59/21
Appearances [1] 3/25
appeared [1] 35/1
appears [2] 35/16 73/17
apple [1] 28/8
application [1] 61/18
applied [2] 9/24 67/18
applies [2] 55/13 56/21
apply [6] 50/24 51/1 51/8 53/5 60/1 60/14
applying [2] 50/20 60/9
appreciate [3] 25/20 27/17 65/23
approach [1] 27/7
appropriate [2] 36/25 82/16
are [123]
area [4] 42/10 42/17 43/17 56/16
aren't [4] 40/7 56/14 58/5 88/20
argue [12] 13/1 35/25 36/2 36/4 42/9 45/11 46/16 46/24 67/19 83/14 84/4 84/7
argued [7] 31/6 31/24 35/12 46/4 55/18 56/21 56/21
argues [1] 41/3 41/17

arguing [2] 32/25 44/5
argument [27] 6/3 7/6 9/16 11/9 11/16 12/22 13/2 15/9 25/1 31/8 32/2 34/10 34/13 35/5 42/7 48/17 55/12 55/15 56/22 67/24 76/18 83/16 83/17 84/8 85/1 91/24 92/1
around [3] 37/14 38/9 38/10
article [1] 13/6
aside [3] 65/18 87/5 87/16
ask [6] 30/16 36/21 44/2 63/9 72/8 87/23
asked [4] 48/9 52/13 52/14 62/14
asking [8] 8/24 30/19 47/12 50/21 50/24 54/7 54/8 56/11
asks [1] 42/2
aspect [1] 58/25
aspects [1] 55/5
asphyxiate [1] 21/24
assembled [1] 12/7
assembling [1] 11/18
asserted [1] 7/24
assignors [2] 83/7 84/23
ASSISTANT [1] 4/24
assume [9] 16/5 33/6 40/9 40/14 51/10 52/21 63/1 77/19 90/2
assumed [2] 49/21 52/4
assumption [1] 17/11
assure [2] 38/13 38/22
astronomical [1] 79/24
ATLAS [24] 1/3 1/7 1/12 2/2 2/7 2/11 2/16 2/21 3/2 3/6 7/7 35/13 35/22 36/10 38/9 41/3 41/5 41/17 45/11 45/20 46/15 46/22 46/24 64/18
Atlas' [2] 37/23 38/15
Atlas's [2] 61/14 62/2
attention [1] 13/17
attorney [2] 4/23 4/24 4/25 5/2 5/2 5/4 11/10 16/10 20/24 21/3 30/2 36/12 41/12 45/11 46/4 46/15 46/22 59/6 59/6 60/19 61/11 86/10
attorney-client [1] 41/12
ATTORNEYS [1] 6/4
August [2] 1/19 92/20
authorities [1] 9/5
authorize [1] 60/10
available [23] 9/17 10/11 18/4 20/9 31/4 33/2 39/25 40/1 69/14 71/9 71/11 73/12 73/15 74/10 75/7 78/8 79/23 81/4 84/3 87/16 88/11 89/7 89/20
availed [1] 78/12
Avenue [1] 4/3
avoid [1] 78/7
avoided [1] 56/21
aware [1] 81/9
away [1] 39/7

**B**

back [11] 17/5 19/13 37/13 52/1 54/7 55/11 57/7 62/18 68/19 78/17 81/9
background [1] 22/16 22/20 22/23
balance [1] 89/3
balancing [1] 85/25
Bank [1] 63/12
BARTLE [1] 1/20 7/2
based [3] 15/18 15/19 60/13
basis [4] 29/3 37/10 39/11 44/10

Batzel [1] 25/4
bear [1] 61/5
bearing [2] 86/15 87/19
became [1] 86/25
because [65] 8/24 9/14 10/19 10/25 13/24 14/12 14/18 14/20 15/12 17/4 17/11 19/16 19/22 20/7 21/12 22/6 23/1 23/10 23/23 24/16 25/11 26/6 27/15 29/2 29/6 30/21 31/7 31/11 31/23 31/25 35/5 36/10 37/13 40/16 42/5 44/4 46/6 46/7 46/20 49/22 49/23 52/4 52/20 54/16 55/16 56/18 56/24 56/25 60/5 62/22 66/20 68/14 71/10 77/6 77/18 78/1 78/9 78/23 82/22 84/4 84/12 86/2 86/18 87/19 87/20
been [13] 9/13 9/14 33/14 37/14 38/20 59/10 60/16 68/11 69/17 78/21 79/18 88/25 89/12
before [33] 7/1 7/15 10/8 17/25 21/18 24/23 25/2 35/1 35/4 48/12 66/20 73/4 73/13 begin [2] 7/9 16/16
beginning [2] 54/8 79/20
behalf [4] 27/10 35/3 68/4 82/3
behind [1] 15/6
being [8] 8/3 9/25 11/9 12/11 14/21 14/22 18/8 22/3 24/8 28/11 31/15 31/24 42/13 42/14 48/1 53/4 54/11 58/6 66/22 73/5 76/24 78/15 87/6 87/15 87/16 89/17
belied [1] 84/9
believe [8] 19/11 37/8 38/9 38/10 46/22 74/18 89/14 91/4
Bellows [12] 70/10 70/20 70/21 70/22 71/17 74/4 75/13 82/14 84/9 89/1 89/14
belongs [1] 32/1
best [1] 44/18
between [7] 18/14 18/22 19/4 27/22 41/7 69/23 89/3
beyond [2] 7/22 90/19
bills [1] 56/14
biographical [1] 48/14
birth [1] 89/16
BISGAARD [1] 4/5
bit [6] 9/22 30/20 44/11 45/7 48/12 58/18
bits [1] 14/16
blackout [2] 21/23 22/3
BLAKE [1] 4/9
blotter [1] 14/11
BOIES [2] 3/13 3/16
Boland [1] 3/20
book [1] 31/16
both [9] 17/4 25/6 46/21 56/3 61/14 65/10 68/6 68/14 70/14
bottom [1] 82/14
Boulevard [1] 3/17
Box [1] 5/3
break [1] 59/25
breathing [1] 81/16
BRIAN [1] 4/6
brief [12] 11/10 42/8 61/14 61/14 61/16 61/20 62/2 64/18 67/10 67/21 71/6 83/10
briefed [2] 38/19 42/18

briefing [1] 38/15
briefs [5] 35/3 35/6 35/17 37/8 46/22
bring [2] 75/17 78/5
bringing [2] 12/20 22/6
BRISBOIS [1] 4/5
broad [1] 85/2
broader [3] 74/5 74/9 83/3
broadly [1] 21/18
brokers [1] 23/19
BROOKS [1] 4/14
BROOME [1] 4/9
brought [2] 12/10 23/14
BRUNO [3] 4/12 6/8 27/9
Building [1] 1/17
bunch [1] 82/18
business [7] 20/9 23/21 32/23 66/15 66/21 70/8 80/12
businesses [1] 66/22
buy [1] 51/12
buyer [1] 29/10

**C**

California [1] 19/11
Calise [1] 19/11
call [3] 51/15 77/6 79/17
called [1] 48/15
calls [1] 35/8
Camden [2] 1/18 91/2
came [6] 14/9 14/10 26/10 29/3 34/25 67/12
can [46] 12/22 13/1 19/7 21/13 24/7 25/1 30/15 32/2 36/14 37/24 39/19 40/2 40/7 40/12 43/1 44/14 50/11 51/14 53/15 53/16 54/2 54/3 58/7 60/19 62/16 63/1 64/11 65/4 65/15 65/16 65/20 65/22 66/8 67/2 74/22 75/3 76/17 76/25 77/1 78/2 84/5 87/2 90/6 90/8 90/12 91/15
can't [23] 18/12 23/22 24/7 25/11 31/5 36/18 39/21 41/1 41/2 43/8 43/22 46/9 46/17 50/1 55/21 58/4 63/5 65/10 65/11 65/12 74/5 77/2 79/4 candid [1] 25/19
candor [1] 27/18
cannot [5] 17/4 23/19 43/6 43/18 45/23
capacity [1] 37/24
Cape [1] 50/7
CAPTION [1] 2/25
captions [1] 1/16
car [1] 28/8
card [3] 44/20 53/12 53/15
cards [1] 53/13
Carnegie [1] 3/23
cart [1] 48/12
case [50] 9/22 9/22 10/3 10/4 10/6 13/25 13/25 14/12 14/23 14/25 27/22 27/22 28/14 29/5 30/9 30/9 33/25 44/3 44/12 52/18 55/1 57/15 70/10 70/12 70/20 70/21 70/22 70/24 71/7 73/21 82/14 82/22 84/18 85/7 86/22 88/21
cases [35] 7/7 7/15 9/18 18/23 19/1 19/9 23/8 23/12 25/6 27/24 30/7 30/21 37/22 56/1 56/2 62/8 62/8 64/10 66/7 66/7 68/13 69/22 70/10 70/15 72/1 74/3 78/21 79/19

82/18 84/10 85/3 89/13 89/14 91/16 92/8
cat [3] 28/6 28/7 28/9
categories [1] 62/3
category [2] 43/1 43/14
cause [1] 34/11
caution [1] 44/8
CDA [5] 8/17 23/1 23/14 24/9 24/19
Cecchi [4] 9/23 12/9 29/1 29/1
Center [1] 3/23
certain [10] 40/16 41/11 43/8 45/18 54/10 55/5 57/24 66/8 81/4 88/11
certainly [3] 51/8 68/24 81/9
CERTIFICATE [1] 92/14
certify [1] 92/16
CFPB [1] 64/17
CFR [2] 64/14 64/16
challenge [3] 21/23 67/18 67/19
challenged [2] 8/4 8/5
challenges [1] 73/24
challenging [2] 36/11 70/13
CHAND [3] 4/24 6/7 21/2
change [1] 11/20 74/17 74/24
changed [1] 17/24
changes [3] 12/12 66/19 79/8
changing [4] 22/2 22/3 22/13 22/15
charge [1] 79/24
charged [1] 71/5
check [2] 77/19 84/1
checking [1] 60/23
child [1] 53/10
children [1] 21/25
chose [1] 45/16
circuit [13] 10/5 14/12 16/18 16/22 19/2 19/12 22/1 25/5 30/8 44/3 44/6 44/9 70/11
Circuit's [2] 19/13 89/4
circumstance [2] 52/25 58/13
circumstances [4] 41/12 72/22 82/24 89/13
citation [3] 23/3 23/4 23/4
citations [1] 64/14
cite [2] 22/24 64/15
cited [8] 22/16 37/22 56/3 62/8 62/8 70/11 89/4 89/14
citing [1] 23/3
citizens [1] 89/18
City [1] 4/20
civic [1] 80/18
CIVIL [14] 1/3 1/7 1/12 2/2 2/7 2/9 2/11 2/16 2/21 3/2 3/6 4/10 35/9 65/1
claim [4] 19/7 35/15 64/25 87/18
claims [7] 7/24 19/15 37/1
clarify [3] 35/5 36/21 69/9
clause [2] 72/24 72/25
clean [5] 20/8 39/5 41/17 42/9 42/11
clear [6] 19/3 54/12 54/19 54/21 84/22 87/11
clearly [3] 24/1 61/6 84/19
Clerk [1] 5/8
client [14] 8/10 8/21 10/23 11/17 11/24 12/1 12/13 12/19 13/12 14/15 14/23 27/4 41/12 65/6

## C

client's [1] 8/7
clients [9] 7/21 8/1 8/19
8/21 10/16 15/20 29/13
31/23 41/10
Coca [1] 31/1
Coca-Cola [1] 31/1
code [2] 12/2 68/17
Cohen [1] 1/17
Cola [1] 31/1
collect [3] 22/11 26/1 69/19
55/20 56/25 76/9
collecting [2] 11/11 80/14
collection [1] 11/16
college [4] 28/20 44/19
53/11 53/14
Collingswood [1] 87/13
color [2] 15/6 29/9
combine [1] 69/20
come [6] 19/10 49/24 55/18
55/20 56/25 76/9
comes [7] 25/20 30/3 40/14
51/7 53/22 80/1 92/4
coming [2] 10/9 18/14
Commencing [1] 1/19
comment [1] 33/19
commentary [2] 32/5 34/3
COMMERCE [1] 2/14
commissions [1] 72/8
common [5] 10/22 11/16
12/13 15/20 64/13
common-sense [1] 11/16
communication [4] 8/4 8/5
32/15 32/16
communications [19] 7/10
7/16 8/23 9/14 9/24 10/3
13/18 14/18 16/16 17/7
21/12 21/14 23/16 23/23
24/6 32/9 32/10 32/12 33/21
companies [3] 27/24 53/13
53/16
company [21] 11/23 14/25
49/10 49/10 49/14 49/21
49/23 49/24 49/25 50/6
50/15 51/12 51/13 51/14
51/17 52/5 52/12 62/18 66/7
68/7 71/1
compare [1] 23/22
compile [2] 24/17 26/2
complaint [14] 15/15 15/17
15/18 22/17 22/18 37/23
38/15 59/16 59/17 59/21
66/2 84/21 84/22 91/5
complex [2] 5/3 9/22
complied [1] 82/8
components [1] 85/16
comprehensive [1] 85/22
computer [2] 1/25 7/20
computer-aided [1] 1/25
concede [6] 26/6 54/22
65/6 66/17 83/9 90/11
conceded [1] 66/14
conceding [5] 55/4 65/25
66/16 66/16 66/18
concerned [4] 10/15 19/23
32/16 33/25
concession [1] 25/15
concluded [1] 92/3
conduct [5] 24/17 25/25
26/3 26/5 79/13
conduit [1] 18/9
conference [1] 91/16
Confidentiality [1] 83/12
conflict [3] 42/10 46/11
73/13
conflicting [1] 47/1
conflicts [1] 75/8
confuse [1] 34/24

confusion [1] 12/5
Congress [22] 13/18 19/16
19/16 19/22 21/14 23/14
32/9 32/13 33/22 71/10 75/5
75/15 75/16 78/24 79/13
81/2 81/9 88/10 88/15 89/4
89/6 89/19
Congress's [3] 20/14 20/18
72/25
congressional [2] 33/20
78/23
connection [1] 88/5
consequence [2] 23/11
consideration [1] 66/8
considered [1] 36/1
considers [1] 32/14
consistent [5] 21/11 23/16
24/8 70/19 76/11
CONSTANGY [1] 4/14
constitutional [2] 24/2
67/19
construed [2] 78/21 89/12
consumer [56] 35/15 35/17
35/20 35/24 36/1 36/4 36/9
36/12 36/19 36/19 37/6
37/18 37/19 37/25 38/1 38/3
38/21 38/24 42/20 42/21
43/2 44/12 44/12 44/25
44/25 45/8 45/25 46/16
46/20 47/1 57/9 59/17 59/19
59/19 61/1 61/13 61/15
61/17 61/19 61/21 61/24
62/1 62/5 62/21 63/8 63/17
64/9 64/11 65/1 65/17 65/25
66/6 66/14 66/22 67/3 67/7
consumer's [1] 64/12
consumers [2] 44/14 45/5
contact [4] 53/17 90/22
90/23 90/25
contain [2] 46/20 64/19
contained [7] 35/15 35/20
37/5 59/17 61/19 61/21
64/25
contemplating [2] 79/14
81/8
content [23] 8/6 8/7 10/10
10/11 14/19 14/21 16/19
16/20 16/24 16/25 17/3 18/9
19/8 19/21 20/8 21/22 22/15
22/21 28/3 28/11 28/13 32/5
35/24
contest [1] 69/10
context [10] 14/23 15/5
32/22 36/5 70/1 75/18 75/18
78/22 79/11 80/6
continue [1] 84/3
continued [5] 1/16 2/25
3/25 4/1 5/1
continuously [1] 17/2
contract [2] 14/24 33/9
contracted [1] 15/1
contradicts [1] 88/10
contrary [6] 44/6 66/3 73/2
73/16 75/7 78/20
Contrast [1] 28/15
contributions [2] 80/2 80/4
control [1] 90/15
controlling [2] 21/8 21/21
convert [1] 17/21
conveys [1] 19/19
Cooper [1] 1/18
copy [2] 32/3 68/19
corners [1] 66/2
CORPORATION [10] 1/3
1/7 1/12 2/2 2/7 2/11 2/16
2/21 3/2 3/6
correct [38] 9/10 10/20
13/15 19/1 24/4 25/18 25/24

27/6 33/12 40/20 40/21
41/12 47/22 48/20 49/11
50/4 50/10 51/6 52/9 52/13
52/22 52/23 53/17 53/18
54/24 65/7 66/23 67/9 67/9
72/10 72/23 76/2 78/18
84/15 89/24 90/11 91/4
92/16
correcting [1] 68/22
could [29] 13/14 28/16
29/20 36/16 36/17 42/15
49/5 51/8 53/8 53/18 53/19
56/12 57/5 60/6 61/2 62/10
63/2 64/23 65/16 71/3 75/20
78/12 81/5 82/23 83/17 84/7
86/21 87/21 88/9
couldn't [3] 70/23 70/25
71/1
counsel [10] 18/24 21/9
25/16 26/17 26/24 27/2 33/8
59/15 81/25 88/1
counsel's [1] 27/4
countless [1] 9/18
county [6] 29/24 77/15
87/21 88/7 88/9 91/2
couple [1] 9/21
course [6] 12/16 15/3
44/22 48/21 52/17 53/21
court [38] 1/1 1/22 7/1 7/6
15/14 16/4 19/3 23/11 24/16
25/14 34/25 35/1 35/8 36/21
36/21 37/24 38/19 44/2 44/5
44/8 46/19 48/9 55/18 55/20
57/17 59/22 61/14 63/6
63/10 64/25 66/1 71/18
73/13 82/22 85/16 87/10
92/14 92/21
Courthouse [1] 1/17
courthouses [1] 29/25
Courtroom [1] 5/7
courts [5] 62/6 64/8 65/18
65/20 66/5
cover [3] 19/15 19/16 81/5
covered [25] 35/13 35/14
42/1 50/13 51/10 58/11 60/6
72/18 75/10 76/25 77/6
78/11 78/18 80/8 80/15
80/23 81/6 82/12 84/23 86/3
86/18 86/19 86/24 86/25
87/7
covering [1] 58/4
covers [1] 77/6
CRA [4] 38/24 65/4 65/19
66/11
CRAs [5] 46/6 46/8 46/13
63/10 63/16
CRC [1] 92/20
create [8] 10/23 11/1 11/3
15/21 17/13 34/11 69/20
87/18
created [6] 17/19 18/10
21/18 24/24 24/24 28/23
creates [1] 11/23
creating [3] 10/10 14/17
14/17
creation [1] 17/15
credit [91] 28/21 34/19
36/17 37/17 37/21 38/4
38/11 38/12 38/23 39/5
39/10 40/10 40/15 44/15
44/16 44/20 45/1 45/10
45/15 45/19 46/1 46/13
48/11 48/13 48/16 48/18
48/22 49/9 49/13 50/6 50/8
50/16 50/19 51/1 51/25 52/1
52/1 52/5 52/19 53/12 53/13
53/15 54/2 54/12 54/15
54/18 54/22 55/7 55/7 55/10

55/11 55/13 55/14 55/16
55/17 55/20 55/21 55/24
56/4 56/7 56/9 56/17 56/20
56/23 57/2 57/17 57/23 58/5
58/6 58/17 58/23 60/3 60/4
60/5 60/8 60/10 61/4 62/5
62/7 62/11 62/14 62/16
62/19 63/7 64/3 64/13 64/19
64/20 64/21 64/24 65/6
creditor [1] 50/24
creditors [2] 44/13 63/11
creditworthiness [3] 56/7
61/5 61/22
crime [3] 14/11 30/10 31/11
criminal [1] 70/22
criteria [1] 10/6
critical [2] 72/2 72/15
critically [1] 83/19
cross [1] 14/19
crowdsource [1] 68/22
CRR [1] 92/20
crucial [1] 69/5
crushing [1] 19/23
cull [1] 24/17
currency [1] 74/12
current [6] 22/10 63/3 63/3
64/19 71/15 79/4
currently [1] 73/21
cv [10] 1/4 1/8 1/13 2/3 2/8
2/12 2/17 2/22 3/3 3/7

## D

dad [1] 44/22
damages [1] 45/21
danced [2] 38/9 38/10
Daniel's [65] 11/15 11/15
23/17 23/18 23/18 24/5 24/8
24/9 33/22 34/4 34/5 34/6
34/8 34/10 34/13 37/11 38/7
39/4 39/24 40/22 40/23 41/1
41/23 41/25 42/25 43/23
45/8 45/12 46/5 46/5 47/18
47/22 48/5 50/14 50/22
52/25 58/2 58/13 58/20
58/21 60/7 62/2 63/20 63/22
63/24 70/1 72/3 72/21 76/25
77/2 77/2 77/5 77/12 78/12
80/14 80/23 81/7 81/8 83/18
84/18 85/16 86/13 86/20
87/1 87/11
data [36] 1/3 1/7 1/12 2/2
2/7 2/9 2/11 2/16 2/18 2/21
3/2 3/6 3/24 4/10 14/20
14/25 15/1 23/19 28/24
34/23 39/1 69/19 69/21
69/24 70/13 70/17 70/23
71/3 73/15 73/15 74/5 76/7
79/22 79/22 88/5 91/6
database [12] 38/18 38/25
39/1 39/6 41/18 42/9 45/18
46/25 47/21 47/25 60/18
70/3
datapoints [2] 12/6 79/5
date [1] 52/8
dates [1] 89/16
daughter [1] 44/19
DAVID [1] 4/15
day [4] 33/1 33/14 85/20
91/15
days [1] 70/8
deadbeat [1] 56/13
deal [2] 57/8 91/18
dealing [2] 58/20 72/19
deals [2] 57/17 62/4
dealt [1] 54/11
deaths [1] 22/1
debating [1] 33/24
debt [2] 57/23 58/16

decades [4] 55/17 55/20
56/20 57/1
deceased [1] 90/10
Decency [18] 7/10 7/16
8/23 9/14 9/24 10/3 13/18
14/18 16/16 17/7 21/12
21/15 23/16 23/23 24/6
32/10 32/10 33/21
decent [3] 32/8 32/15 32/18
decide [1] 59/13
decided [9] 9/20 22/5 24/16
26/1 29/18 84/1 91/14
decides [1] 33/22
deciding [6] 22/4 22/11
22/19 32/7 91/19 92/2
decision [9] 21/6 24/17
32/8 33/21 38/4 44/6 62/19
87/10 89/5
decisions [2] 37/18 62/17
declaration [1] 27/12
deemed [1] 48/10
DEENEY [1] 4/6
defamation [2] 13/7 13/10
defeat [1] 78/3
defendant [13] 4/7 4/10
7/19 7/24 18/5 18/15 26/23
34/23 65/13 82/9 83/14
83/22 86/2
defendant's [1] 10/7
defendants [31] 1/6 1/10
1/15 2/5 2/10 2/14 2/19 2/24
3/5 3/9 3/24 4/4 4/13 4/17
4/20 7/8 17/2 17/18 18/11
22/10 22/24 25/17 26/20
26/21 27/10 51/7 68/12
79/22 82/5 83/9 86/17
defendants' [1] 26/11
defense [8] 17/7 17/9 25/16
26/17 27/2 34/20 59/15 88/1
defies [1] 12/13
definition [1] 47/24
definitive [1] 56/1
delete [2] 47/16 60/17
demand [1] 78/19
demonstrated [1] 59/12
denied [1] 55/9
Dennis [5] 9/20 15/12 21/8
21/20 23/10 23/13
denoting [1] 56/1
deny [2] 26/11 87/23
departing [3] 23/6 23/6
23/8
department [5] 30/14 30/15
71/5 76/6 80/11
departure [1] 13/19
depending [1] 92/4
depends [1] 22/17
DEPUTY [2] 5/2 5/7
described [1] 58/16
designated [1] 63/17
designed [1] 80/15
details [2] 20/1 58/11
determinations [1] 49/6
determine [7] 22/22 25/11
36/3 39/16 42/13 60/3 79/3
determined [2] 86/25 89/6
determining [1] 60/13
developed [1] 24/23
development [3] 13/20
15/13 32/11
device [1] 32/12
dictates [1] 15/20
did [10] 13/13 21/22 46/7
58/14 72/13 75/15 75/16
78/6 86/2 89/4
didn't [9] 20/13 30/13 30/14
30/16 31/12 42/11 47/17
78/11 78/14

4

...ence., giving

## D

**difference [4]** 9/12 9/13 18/13 27/23
**different [24]** 7/8 7/9 7/15 8/14 8/16 12/10 12/19 29/8 29/8 29/23 40/2 41/16 45/7 45/14 46/13 52/14 52/17 60/19 66/11 70/14 73/10 74/7 74/17 79/11
**differently [1]** 79/21
**DIGITAL [1]** 2/4
**digits [2]** 11/16 11/17
**direct [2]** 61/14 63/6
**direction [1]** 19/15
**directly [2]** 75/8 76/6
**disagree [5]** 31/15 35/18 35/22 39/4 46/18
**disclose [20]** 31/2 38/2 39/25 41/2 41/11 41/24 42/1 42/2 43/9 46/9 46/17 51/11 53/24 60/16 63/9 63/21 65/11 73/9 77/8 84/2
**disclosed [22]** 14/21 28/11 33/7 42/19 42/21 43/5 43/6 43/12 43/14 43/18 43/22 48/3 50/22 51/5 70/6 71/24 72/9 75/11 75/16 76/24 78/11 88/24
**discloses [1]** 68/10
**disclosing [3]** 31/24 41/7 41/15
**disclosure [20]** 8/1 8/2 15/20 32/17 47/23 53/1 60/2 60/2 60/4 60/12 60/12 61/16 69/15 70/16 74/8 75/18 76/9 78/20 84/13 88/16
**disclosures [6]** 57/9 59/18 59/24 60/25 61/1 61/6
**discovery [17]** 26/13 26/13 33/8 36/14 36/15 36/16 36/17 36/18 37/2 37/4 48/10 55/9 60/12 67/5 91/19 91/25 92/2
**discrepancies [1]** 63/11
**discrepancy [1]** 63/15
**discrete [3]** 11/13 11/21 34/12
**discussed [1]** 88/3
**discussion [1]** 12/18
**dismiss [14]** 10/21 25/8 26/9 26/12 27/15 32/22 36/8 46/19 54/12 54/24 62/1 64/25 66/9 87/23
**dismissal [3]** 36/8 36/25 37/4
**dismissed [3]** 55/5 59/16 67/8
**dispute [9]** 7/23 8/2 33/18 35/5 37/21 64/3 76/4 76/5 76/7
**disputed [1]** 37/9
**disputes [1]** 38/1
**disputing [1]** 54/15
**disseminate [3]** 69/24 76/10 76/14
**disseminated [4]** 24/22 76/15 78/19 84/18
**disseminating [2]** 70/13 71/20
**dissemination [4]** 69/16 70/1 71/4 71/8
**distinct [1]** 82/22
**distinction [13]** 8/17 8/22 9/16 9/25 10/2 14/14 18/19 18/22 27/22 29/12 30/1 41/7 69/23
**distinctions [3]** 13/16

13/24 72/16
**distribute [1]** 7/22
**distributed [1]** 11/24
**district [13]** 1/1 1/1 1/21 7/2 9/20 10/4 18/6 19/10 25/6 57/18 62/12 70/12 71/18
**DIVISION [1]** 4/23
**does [23]** 10/23 13/5 19/12 24/9 24/10 31/20 31/24 34/4 35/22 39/9 43/5 57/8 61/16 62/2 65/3 68/18 75/24 76/8 78/5 80/22 82/25 83/14 86/13
**doesn't [30]** 8/9 10/5 20/15 24/11 24/11 35/18 39/24 41/10 42/23 42/23 43/4 43/11 43/13 48/22 51/7 52/2 52/2 54/2 56/10 57/10 58/3 58/13 61/5 63/23 69/10 72/21 76/3 76/18 85/11 87/18
**dog [1]** 28/8
**doing [7]** 8/2 19/18 23/20 31/24 39/16 76/11 78/16
**DOJ [2]** 71/19 75/14
**dollar [1]** 56/13
**domain [1]** 32/2
**done [3]** 19/2 85/8 88/16
**Donegan [1]** 25/5
**down [8]** 30/21 42/2 45/17 59/25 70/22 73/15 73/17 74/4
**downplay [1]** 88/8
**draw [3]** 13/17 14/14 27/21
**Drive [2]** 3/20 3/23
**duplicative [1]** 45/12
**dynamic [1]** 34/10

## E

**each [3]** 29/1 29/2 90/22
**earlier [3]** 31/14 83/20 88/3
**easier [1]** 48/8
**East [1]** 3/17
**Eastern [1]** 25/5
**easy [2]** 15/24 30/20
**editing [1]** 12/14
**editorial [1]** 11/19
**editorializing [3]** 12/12 34/3 69/19
**EDPA [1]** 1/21
**education [1]** 12/8
**effect [2]** 51/19 51/22
**Eighth [1]** 4/3
**either [5]** 11/4 56/6 71/25 86/18 86/25
**elected [1]** 45/9
**election [4]** 68/15 71/14 85/20 88/15
**elections [6]** 72/24 72/25 75/3 76/6 80/11 81/12
**element [3]** 7/16 7/23 8/3
**elements [1]** 39/1
**eligible [1]** 32/3
**eliminate [1]** 64/23
**Elliot [1]** 25/5
**Elm [1]** 63/14
**else [4]** 15/24 19/19 32/1 58/5
**else's [3]** 10/11 16/23 31/19
**elsewhere [1]** 69/19
**email [2]** 45/19 89/15
**enacted [3]** 19/22 21/14 24/6
**enactment [1]** 23/17
**encountered [1]** 9/15
**end [2]** 82/19 88/2

**enforcement [1]** 53/23
**enforcing [1]** 71/6
**engage [1]** 74/21
**engaging [1]** 22/21
**engine [1]** 30/9
**enough [2]** 15/13 38/16
**ensure [5]** 19/17 39/19 50/18 64/12 74/12
**ensuring [1]** 71/14
**entering [1]** 53/11
**entire [7]** 7/20 85/4
**entirely [2]** 17/9 59/13
**entities [1]** 86/16
**entitled [2]** 69/12 92/17
**entity [2]** 23/21 33/9
**erase [1]** 42/4
**ERIC [2]** 3/16 16/14
**error [1]** 90/23
**errors [2]** 75/24 88/17
**especially [2]** 10/3 32/6
**ESQUIRE [11]** 3/13 3/16 3/19 3/22 4/2 4/6 4/9 4/12 4/15 4/15 4/19
**essence [1]** 81/13
**essential [1]** 88/4
**essentially [24]** 20/6 23/11 48/15 51/2 68/15 68/21 70/1 70/15 71/7 71/18 72/24 74/21 77/23 78/3 78/7 78/10 79/4 79/12 79/21 83/10 88/4 88/7 88/18 91/5
**et [20]** 1/3 1/8 1/10 1/12 1/14 2/2 2/5 2/7 2/12 2/14 2/16 2/19 2/21 2/23 3/2 3/4 3/7 3/9 4/4 4/10
**ethical [1]** 41/11
**even [24]** 12/9 15/11 24/14 39/17 46/25 47/24 54/12 54/19 54/21 55/10 57/5 58/23 58/25 65/18 66/16 67/6 71/16 71/23 72/5 82/23 84/11 87/5 87/16 88/7
**event [1]** 55/6
**everybody [4]** 31/12 32/14 33/14 68/23
**everyone [2]** 62/14 65/2
**everything [1]** 46/25
**exact [4]** 76/7 87/7 87/9 87/11
**exactly [9]** 18/25 54/4 54/6 58/11 69/17 82/21 83/1 84/20 85/14
**examination [1]** 17/9
**example [8]** 8/10 12/6 12/7 13/4 18/5 29/25 56/2 56/22
**except [1]** 57/10
**exclude [3]** 22/4 22/12 28/8
**excluded [1]** 45/10
**excludes [1]** 46/6
**excuse [1]** 8/4
**exempt [1]** 14/18
**exercise [1]** 85/24
**Exhibits [1]** 27/12
**exist [2]** 17/21 68/15
**existed [2]** 17/24 25/2
**exists [2]** 17/14 17/19
**explain [2]** 16/22 44/18
**explained [1]** 16/18
**explicit [2]** 13/19 76/2
**exposed [1]** 47/25
**expressive [9]** 16/24 16/25 17/22 18/9 18/10 18/12 19/6 22/21 24/18
**extending [1]** 19/14
**extent [7]** 12/5 16/19 19/9 26/12 35/13 38/7 56/24
**extra [2]** 56/5 56/5

## F

**face [2]** 15/12 15/13
**Facebook [1]** 23/5
**fact [19]** 7/21 9/22 15/18 15/19 17/7 17/14 17/14 18/1 18/2 23/13 24/8 24/20 25/6 35/18 58/10 66/5 73/22 76/5 79/22
**factor [1]** 72/2
**factors [1]** 56/18
**facts [3]** 9/21 54/10 59/24
**factual [4]** 15/13 59/20 60/6 60/11
**fails [1]** 31/8
**Fair [8]** 34/19 36/17 38/11 39/9 45/15 46/13 55/13 63/7
**fairness [1]** 37/17
**far [9]** 10/14 19/14 32/15 33/25 34/4 42/3 45/14 73/22 80/8
**fashion [1]** 10/12
**faulting [1]** 80/21
**favor [1]** 71/6
**FCRA [19]** 35/23 36/11 36/20 37/1 37/12 37/13 38/24 43/22 45/4 55/19 57/7 58/12 59/13 59/25 60/14 61/16 61/18 61/23 79/11
**FCRA's [1]** 61/20
**federal [32]** 1/22 20/1 23/17 23/18 24/1 24/5 24/5 24/8 24/10 33/22 34/19 35/9 37/22 38/5 43/2 43/17 45/16 46/4 46/5 46/13 55/13 64/8 64/17 65/1 69/4 73/7 73/16 73/18 78/9 81/2 84/5 92/14
**feeding [2]** 28/12 28/13
**feel [1]** 16/2
**fell [1]** 25/6
**few [3]** 56/1 59/11 78/21
**field [1]** 58/4
**fighter [1]** 32/7
**figure [1]** 78/2
**file [1]** 82/18
**filed [2]** 35/3 71/6
**files [3]** 36/20 47/1 60/18
**fill [1]** 45/8
**financial [1]** 12/8
**find [3]** 14/24 58/25 78/7
**finding [4]** 9/23 12/9 29/1 81/17
**finds [1]** 8/10
**finite [3]** 11/13 11/21 12/3
**firm [9]** 34/25 44/16 44/16 45/1 46/1 52/19 58/16 58/17 58/23
**first [18]** 7/19 17/1 17/3 17/6 17/21 19/4 21/8 21/20 31/21 31/25 32/3 44/6 53/6 54/10 70/11 72/5 75/16 86/14
**first-party [1]** 17/1
**fits [1]** 57/5
**flag [2]** 56/4 56/5
**FLEMING [3]** 5/2 6/11 59/8
**FLEXNER [2]** 3/13 3/16
**Floor [3]** 3/14 4/3 4/24
**Florida [1]** 3/17
**focus [2]** 36/21 65/2
**focuses [1]** 58/24
**FOIA [1]** 75/18
**folks [11]** 74/22 74/25 75/9 75/20 78/10 79/3 80/8 81/6 81/10 88/14 89/16
**follow [1]** 83/18
**following [1]** 70/7
**follows [2]** 7/3 21/13

**font [1]** 29/8
**footnote [5]** 22/24 23/3 35/18 61/23 87/10
**Force [1]** 23/5
**foregoing [1]** 92/16
**foremost [1]** 7/19
**form [4]** 45/8 45/18 45/19 51/18
**format [3]** 17/17 18/3 24/18
**formatting [1]** 26/2
**former [1]** 64/19
**Fort [1]** 3/17
**forth [2]** 52/11 52/19
**forum [1]** 90/5
**forward [3]** 12/11 18/8 55/2
**foster [2]** 13/20 32/11
**found [8]** 29/1 37/22 62/7 62/19 64/9 65/19 70/15 89/17
**Foundation [3]** 4/17 4/21 68/5
**four [4]** 25/17 26/19 66/2 71/12
**fourth [1]** 26/23 89/4
**franchise [1]** 85/25
**fraud [1]** 75/25
**free [5]** 41/25 42/1 76/19 79/23 90/5
**freedom [3]** 13/21 32/6 32/11
**Freehold [1]** 4/10
**freeze [2]** 58/9 58/10
**Friedman [1]** 27/12
**friend [1]** 59/15
**FTC [1]** 57/1
**full [1]** 81/5
**fully [1]** 33/23
**function [2]** 11/20 46/8 28/12 28/18
**functionality [3]** 28/10 28/12 28/18
**fundamental [4]** 16/17 18/21 27/21 65/8
**Fundamentally [1]** 27/23
**funding [1]** 80/1
**further [6]** 20/20 23/17 57/12 59/3 90/18 91/12

## G

**gain [1]** 44/14
**game [1]** 76/19
**GARRETT [2]** 4/18 68/4
**gather [1]** 33/5
**gathered [2]** 8/21 17/12
**gathering [4]** 13/4 18/7 18/16 29/24
**gave [1]** 63/12
**general [21]** 4/23 4/24 4/25 5/2 5/2 5/4 16/10 30/2 36/12 45/11 46/4 46/15 46/22 52/15 57/9 59/6 74/9 74/23 81/10 81/15 88/15
**general's [7]** 11/10 20/25 21/3 59/9 60/16 69/11 86/10
**generally [3]** 57/8 58/22 74/4
**getgo [1]** 69/25
**gets [2]** 26/17 49/14
**getting [1]** 23/2
**give [23]** 15/6 22/19 23/4 27/8 36/18 36/19 38/24 40/12 40/15 47/7 49/25 50/17 50/24 51/8 51/15 62/20 76/22 76/23 77/18 77/18 77/20 78/18 88/1
**given [5]** 18/12 26/25 29/10 64/10 77/22
**gives [1]** 31/1 77/20 85/19
**giving [4]** 40/10 58/16

## G

**giving...** [2] 62/18 62/21
**goes** [11] 8/10 13/5 16/22 29/10 36/14 42/3 51/12 51/17 58/24 80/7 82/18
**gone** [2] 19/14 34/4
**good** [13] 7/5 7/11 7/12 16/13 16/14 21/1 21/2 34/17 34/22 47/9 59/7 59/8 68/3
**Google** [10] 9/10 9/14 9/18 18/23 18/25 19/9 30/3 30/7 30/9 30/14
**got** [13] 20/21 28/11 34/9 41/21 42/4 55/18 73/18 76/6 78/2 78/8 78/14 80/10 92/6
**government** [9] 31/7 38/5 42/19 43/2 43/17 45/16 81/13 82/23 84/5
**governs** [1] 44/12
**graduate** [4] 53/14 53/17 53/22 53/23
**graduated** [2] 44/19 53/11
**grand** [1] 91/15
**grant** [1] 67/2
**grapple** [1] 30/6
**GRAVES** [2] 4/18 68/4
**Great** [1] 92/9
**Green** [1] 23/7
**GREIM** [2] 4/18 68/4
**guess** [6] 51/24 53/23 69/16 69/22 74/7 77/16
**guidance** [2] 27/13 64/17
**guide** [2] 21/6 90/13

## H

**hac** [2] 4/15 4/19
**hadn't** [1] 86/19
**half** [1] 28/24
**Halsey** [1] 4/24
**hand** [1] 56/15
**handle** [1] 79/18
**handled** [1] 78/22
**happen** [1] 53/20
**happened** [1] 15/12
**happening** [1] 11/21
**happens** [3] 46/21 54/1 85/15
**happy** [3] 16/5 61/8 87/24
**harder** [1] 88/13
**HARVEY** [2] 1/20 7/2
**has** [51] 7/16 9/15 10/7 16/4 26/23 33/9 34/15 35/12 37/14 38/5 38/9 38/10 40/15 41/25 42/20 43/2 45/4 45/18 46/14 48/13 48/14 49/23 49/24 51/11 52/5 52/12 52/13 55/14 57/12 57/18 59/3 60/15 64/3 64/3 66/1 71/12 73/20 73/21 74/7 76/14 76/22 79/18 81/14 82/8 85/17 86/15 87/3 87/19 89/12 89/19 91/5
**hasn't** [2] 38/19 53/14
**have** [139]
**haven't** [3] 62/8 62/9 66/14
**having** [6] 8/14 8/16 39/22 53/16 79/5 91/24
**HB** [10] 1/4 1/8 1/13 2/3 2/8 2/12 2/17 2/22 3/3 3/7
**he** [12] 19/1 28/20 28/20 28/21 34/25 34/25 35/3 47/14 47/15 63/13 63/14 67/12
**he's** [6] 18/23 25/19 28/21 28/24 48/9 48/12
**head** [2] 82/7 82/15
**header** [1] 55/15
**hear** [4] 16/7 20/24 47/7 81/25
**heard** [1] 59/15
**hearing** [2] 1/5 42/7
**heart** [1] 78/17
**heavily** [1] 70/11
**held** [3] 7/1 13/15 19/18
**help** [2] 50/18 90/8
**helpful** [1] 66/3
**helps** [1] 65/13
**Hepp** [1] 10/6
**her** [2] 51/13 84/17
**here** [63] 9/12 12/18 14/14 14/20 15/13 16/17 17/2 19/17 21/6 21/9 21/21 22/10 26/12 26/17 29/6 30/6 31/13 31/16 31/23 33/25 34/7 34/9 34/12 34/24 37/16 39/22 42/18 43/22 44/5 46/6 46/19 47/13 48/12 54/10 59/24 60/22 65/9 67/2 68/7 72/13 72/17 72/23 73/14 74/4 76/8 76/13 79/22 81/1 81/14 82/21 82/24 83/7 83/18 83/23 84/12 84/23 85/2 85/4 85/22 86/2 86/17 87/6 88/8
**here's** [10] 11/11 28/18 28/19 28/19 28/20 28/20 28/21 28/22 30/13 90/23
**hey** [2] 30/15 31/12
**high** [1] 56/14
**highlighted** [1] 83/20
**highly** [2] 82/17 89/18
**hire** [1] 33/8
**his** [6] 27/3 28/19 28/19 28/21 50/17 84/17
**historically** [1] 31/4
**histories** [2] 12/8 12/8
**history** [1] 64/21
**hit** [1] 82/6
**hog** [1] 56/15
**hold** [1] 91/15
**holding** [2] 7/6 23/7
**holdings** [1] 59/23
**home** [28] 22/14 25/22 29/20 31/5 35/14 38/16 38/20 39/3 39/6 39/6 40/11 48/18 48/25 51/4 51/14 52/11 53/4 55/23 61/14 61/23 62/23 62/10 62/20 63/9 64/9 64/12 64/13 64/19
**honor** [68] 7/12 7/15 10/22 13/17 14/15 16/14 18/18 21/2 24/4 24/13 25/3 26/15 26/18 27/2 27/7 27/11 27/13 27/19 27/20 28/5 28/7 29/10 33/19 34/15 34/22 35/4 36/7 37/10 39/21 41/14 42/15 44/2 44/10 44/18 46/3 46/19 47/9 47/12 50/10 57/22 58/8 58/12 58/18 58/23 59/3 59/8 60/5 61/13 62/6 62/13 62/25 64/8 65/11 67/21 68/3 72/9 82/1 82/4 82/6 83/1 83/20 84/8 84/20 85/3 85/13 86/11 91/22 92/9
**Honor's** [2] 15/5 32/22
**HONORABLE** [2] 1/20 7/1
**hope** [2] 7/12 42/5
**horse** [1] 48/12
**host** [1] 19/20
**hosting** [2] 19/8 19/19
**house** [2] 12/2 51/12
**how's** [2] 53/2 53/2
**however** [2] 33/23 48/20
**Hughes** [1] 5/3
**hundred** [2] 41/8 77/14
**hundreds** [1] 49/3

**hypothetical** [2] 14/15 49/2

## I

**I'd** [5] 21/5 23/15 24/20 36/21 49/16
**I'll** [10] 8/25 47/5 47/7 59/10 79/16 91/13 91/14 91/16 91/19 92/2
**I'm** [25] 8/24 15/16 16/4 19/25 21/16 26/25 29/7 30/5 31/18 35/7 36/7 42/7 49/2 50/1 50/1 50/1 51/14 56/10 56/11 56/17 61/8 68/6 77/10 79/25 87/24
**I've** [4] 16/2 45/9 64/10 75/1
**i.e** [1] 17/1
**idea** [5] 9/25 11/10 20/14 22/20 61/1
**identical** [1] 9/21
**identified** [3] 49/4 66/6 66/7
**identifiers** [3] 38/21 39/7 39/22 49/17
**identify** [4] 49/13 50/12 75/24 88/17
**identifying** [2] 48/14 51/9
**identities** [1] 89/16
**identity** [3] 63/18 63/23 64/12
**ii** [1] 63/16
**III** [3] 1/20 3/22 7/2
**Illinois** [1] 18/6
**immigrant** [1] 90/1
**immune** [3] 20/15 20/16 23/1
**immunity** [8] 7/17 10/8 14/8 14/12 23/14 24/19 28/12 28/25
**immunized** [2] 16/23 16/24
**immunizes** [1] 16/18
**impede** [1] 38/7
**implicated** [2] 11/15 12/6
**implicitly** [1] 63/24
**implied** [2] 70/15 84/4
**important** [7] 21/5 27/21 37/16 46/8 80/7 83/20 87/22
**impose** [5] 42/25 45/16 45/23 62/2 81/16
**imposes** [3] 34/6 34/6 45/15
**imposing** [2] 43/20 46/12
**impossible** [1] 88/18
**inaccuracy** [1] 62/23
**INC** [2] 2/18 3/24
**include** [7] 22/4 22/12 23/12 40/11 77/14 78/6 89/12
**included** [1] 23/13
**includes** [5] 64/21 74/15 79/8 81/15 89/14
**including** [6] 29/3 71/3 73/1 81/3 81/6 89/1
**inconsistency** [1] 46/6
**inconsistent** [3] 23/23 63/20 84/7
**incorporated** [2] 34/24 37/23
**incorporating** [1] 31/20
**incorrect** [1] 90/25
**increasing** [1] 71/13
**indecent** [3] 19/21 32/5 32/8
**Indeed** [1] 19/21
**independent** [1] 86/14
**INDEX** [1] 6/2
**indicate** [3] 22/25 23/5

64/11
**indicated** [1] 21/24
**indicates** [1] 23/20
**indicating** [1] 23/12
**indication** [1] 26/6
**indicative** [1] 24/7
**individual** [6] 75/24 84/16 84/23 85/12 85/17 86/3
**individual's** [1] 22/23
**individuals** [4] 22/20 74/16 80/16 80/23
**inevitable** [1] 81/18
**inexpensive** [1] 35/10
**INFOMATICS** [2] 1/10 4/4
**INFORM** [3] 1/5 4/4 7/14
**Informatics** [1] 7/14
**information** [200]
**information-content** [2] 16/19 16/20
**inhibits** [1] 39/8
**initiate** [2] 53/15 53/17
**initiating** [1] 9/8
**initiative** [1] 52/20
**INNOVIS** [15] 2/18 3/24 34/20 34/23 35/3 35/12 37/21 38/2 51/18 51/25 54/12 60/3 60/17 65/3 65/19
**Innovis'** [1] 37/10
**inquired** [1] 49/22
**inside** [1] 65/16
**inspection** [1] 74/10
**institution** [1] 56/16
**instructions** [1] 91/6
**instructive** [2] 30/8 30/9
**insurance** [10] 44/15 44/17 45/2 45/10 49/9 52/21 53/3 53/5 58/17 62/19
**insurers** [1] 44/13
**integral** [1] 20/9
**integrity** [3] 68/15 71/14 88/15
**intended** [8] 19/16 21/17 25/12 30/19 30/22 30/24 31/6 31/10
**intending** [1] 33/17
**intent** [3] 24/21 24/25 25/9
**intention** [3] 20/18 33/1 33/14
**intentional** [2] 13/19 71/17
**interactive** [1] 7/20
**interest** [7] 80/19 81/12 87/1 88/25 89/2 89/8 89/9
**interested** [3] 40/13 42/7 88/14
**interests** [3] 81/3 81/6 86/1
**internal** [3] 60/17 60/19 68/16
**internally** [7] 47/17 48/4 48/5 49/6 60/18 67/15 83/25
**Internet** [22] 7/18 8/13 12/21 13/21 13/22 13/25 19/23 20/3 21/18 24/22 24/23 24/25 25/2 25/9 25/21 25/23 26/3 29/14 29/25 31/3 32/11 70/2
**interpreted** [1] 39/5
**interpreting** [1] 87/11
**Intervenor** [3] 4/22 4/25 5/4
**Investigate** [1] 90/9
**investigated** [1] 89/16
**investigation** [4] 13/5 13/13 14/4 64/4
**invocation** [1] 60/7
**invoke** [1] 87/1
**invoked** [1] 86/20
**involved** [3] 55/3 56/18 89/21
**involves** [3] 34/1 34/2

72/17
**isn't** [9] 8/15 9/12 17/19 45/12 55/23 72/3 85/3 85/8 89/21
**issue** [44] 8/8 9/23 11/12 12/9 14/20 24/12 28/10 29/1 30/5 32/15 34/7 38/10 38/10 39/22 52/1 60/1 60/6 65/3 65/9 66/12 68/8 69/5 71/25 72/25 73/11 76/13 76/17 81/2 82/7 82/21 83/8 83/14 83/23 84/12 85/16 86/21 87/6 87/17 88/8 88/21 91/19 91/19 91/25 92/2
**issued** [1] 50/11
**issues** [5] 7/9 59/14 60/11 75/21 85/23
**items** [5] 55/12 57/19 58/2 58/3 58/7
**its** [14] 15/12 15/13 33/24 37/15 37/16 37/17 38/15 46/6 60/18 64/18 73/13 74/8 82/17 87/4
**itself** [6] 31/7 32/16 59/17 76/3 81/7 87/4

## J

**Jason** [1] 34/25
**JERSEY** [43] 1/1 1/8 3/20 3/23 4/7 4/10 4/16 4/23 4/25 4/25 5/2 5/4 5/4 9/6 16/10 21/3 24/9 29/16 33/6 40/9 49/2 57/18 59/9 68/19 69/2 72/5 72/7 73/4 76/21 77/7 77/8 77/17 78/6 82/25 83/3 83/6 85/6 86/8 87/10 87/13 89/23 90/16 90/20
**Jersey's** [1] 23/18
**job** [1] 60/9
**John** [23] 1/22 1/23 4/15 19/14 39/14 40/8 40/10 40/12 40/15 40/16 42/14 49/2 49/4 49/20 49/22 49/23 49/23 50/1 50/6 50/16 50/18 52/7 92/20
**join** [1] 27/2
**JUDGE** [1] 1/21 7/2 9/23 12/9 28/25 29/1 35/7 41/20 83/4 83/19 86/6
**judgment** [2] 15/3 32/17
**judicial** [2] 5/8 65/22
**jurisdiction** [2] 91/18 91/25
**just** [57] 8/10 8/24 9/21 11/7 14/23 15/5 15/6 15/12 17/9 20/2 20/16 21/9 21/13 25/9 25/22 26/21 26/22 27/14 31/13 31/23 31/25 32/22 33/5 34/5 34/23 35/9 36/20 38/16 41/2 44/19 46/3 50/1 52/14 56/8 56/10 56/14 59/11 59/23 60/1 61/4 61/7 63/6 64/23 75/17 77/18 77/19 78/22 79/16 80/1 80/22 84/6 86/12 87/9 88/2 88/8 88/14 88/22
**Justice** [2] 5/3 71/5

## K

**Kansas** [1] 4/20
**KASHIF** [2] 4/24 21/2
**keep** [2] 63/8 84/6
**keeps** [1] 80/2
**kept** [4] 30/24 31/6 31/10 31/11
**key** [1] 78/25
**kicks** [2] 10/8 75/14
**kids** [1] 20/10
**kind** [20] 15/6 20/7 30/20

6 . . . . . . . . . number

**K**

kind... **[17]** 31/19 32/2 33/19 47/23 48/4 52/16 56/1 56/4 58/14 58/24 71/13 73/2 73/24 79/18 85/1 85/22 88/2
kinds **[3]** 12/8 57/24 81/5
knew **[1]** 78/24
know **[48]** 10/17 10/24 17/20 18/11 20/13 33/4 35/8 39/14 41/10 46/15 51/21 56/12 56/13 56/16 58/10 59/13 60/7 60/13 63/2 63/12 63/13 67/13 69/20 70/2 72/24 73/11 73/22 74/4 74/21 75/17 75/23 77/17 77/23 78/10 78/15 79/10 80/7 80/18 81/10 81/13 81/16 83/5 84/11 86/19 88/5 88/9 89/1 91/18
knowing **[1]** 81/4
knowledge **[2]** 73/23 89/12
Kratovil **[1]** 87/10
Kurz **[3]** 1/22 1/23 92/20

**L**

Labor **[1]** 91/15
language **[2]** 12/16 43/19
Larry **[1]** 5/7
Las **[1]** 3/17
last **[4]** 26/17 47/7 61/11 88/1
Lastly **[1]** 24/20
later **[2]** 15/9 20/13
Lauderdale **[1]** 3/17
law **[111]**
Law's **[1]** 86/20
Lawrenceville **[1]** 4/16
laws **[4]** 21/14 57/8 59/1 61/19
lawsuit **[2]** 13/7 72/17
lawyers **[1]** 41/9
least **[10]** 36/8 44/8 55/14 66/11 66/15 67/4 69/5 75/9 76/21 79/12
leaving **[1]** 65/18
legal **[1]** 90/1
Legislature **[1]** 78/6
legitimate **[1]** 80/14
lender **[1]** 51/9
less **[1]** 83/7
let **[1]** 47/13
let's **[4]** 12/15 14/10 51/10 54/17
letting **[1]** 29/15
LEWIS **[1]** 4/5
Lexis **[1]** 62/12
LexisNexis **[1]** 62/11
liability **[4]** 19/23 23/1 34/5 56/21
liable **[6]** 12/25 13/15 19/18 19/19 23/20 86/4
licenses **[1]** 74/22
like **[24]** 14/11 15/12 16/2 21/5 22/21 23/15 24/20 28/24 29/5 31/5 32/14 32/17 35/6 48/10 49/17 60/8 60/16 60/23 61/1 61/22 69/10 75/24 85/21 88/14
likewise **[1]** 35/22
liking **[1]** 28/6
limitation **[1]** 79/17
limitations **[1]** 57/12
limited **[5]** 44/14 57/23 61/21 73/14 82/24
limiting **[1]** 48/10
line **[9]** 14/19 25/25 31/9 71/19 75/13 75/14 82/14

89/13 89/14
lines **[1]** 19/2
LinkedIn **[1]** 62/9
list **[10]** 42/20 68/19 69/12 69/17 69/20 71/2 74/11 74/13 74/23 79/4
lists **[3]** 69/13 73/1 85/4
litany **[1]** 67/13
literally **[1]** 20/16
litigation **[7]** 7/21 7/25 25/10 32/25 34/9 35/10 89/11
little **[12]** 9/22 19/14 30/20 34/3 44/11 45/7 48/12 58/18 66/20 70/14 83/2 83/3
live **[3]** 50/2 56/12 88/9
lived **[2]** 63/2 87/21
lives **[4]** 51/13 62/22 87/13 90/10
living **[2]** 56/14 56/15
LIZA **[1]** 5/8
LLC **[16]** 1/5 1/10 1/14 2/4 2/14 3/4 3/9 4/4 4/4 4/4 4/7 4/10 4/13 4/17 4/18 4/21
LLP **[6]** 3/13 3/16 3/19 4/2 4/11 4/14
location **[2]** 62/16 85/20
LOCKE **[1]** 3/22
LOMURRO **[1]** 4/8
long **[6]** 32/20 41/24 62/14 62/15 70/18 76/10
longer **[1]** 19/7
look **[23]** 9/16 12/15 20/10 22/22 23/17 24/14 25/4 25/5 25/14 25/25 27/11 37/15 37/23 37/24 43/19 44/3 45/22 63/10 65/11 65/12 65/16 87/14 90/14
looked **[3]** 22/1 28/23 58/9
looking **[8]** 22/18 26/3 26/5 30/23 72/23 73/14 75/15 85/23
looks **[3]** 9/11 22/20 31/9
lose **[2]** 31/20 31/25
lot **[7]** 19/12 34/4 39/14 56/12 56/18 59/12 66/7
lots **[1]** 82/4
Lukis **[1]** 18/6

**M**

MACDONALD **[1]** 4/15
MacStravic **[1]** 5/7
made **[28]** 11/9 11/17 13/18 15/9 16/2 18/6 31/4 31/14 33/19 50/22 56/6 56/22 59/18 59/20 61/2 69/14 71/9 72/19 73/12 73/15 75/6 78/8 81/4 86/3 87/11 88/11 89/7 89/20
magically **[1]** 11/18
mail **[2]** 64/2 64/4
mailer **[1]** 52/21
Main **[3]** 4/19 63/13 87/12
maintained **[2]** 86/15 87/4
maintaining **[1]** 71/15
maintenance **[3]** 74/11 74/23 87/17
make **[23]** 9/17 21/16 23/15 25/1 32/2 33/1 39/13 39/15 39/25 40/8 40/9 49/6 59/11 59/22 63/23 74/10 75/20 76/18 79/23 84/2 84/22 85/17 90/4
makes **[7]** 17/23 31/7 48/8 71/23 77/22 85/12 88/1
making **[16]** 10/11 14/3 18/4 30/1 30/2 31/17 31/18 31/19 32/17 40/1 45/1 48/17

51/3 62/19 71/11 84/17
malice **[1]** 13/8
man's **[1]** 32/6
MANATT **[2]** 4/11 27/9
manner **[1]** 59/19
Market **[1]** 5/3
marketing **[1]** 61/3
marshal **[1]** 29/13
mass **[1]** 45/19
match **[2]** 38/25 58/13
matches **[1]** 11/19
materials **[1]** 76/4
matter **[11]** 43/21 43/22 45/24 57/13 58/11 58/18 58/20 58/21 78/17 91/13 92/17
MATTHEW **[4]** 4/12 4/19 27/9 68/4
maximum **[4]** 38/13 38/22 39/8 64/6
may **[19]** 7/5 9/4 10/20 15/4 15/8 15/8 24/1 24/3 33/3 34/4 42/19 42/20 50/7 56/12 56/15 56/18 81/24 83/2 92/5
maybe **[8]** 19/14 33/3 34/2 39/17 47/25 53/14 77/14 83/2
me **[11]** 8/4 12/19 13/3 27/7 28/16 31/1 41/6 47/13 56/24 56/25 73/4
mean **[14]** 10/20 13/1 20/15 25/19 35/7 41/9 41/10 41/12 49/2 54/13 60/22 61/2 76/23 77/5
meaning **[2]** 8/6 10/10
meaningful **[1]** 10/2
meaningless **[1]** 48/22
means **[2]** 16/22 60/16
meant **[1]** 74/12
mechanical **[1]** 1/24
media **[2]** 13/20 28/1
medical **[1]** 57/24
meeting **[1]** 92/5
mention **[2]** 42/23 42/24 63/24
mentioned **[1]** 64/5
merely **[1]** 19/7
merits **[1]** 92/7
Meta **[1]** 19/11
method **[1]** 75/25
Metroka **[1]** 30/8
Mexico **[2]** 70/13 71/18
might **[7]** 14/5 14/18 14/19 31/17 31/17 57/22 81/10
million **[3]** 56/13 83/5 83/6
millions **[3]** 28/2 28/2 28/2
minimum **[3]** 36/10 37/5 64/24
minute **[1]** 81/20
Missouri **[1]** 4/20
Mitchell **[1]** 1/17
mixed **[1]** 14/21
model **[1]** 20/10
Monday **[1]** 1/19
more **[12]** 8/10 9/22 16/5 16/5 19/2 24/9 26/9 27/13 28/7 73/14 74/9 84/25
morning **[14]** 7/5 7/6 7/11 7/12 16/13 16/14 21/1 21/2 34/22 47/9 59/7 59/8 59/12 68/3
mortgage **[19]** 49/10 49/14 49/21 49/22 49/24 49/24 49/25 50/3 50/6 50/15 50/21 51/8 51/12 51/13 51/14 51/17 52/5 52/12 60/9
most **[1]** 16/17
mostly **[1]** 54/16 57/23

motion **[16]** 1/5 10/21 15/14 25/8 26/9 26/12 27/15 32/22 36/8 37/10 46/18 54/11 55/6 61/25 66/9 87/23
motions **[1]** 7/7
motor **[5]** 74/21 82/8 82/10 83/21 86/5
move **[2]** 55/2 91/20
moved **[1]** 75/1
Mr **[9]** 6/5 6/6 6/7 6/8 6/9 6/10 6/12 6/13 47/10
Mr. **[7]** 34/21 53/10 61/11 63/12 65/24 67/1 67/18
Mr. Shaw **[1]** 65/24
Mr. Stio **[5]** 34/21 53/10 61/11 67/1 67/18
Mr. Stio's **[1]** 63/12
Ms **[1]** 6/11
much **[16]** 20/23 27/17 29/5 29/5 34/14 39/23 47/13 54/9 61/9 67/17 69/10 77/5 87/25 88/13 91/13 92/10
MUELLER **[3]** 4/19 6/12 68/4
multi **[1]** 56/13
multi-million-dollar **[1]** 56/13
multiple **[3]** 34/11 63/7 65/18
multitude **[1]** 68/13
murderer **[4]** 13/6 13/14 13/14 14/3
must **[11]** 7/19 7/24 8/4 8/5 43/4 69/14 73/12 74/10 75/6 75/11 78/8
my **[36]** 7/13 7/21 8/1 8/6 10/15 10/16 10/22 10/25 11/17 11/24 12/1 12/13 14/15 14/23 15/20 16/2 18/15 21/20 31/16 31/16 31/20 31/23 34/3 35/16 45/9 50/2 55/18 56/23 56/24 59/15 72/6 73/9 73/23 75/1 77/8 89/12
MyLife **[15]** 9/20 9/20 12/5 15/13 21/8 21/20 23/10 23/13 27/22 28/15 28/15 28/15 28/17 29/5 29/6

**N**

nail **[1]** 82/7
name **[31]** 7/13 27/8 35/13 35/14 38/16 38/17 39/2 39/14 44/25 45/9 46/20 48/18 48/21 48/22 48/24 49/15 49/16 51/4 51/13 52/2 54/3 61/13 63/13 64/22 73/5 79/1 79/5 79/12 87/21 88/5 88/18
names **[9]** 38/20 38/20 39/6 74/16 75/6 75/11 78/13 81/3 88/11
narrative **[1]** 14/17
narrow **[3]** 57/18 58/25 87/14
narrower **[1]** 77/5
narrowly **[1]** 85/24
National **[2]** 67/25 74/24
near **[1]** 82/19
nearly **[1]** 9/21
necessary **[2]** 39/8 39/18
necessitates **[1]** 83/22
need **[13]** 15/11 22/22 23/16 25/24 26/9 38/3 39/13 42/9 46/9 75/1 79/1 79/12 88/5
needed **[1]** 26/13
nefarious **[1]** 80/15

NetChoice **[2]** 23/8 23/12
never **[8]** 9/13 9/15 19/16 20/17 60/15 77/17 79/25 89/12
nevertheless **[1]** 70/14
new **[56]** 1/1 1/18 3/14 3/20 3/23 4/3 4/3 4/7 4/10 4/13 4/13 4/16 4/23 4/25 4/25 5/2 5/4 5/4 9/6 16/10 17/16 18/3 21/3 22/6 23/18 24/9 25/6 29/16 33/6 40/9 49/2 57/18 59/9 68/19 69/1 70/13 71/18 72/5 72/7 73/4 75/1 76/21 77/7 77/8 77/17 78/6 82/25 83/3 83/5 85/6 86/8 87/9 87/13 89/23 90/16 90/19
Newark **[3]** 4/7 4/25 50/7
newspaper **[4]** 13/5 13/7 13/25 14/4
newspapers **[1]** 13/19
next **[4]** 1/16 2/25 3/25 56/1
nice **[3]** 7/13 82/1 82/2
night **[1]** 35/7
Ninth **[3]** 19/12 19/13 25/4
Ninth Circuit's **[1]** 19/13
njd.uscourts.gov **[1]** 1/23
no **[56]** 8/2 9/13 9/23 11/16 11/19 11/20 11/20 12/9 19/7 20/22 23/17 25/7 26/6 26/21 29/1 32/17 32/25 33/7 33/18 33/24 37/2 37/21 38/1 39/24 40/25 40/25 40/25 43/6 49/8 49/20 54/13 55/4 55/24 55/25 56/9 56/21 59/18 60/17 60/23 61/1 72/22 73/21 73/23 77/23 78/4 83/16 83/17 85/1 86/5 86/15 87/19 90/3 90/14 90/14 92/1 92/2
Nobody's **[1]** 85/8
non **[1]** 66/11
non-CRA **[1]** 66/11
noncitizens **[1]** 89/17
nondisclosure **[2]** 51/18 82/11
none **[5]** 10/15 11/21 24/20 34/7 59/21
nonetheless **[2]** 82/6 88/12
nonprofit **[2]** 68/14 80/3
nonprofits **[1]** 79/20
Northern **[2]** 18/6 19/10
not **[164]**
notably **[2]** 73/20 74/7
note **[8]** 60/15 60/25 64/18 69/25 79/16 80/7 87/6 88/20
noted **[2]** 60/5 79/20
nothing **[4]** 24/9 82/15 83/21 87/2
notice **[7]** 63/20 63/22 64/2 64/4 65/22 74/17 75/10
notices **[1]** 44/20 74/24
notification **[1]** 45/13
notify **[2]** 62/22 63/11
notion **[1]** 58/16
now **[28]** 7/6 8/18 10/17 26/19 29/23 34/12 34/19 35/12 37/10 38/1 38/9 38/19 40/22 42/25 45/4 45/11 46/15 49/1 51/17 52/16 53/14 54/5 55/9 67/18 67/24 68/18 69/13 78/15
number **[36]** 1/3 1/7 1/12 2/2 2/7 2/11 2/16 2/21 3/2 3/6 11/13 11/18 11/24 13/17 14/1 18/22 28/19 36/9 35/15 38/17 39/2 39/17 50/2 50/12 50/13 50/16 50/18 51/5 51/14 52/11 55/14 56/5 56/6

**N**

number... [3]  56/8 56/24 63/17
numbers [27]  10/23 11/2 12/14 15/21 22/13 22/14 22/15 24/23 29/9 29/20 29/21 31/5 38/21 39/7 42/24 48/18 48/25 49/18 61/17 61/24 62/4 63/9 64/20 88/20 88/24 89/15 89/15
numerous [3]  9/15 21/25 62/6
NVRA [24]  69/15 70/19 71/6 71/9 71/11 71/21 73/20 73/23 74/7 74/19 75/8 75/11 75/12 75/23 76/12 80/9 80/10 81/15 82/16 86/12 86/14 87/22 87/19 89/11
NVRA's [2]  78/20 80/9

**O**

objectives [4]  37/12 37/16 37/20 39/9
obligates [1]  83/21
obligation [2]  41/11 63/14
obligations [6]  34/6 34/7 45/15 74/23 82/6 82/8
obstacle [6]  37/11 71/9 71/22 79/17 80/6 87/18
obtain [8]  25/21 33/7 31/10 40/2 68/24 71/21 89/22 90/4
obtained [10]  9/2 11/23 15/2 28/22 28/25 32/23 36/11 60/10 70/23 86/17
obtaining [3]  10/1 12/1 14/16
obtains [1]  27/4
obviously [3]  24/2 51/12 81/8
off [2]  44/19 72/15
offer [9]  44/16 44/16 45/1 52/19 53/3 53/3 53/13 54/2 54/16
offers [5]  45/10 46/1 58/16 58/17 58/23
office [9]  4/23 5/2 20/25 21/3 59/9 69/11 85/17 86/10 91/2
Official [2]  1/22 92/14
officials [1]  86/1
often [1]  64/19
oh [3]  17/5 33/11 66/18
okay [17]  9/1 20/14 20/24 30/17 33/12 37/7 41/4 43/25 47/4 49/1 51/3 51/10 54/5 90/24 91/7 91/21 92/3
Olas [1]  3/17
old [1]  56/3
oldest [1]  37/14
one [43]  4/6 10/6 12/1 12/3 13/17 14/1 20/2 27/21 32/6 32/25 33/15 34/5 36/20 38/1 38/10 39/16 39/16 39/25 42/10 45/17 47/23 49/7 50/10 50/14 51/5 56/2 62/9 62/14 64/13 65/2 66/11 66/21 69/14 71/17 72/15 74/19 76/23 76/24 77/1 77/16 79/16 84/7 88/10 one's [3]  33/24 35/9 55/24
online [6]  20/11 23/7 69/18 71/3 79/23 90/5
only [26]  11/14 16/19 16/23 32/13 32/14 34/12 45/13 46/21 53/22 55/12 57/19 58/6 58/19 61/18 62/4 70/4 70/7 70/16 76/3 76/7 77/6

open [2]  7/1 33/14
opened [1]  65/15
opening [2]  25/22 29/15
operated [3]  15/19 27/24 28/16
operating [1]  17/11
operators [1]  7/22
opinion [1]  82/20
opportunity [3]  27/1 74/25 76/22
opposed [3]  13/25 25/22 29/14
opposing [1]  18/24
opposite [1]  30/23
opposition [1]  64/18
opt [8]  45/4 45/5 45/12 45/14 45/14 45/18 73/25 74/1
opt-out [5]  45/4 45/12 45/14 45/18 74/1
opted [1]  77/17
opts [1]  77/16
oral [3]  7/6 91/24 92/1
Orange [1]  3/20
order [5]  13/20 38/2 38/23 39/19 91/17
ordered [1]  26/14
orderly [1]  7/9
organization [4]  75/24 80/3 80/22 89/21
organizations [3]  68/15 82/4 88/14
original [8]  8/7 14/19 14/21
originated [1]  14/13
originates [2]  10/16 32/20
other [64]  9/4 9/11 9/11 9/16 9/18 11/10 12/7 13/1 13/20 14/14 16/4 17/20 21/25 22/25 25/12 28/22 29/16 30/25 33/5 34/15 37/3 39/19 40/14 41/24 42/17 44/2 45/20 48/9 48/15 49/17 52/10 52/13 54/16 54/19 54/23 55/2 56/15 56/18 56/19 58/6 60/15 63/6 66/4 66/5 66/24 67/4 68/18 69/25 70/17 71/24 72/5 75/18 76/10 77/7 77/12 79/21 82/18 83/12 83/19 84/9 90/10 85/3 85/15 85/20 91/8
others [4]  23/2 90/6 90/8 90/16
otherwise [2]  33/1 84/2
our [24]  17/5 17/6 18/11 19/6 23/7 23/8 31/15 33/1 33/2 34/25 37/23 55/11 55/15 61/3 63/14 67/10 67/21 69/23 79/17 80/7 80/12 81/13 89/2 92/5
out [45]  8/10 12/20 13/4 13/5 13/12 14/3 14/16 17/8 17/14 17/19 18/15 19/10 19/12 22/10 28/24 29/19 29/24 33/5 36/4 39/15 39/20 40/8 45/4 45/5 45/8 45/12 45/14 45/14 45/18 46/3 51/7 52/15 53/12 56/1 62/20 70/12 71/18 73/25 74/1 74/25 77/16 77/17 78/2 81/14 92/4
outlined [1]  38/5
outlines [1]  42/19
outside [5]  36/16 46/16 57/2 65/3 66/1
outweighs [1]  89/9
over [5]  14/24 34/25 64/3 68/11 90/15

overcoming [1]  85/1
overlap [1]  71/13
oversight [2]  75/19 79/13
own [16]  16/25 17/4 17/5 17/6 17/22 17/22 18/11 22/21 25/25 26/23 31/15 31/20 62/15 73/13 80/24 87/17

**P**

p.m [1]  92/13
page [10]  1/16 3/25 6/4 61/15 61/18 61/20 62/2 64/18 82/15 83/10
Page 23 [1]  61/15
Page 25 [1]  61/18
Page 26 [1]  61/20
page 41 [1]  62/2
page 56 [1]  82/15
page 60 [1]  64/18
page 7 [1]  83/10
pages [3]  2/25 22/5 42/8
PALMER [3]  3/16 6/16 6/14
Paragon [1]  4/9
paragraphs [1]  22/17
parameters [1]  33/23
paramount [1]  12/16
parent [1]  68/7
parenthetical [2]  23/4 23/5
parents [1]  20/10
PARIKH [3]  3/19 6/13 82/3
part [19]  9/19 15/3 32/19 32/21 34/3 34/12 36/1 47/23 48/13 48/18 51/7 55/21 59/18 62/7 62/10 64/13 66/15 66/17 66/21
partial [2]  36/8 61/25
participating [2]  21/25 74/23
particular [4]  11/19 74/16 79/9 90/22
parties [8]  8/14 8/17 8/19 9/3 9/17 10/2 25/16 26/6
party [23]  10/10 11/23 14/10 14/13 15/2 15/23 17/1 17/13 18/10 18/14 19/8 20/3 21/22 26/7 32/21 32/23 40/19 45/20 49/9 70/12 71/21 86/24 87/2
pass [1]  33/22
passed [5]  12/11 13/18 14/22 32/9 74/20
passing [2]  33/21 35/6
passive [2]  18/8 19/20
passively [1]  19/8 19/18 31/13
pattern [2]  23/13 73/22
pay [3]  33/4 33/5 79/22
paying [1]  56/14
payroll [1]  44/19
Pearl [1]  3/14
PEM [1]  3/19
penalties [1]  78/16
pending [1]  55/9
people [14]  1/14 4/4 7/14 12/21 13/1 20/9 27/5 55/18 69/25 70/18 72/18 73/8 76/10 81/4
people's [2]  9/17 85/24
PEPPER [1]  3/22
per [1]  78/15
percent [4]  41/8 83/7 85/5 90/10
perfectly [1]  10/20
perhaps [1]  85/19
permissible [9]  38/3 38/6 38/7 40/4 44/11 46/10 46/21

47/2 54/24
permit [1]  12/21
permits [4]  73/5 73/8 77/7 77/13
permitted [2]  41/23 68/16
person [29]  11/19 13/14 22/20 28/16 40/15 42/1 50/3 50/12 50/21 50/25 51/1 51/3 51/10 51/11 51/15 52/13 52/19 52/20 53/2 53/3 54/1 60/7 61/5 62/22 76/25 85/20 87/8 90/9 90/23
person's [3]  35/14 64/13 77/24
personal [6]  38/21 82/17 89/10 91/18 91/18 91/25
persons [14]  72/18 75/10 77/6 78/12 78/18 80/15 81/5 82/12 84/23 86/3 86/18 86/19 86/24 86/25
persons' [1]  35/13
pertinent [1]  29/9
PHELPS [2]  4/11 27/9
PHILLIPS [2]  4/11 27/10
phone [34]  10/23 11/2 11/13 11/18 11/23 11/24 12/14 15/21 18/12 28/19 29/6 29/20 29/21 31/5 38/17 38/21 39/2 39/7 39/17 42/24 50/2 50/12 51/4 51/14 52/11 56/6 56/8 56/24 61/17 61/24 62/3 63/9 63/17 64/20
photocopy [1]  69/5
photocopying [1]  74/11
picked [1]  30/9
pie [1]  28/8
piece [4]  11/21 12/4 83/19 88/4
pieces [6]  12/7 14/16 21/6 28/13 29/2 29/2
Pike [1]  4/16
PILF [2]  70/23 71/6
place [7]  12/1 12/2 17/21 29/14 46/14 75/16 88/6
placed [1]  20/2
places [1]  11/10
placing [1]  18/16
plain [1]  33/1
plaintiff [3]  16/8 16/12 47/8
plaintiffs [24]  1/4 1/8 1/13 2/3 2/8 2/12 2/17 2/22 3/3 3/7 3/15 3/18 3/21 16/15 30/1 31/14 47/11 56/22 56/22 65/5 69/11 72/12 82/3 84/23
plaintiffs' [4]  21/9 22/17 33/8 81/25
platform [5]  18/15 12/23 18/14 18/17 22/8
platforms [1]  8/18
play [1]  53/22
Plaza [1]  4/6
please [3]  27/8 30/15 77/8
plethora [1]  69/13
PO [1]  5/3
point [23]  10/15 10/18 15/9 16/2 16/7 18/5 21/16 21/20 23/15 25/7 31/14 36/20 36/23 46/3 62/13 65/5 65/24 67/16 78/3 78/5 83/9 84/12 90/3
points [3]  11/11 59/11 71/7
police [4]  14/11 30/10 30/14 30/15
policy [5]  12/18 12/22 20/7 32/8 33/20
political [2]  31/17 82/4
polling [1]  85/20

pornography [1]  32/18
portion [2]  34/5 34/8
position [12]  17/3 17/8 18/12 22/25 26/8 35/5 37/13 38/15 41/20 44/4 59/22 60/16 61/4
possession [4]  37/19 86/16 86/24 87/3
possible [2]  38/13 64/6
post [15]  8/14 8/17 8/19 10/7 12/21 18/15 20/7 21/23 22/12 25/21 26/3 26/7 27/5 29/15 29/20
posted [12]  13/12 13/13 14/3 14/7 21/18 22/3 25/12 31/3 31/13 31/13 68/20 78/9
posting [12]  9/8 10/1 10/6 10/7 10/12 13/4 19/21 20/17 22/13 22/14 22/18 23/1
postings [1]  25/16
posture [1]  84/25
potentially [2]  79/11 89/17
poverty [1]  56/16
power [1]  80/12
pre [2]  23/8 23/12
pre-NetChoice [2]  23/8 23/12
precedent [1]  69/13
precinct [2]  77/15 88/7
precipitated [1]  20/1
predicated [2]  7/21 8/1 32/25
preempt [5]  35/23 57/8 57/10 73/7 86/13
preempted [18]  21/12 24/2 24/16 35/16 35/21 38/8 46/2 57/16 58/12 58/19 58/25 61/6 61/25 71/9 71/21 73/6 83/15 83/17
preemption [29]  24/12 33/20 37/16 42/17 44/1 46/24 47/12 54/8 55/12 57/19 58/1 58/3 59/18 58/24 59/14 59/23 60/13 61/15 62/1 71/22 73/24 79/18 80/6 81/17 83/17 85/2 85/2 86/5 87/18
preempts [3]  61/18 73/2 73/16
preferred [1]  79/18
premature [1]  59/13
premise [1]  57/10
prepares [1]  50/8
prescreening [3]  45/25 46/1 58/22
present [3]  5/6 11/22 73/10
presents [1]  73/12
pressing [1]  48/5
presumably [5]  29/19 49/23 50/15 52/12 86/18
presuming [1]  78/18
presupposes [1]  14/15
pretty [1]  72/2
prevent [4]  19/20 52/25 76/24 84/13
prevented [1]  87/15
preventing [2]  53/6 67/14
prevents [1]  54/11
previously [1]  50/22
prices [1]  79/24
primarily [1]  68/13
primary [2]  69/22 74/19
Princeton [2]  3/23 4/16
principle [2]  35/23 89/5
prints [1]  13/5
prioritize [1]  22/19
privacy [22]  1/3 1/7 1/12 2/2 2/7 2/11 2/16 2/21 3/2

**P**

privacy... [13]  3/6 37/14 37/18 78/24 81/6 81/15 84/24 85/18 85/25 88/25 89/2 89/3 89/9
private [14]  23/21 30/24 31/6 31/11 33/9 34/11 45/21 71/1 75/22 76/8 81/11 86/16 86/24 87/2
privilege [1]  41/13
pro [2]  4/15 4/19
problem [1]  60/23
procedure [3]  35/9 65/2 78/13
procedures [1]  38/13
proceedings [4]  1/24 7/1 92/13 92/17
process [1]  78/1
processing [4]  17/16 18/3 29/8 83/25
Prodigy [3]  20/4 20/6 20/14
produced [2]  1/25 69/18
product [3]  17/22 18/10 19/6
products [3]  2/4 18/12 66/12
program [2]  74/24 83/12
programs [1]  74/11
prohibit [2]  54/25 58/5
prohibited [2]  53/19 57/20
prohibitions [1]  45/24
prohibits [4]  43/20 47/23 70/1 82/16
Project [1]  89/5
promote [3]  13/21 22/7 37/17 37/17 38/12 39/8 39/9 64/7 65/1
prong [2]  8/9 10/14
proper [1]  89/3
property [1]  56/13
PROPHETE [1]  4/14
protect [1]  80/15
protection [2]  31/21 31/25
protections [6]  19/4 19/5 19/15 32/4 86/20 87/1
protects [1]  17/3
provide [6]  8/20 27/13 63/17 64/2 64/4 90/21
provided [5]  8/5 16/20 24/21 25/9 49/20
provider [5]  7/19 8/6 16/21 21/22 28/2
providers [3]  9/19 16/19 19/23
provides [6]  7/17 14/25 24/18 33/11 43/23 51/13
providing [1]  12/22
province [1]  89/2
provision [11]  45/5 69/15 70/16 74/8 74/9 76/9 77/11 78/6 78/21 86/21 88/16
provisions [3]  37/12 63/7 75/19
public [20]  12/23 29/19 31/7 32/2 46/9 60/18 68/21 69/15 70/16 74/8 74/10 75/18 75/19 76/8 76/9 78/8 78/20 81/12 86/1 88/16
publicized [2]  31/5 73/5
publicly [6]  31/4 31/8 73/15 78/8 84/2 87/16
publish [15]  30/15 33/14 33/17 36/15 39/18 40/3 40/4 69/6 69/18 72/22 76/19 83/22 89/22 90/15 90/21
published [6]  30/16 30/19 30/22 76/7 78/14 84/17

publisher [2]  7/25 19/18
publishers [1]  7/17
publishing [4]  9/3 39/20 39/23 90/19
purchaser [1]  40/12
purpose [20]  9/3 15/1 32/10 35/9 37/11 37/15 37/17 38/3 38/8 39/9 40/5 44/11 45/1 46/10 46/21 47/2 68/21 71/10 74/6 78/23
purposes [21]  8/17 17/5 17/6 17/13 17/23 37/20 38/6 61/3 67/14 67/15 68/16 68/16 70/18 71/12 71/16 76/11 80/9 80/9 80/14 80/24 84/24
purview [1]  33/24
put [7]  18/3 24/18 24/25 25/12 25/22 90/24 91/16
puts [1]  8/13
putting [5]  18/7 22/16 29/25 48/12 65/15

**Q**

qua [1]  18/10
queries [1]  79/11
question [12]  16/4 28/14 30/20 40/3 40/11 54/14 69/16 69/23 80/13 80/22 90/1 91/22
questions [10]  16/6 20/21 34/16 47/5 59/4 59/12 61/8 62/14 87/24 91/9
quick [1]  91/22
quite [1]  12/19

**R**

R.J [1]  5/3
Raj [1]  82/3
RAJIV [1]  3/19
RDR [1]  92/20
RDR-RMR-CRR-CRC [1]  92/20
reach [2]  46/6 84/11
read [3]  31/16 37/8 44/9
reading [2]  35/6 35/16
real [2]  65/3 91/22
really [20]  8/2 8/22 10/15 12/11 15/11 17/19 17/19 19/6 19/17 23/22 29/7 30/23 31/9 31/9 32/1 34/12 38/20 60/11 83/17 90/9
realm [1]  69/13
reason [2]  19/22 79/10
reasonable [2]  38/13 39/7
reasonably [1]  39/22
reasoning [5]  31/9 71/19 71/19 75/13 75/14
reasons [5]  58/15 67/9 68/13 84/19 86/14
recall [1]  57/22
receipt [1]  82/11
receive [4]  52/21 74/16 90/15 90/19
received [1]  75/10
receives [1]  80/4
receiving [1]  83/24
recently [1]  75/14
recess [2]  81/20 81/22
recipient [1]  71/2
recognize [2]  46/8 89/1
recognizes [2]  45/23 46/5
recognizing [1]  78/23
recommend [1]  26/13
record [8]  15/4 32/21 33/3 64/21 73/11 73/17 78/8 92/17
recorded [1]  1/24

records [22]  47/16 48/4 60/17 63/14 69/14 71/8 71/11 71/20 74/6 74/11 75/20 80/8 86/15 86/16 86/17 86/23 87/3 87/8 87/20 89/7 89/8 90/4
rectify [1]  88/17
redact [4]  38/16 62/20 82/23 83/13
redacted [5]  77/22 77/24 78/2 78/13 85/18
redacting [1]  87/19
redaction [5]  73/24 78/22 82/16 87/7 89/10
reel [1]  19/13
refer [1]  68/6
Reference [3]  4/17 4/21 68/5
references [2]  82/18 82/19
referencing [2]  19/10 74/3
referred [1]  18/24
referring [1]  19/1
refusal [1]  72/17
regarding [2]  31/15 55/19
regardless [1]  70/2
register [1]  78/25
registered [4]  73/6 83/8 85/5 88/6
registration [10]  9/5 67/25 72/8 73/1 73/8 74/21 75/2 85/24 88/4 91/2
regulate [5]  35/19 35/24 54/25 58/2 58/3 58/7 61/16 62/14 87/24 91/9
regulated [6]  36/11 43/2 43/7 43/21 45/24 57/6
regulates [1]  86/14
regulating [1]  43/21
regulation [1]  61/21
regulations [1]  64/11
reinvestigation [1]  64/2
reiterated [1]  71/7
relate [5]  55/14 57/13 57/14 57/23 61/19
related [11]  36/22 55/25 55/6 56/7 56/24 57/1 57/16 58/17 64/9 64/25 74/11
relates [1]  57/19
relevance [1]  56/11
relevant [4]  17/15 55/24 56/17 62/16
reliance [1]  78/10
relief [1]  67/2
relies [2]  44/6 64/18
religious [1]  31/18
reluctant [1]  66/1
rely [2]  37/13 67/21
remaining [1]  7/7
remedy [2]  75/25 90/23
remember [1]  19/25
remove [13]  38/18 46/25 47/20 47/20 54/3 72/18 73/5 75/3 80/24 82/12 85/9 85/12 86/2
rent [1]  62/15
RentGrow [1]  44/3
repeat [1]  59/10
reply [1]  91/9
report [55]  18/4 18/8 35/15 35/17 35/20 35/24 36/1 36/4 36/12 37/6 38/3 38/23 38/24 39/19 40/11 40/15 41/21 42/13 42/14 42/20 42/21 43/2 48/22 49/9 49/13 49/20 50/9 50/19 51/6 52/1 52/1 52/7 52/11 54/2 55/16 56/4 56/9 56/20 57/2 60/4 60/5 60/8 60/10 61/4 61/15 61/24 62/1 62/7 62/11 62/21 64/3

64/10 64/14 64/20 65/1
report' [1]  62/5
reported [1]  30/10
reporter [3]  1/22 14/4 92/21
REPORTER'S [1]  92/14
Reporter/Transcriber [1]  92/21
reporting [42]  34/20 36/17 37/19 37/21 37/25 38/1 38/11 38/12 38/22 39/5 39/10 44/25 45/15 45/19 46/14 47/1 50/6 50/8 50/17 52/6 52/6 52/15 54/13 54/15 54/23 55/1 55/5 55/11 55/17 60/3 63/7 63/8 64/11 65/6 65/17 65/25 66/6 66/15 66/22 67/3 67/7
reports [31]  22/16 36/9 36/19 44/12 44/13 46/1 46/16 46/20 48/11 48/13 48/19 50/11 54/18 55/11 55/15 55/20 55/21 57/17 57/23 58/5 58/6 59/17 59/19 59/19 61/1 61/13 61/17 61/19 61/22 64/19 64/24
represent [2]  7/14 34/23
representational [1]  17/17
representing [2]  26/19 26/22
reprocessing [1]  18/7
republish [1]  31/12
reputation [2]  28/23 29/4
request [17]  26/11 40/24 41/24 50/23 51/4 53/19 63/23 70/7 71/23 72/19 75/20 77/22 79/24 84/17 85/12 85/17 86/4
requested [10]  42/13 42/14 52/7 59/20 60/5 63/18 68/19 76/15 80/10 87/7
requester [1]  71/21
requests [4]  45/20 63/19 70/4 82/11
require [2]  8/9 63/8
required [6]  36/9 38/11 43/11 43/13 73/16 75/10
requirement [1]  60/17
requirements [1]  45/23
requires [6]  47/18 48/6 63/10 63/16 64/6 83/22
requiring [2]  64/1 85/9
rescind [1]  51/23
RESEARCH [2]  2/9 4/10
Reserve [1]  64/17
resided [1]  62/15
residents [1]  83/5
resides [2]  63/13 63/14
resolution [1]  35/10
resolves [1]  67/2
respect [8]  35/17 45/24 55/2 67/2 67/3 67/24 83/18 84/21
respond [2]  74/25 75/2
responded [1]  38/20
responsibility [1]  86/4
responsible [1]  55/22
rest [1]  13/8
RESTORATION [6]  2/23 4/17 4/20 67/25 68/4 68/7 71/10
restricting [1]  85/4
restriction [1]  43/1
restrictions [5]  46/12 62/3 70/13 71/8 71/20 74/5 81/17 84/21
resulted [1]  21/25
results [1]  64/2
retain [1]  41/23

Revenue [1]  68/17
reverse [1]  52/16
revision [1]  11/20 12/11
revokes [1]  63/25
right [125]
rights [1]  78/2
rise [4]  7/4 81/21 81/23 92/12
Risk [1]  62/11
Riverfront [1]  4/6
RMR [1]  92/20
Rob [3]  7/13 28/17 28/19
ROBERT [1]  4/2
role [1]  66/11
roles [1]  66/11
roll [1]  78/14
rolls [6]  71/15 75/4 75/21 78/14 85/19 88/17
room [1]  81/16
Rose [1]  5/8
route [1]  79/18
rub [1]  47/25
rule [2]  15/14 35/9
rules [2]  17/8 65/1
ruling [2]  42/5 48/10
running [1]  72/25
runs [1]  68/7
Ryan [1]  5/8

**S**

safe [1]  20/11
safety [2]  2/4 80/24
said [35]  18/11 22/2 28/18 28/23 30/13 31/11 31/13 32/21 42/19 43/18 47/14 47/15 53/14 55/20 56/23 57/15 57/15 57/18 58/12 59/11 62/6 63/13 64/8 67/12 70/23 71/20 74/5 75/5 81/3 81/13 85/3 88/10 88/11 89/1 89/5
same [19]  9/10 9/15 11/24 17/9 18/8 23/11 24/16 29/9 31/23 44/4 58/11 58/13 71/7 71/18 71/19 76/7 79/25 85/15 89/5
satisfied [3]  7/23 8/3 85/1
satisfy [1]  74/22
saw [1]  24/8
say [62]  9/5 12/13 13/1 14/10 17/5 18/5 19/10 20/10 28/17 29/7 30/15 31/12 33/19 36/10 37/3 38/6 40/16 42/3 43/4 43/11 43/13 43/8 47/17 50/1 50/17 51/11 52/6 53/24 54/17 55/18 55/24 55/25 58/4 59/15 63/1 63/2 63/14 63/24 64/23 65/5 65/11 65/12 66/7 66/10 66/14 72/21 73/8 74/20 74/25 76/18 77/4 78/20 80/20 81/1 83/10 83/11 83/13 84/5 85/11 86/12 90/22 91/21
saying [30]  11/7 14/2 18/13 18/15 19/6 21/13 22/22 24/6 32/13 37/4 41/22 43/23 44/22 47/17 49/19 53/10 55/5 55/8 56/17 58/6 58/15 63/3 67/1 67/6 69/13 69/17 71/7 75/8 82/23 83/8 says [29]  19/3 23/19 31/1 36/10 39/24 41/1 41/2 41/5 44/16 47/24 56/24 56/25 57/7 58/19 64/9 67/5 67/13 70/20 71/13 71/14 74/9 74/22 75/7 75/15 81/16 82/10 82/15 87/2 89/19

**S**

SCALABLE [1] 2/14
scene [1] 15/6
SCHILLER [2] 3/13 3/16
school [1] 28/21
scope [2] 61/20 73/11
score [3] 28/21 28/23 29/4
screenshot [1] 91/5
search [2] 9/18 30/9
searched [2] 47/24 48/1
SEARCHERS [3] 1/14 4/4
7/14
searching [2] 12/20 68/22
seated [2] 7/5 81/24
second [3] 21/11 23/15
44/10
secret [2] 30/25 31/1
section [18] 16/18 17/7
17/8 17/10 17/23 18/22 19/4
19/13 28/11 28/25 46/2
57/16 57/20 63/10 64/14
64/16 75/5 86/13
security [14] 49/18 50/13
50/16 50/17 52/10 56/3 58/9
58/10 58/14 80/25 84/19
84/24 86/1 89/15
see [17] 12/22 21/13 24/15
33/11 48/2 54/14 63/19
65/17 75/17 75/21 76/13
82/1 82/2 84/9 87/18 87/21
90/22
seeking [3] 35/19 42/25
54/25
seem [4] 35/18 69/10 76/3
79/21
seemed [1] 56/4
seems [5] 12/19 13/3 35/6
69/4 86/17
self [1] 81/13
self-government [1] 81/13
sell [1] 79/22
selling [1] 49/9
sells [1] 32/24
send [4] 28/6 28/9 53/16
80/11
sending [2] 49/13 52/18
sends [1] 50/6
sense [7] 10/22 11/16
12/13 15/20 17/12 56/8
81/10
sensitive [3] 82/17 89/10
89/18
sent [3] 40/23 45/20 53/4
separate [1] 32/15
September [2] 91/21 92/5
serves [1] 37/24
service [2] 7/20 90/13
services [1] 54/17
set [4] 11/13 17/20 52/10
91/21
setting [1] 87/5 87/16
Seventh [2] 44/3 44/9
several [3] 7/8 7/8 82/19
SEYFARTH [2] 4/2 7/13
shalt [1] 31/2
share [9] 23/19 24/7 24/7
70/17 70/23 70/25 71/1 71/3
74/5
sharing [2] 61/2 70/18
SHAW [7] 3/13 4/2 6/10
7/13 47/9 47/10 65/24
she [1] 51/13
She's [1] 44/20
shielded [1] 24/19
ships [1] 35/6
shortly [1] 91/20
should [1] 21/6 21/12

26/25 37/3 46/19 55/8 59/16
61/25 64/12 64/25
shouldn't [3] 12/25 36/18
67/8
show [1] 60/11
shown [1] 17/9
shows [2] 60/1 89/11
side [1] 66/4
sign [2] 74/22 78/25
significant [1] 9/12
similar [3] 14/4 23/18 58/15
simpler [1] 29/5
simply [3] 14/22 24/16
82/11
since [1] 37/14
sir [1] 68/2
sitting [1] 32/13
situated [2] 68/12 79/21
situation [2] 52/18 78/7
situations [1] 75/6
slippery [1] 30/21
slope [1] 30/21
small [1] 87/8
SMARTY [4] 3/9 4/13 27/10
29/13
SMITH [19] 4/5 4/14 25/4
39/14 40/8 40/10 40/13
40/15 40/16 42/14 49/4
49/20 49/22 49/23 49/24
50/1 50/7 50/18 52/7
Smith's [1] 50/16
Smiths [2] 39/15 49/2
so [120]
social [9] 28/1 49/17 50/13
50/16 50/17 52/10 56/3
68/16 89/15
Sofia [1] 44/23
sole [1] 45/1
solicitations [1] 80/12
solid [1] 28/24
SOLUTIONS [3] 2/18 3/24
34/24
solve [1] 24/12
some [20] 10/12 11/10
14/17 15/6 17/12 17/14 18/4
27/13 28/22 38/4 48/4 49/13
56/1 56/4 56/11 69/20 79/23
81/15 84/9 92/8
somebody [13] 10/1 10/7
13/6 13/13 19/19 31/19
53/19 56/12 56/15 63/19
84/13 87/12 87/21
somebody's [3] 18/2 39/14
89/25
somehow [4] 12/14 22/25
48/10 53/12
someone [10] 10/11 16/23
18/14 19/20 32/1 40/14 53/9
64/3 70/4 71/23
someone's [2] 50/20 55/23
something [7] 10/7 46/4
56/7 56/24 56/25 60/2 67/19
sometime [1] 91/15
sometimes [1] 71/16
somewhat [1] 79/10
somewhere [2] 15/24
28/22
soon [1] 91/14
sorry [2] 15/16 26/25
sort [10] 14/17 19/12 21/23
24/17 38/4 59/13 59/22 65/8
76/24 79/16
sought [1] 35/24
source [1] 29/3
sources [5] 8/21 11/18
12/11 22/11 25/13
South [1] 3/14
space [1] 81/17

Spak [1] 34/25
speak [2] 12/23 27/1
speaker [1] 7/25
speaks [1] 81/2
specific [24] 11/15 11/22
12/4 14/25 28/13 38/5 45/4
47/13 50/11 55/12 57/5
57/10 57/11 57/12 57/13
57/14 58/2 58/3 58/7 60/8
77/10 77/15 77/15 87/5
specifically [11] 15/1 28/12
46/7 50/23 52/14 57/19
69/22 79/7 80/8 85/23 88/10
speech [7] 13/21 17/1
17/22 31/15 31/17 31/20
32/11
speedy [1] 35/10
spirit [2] 84/7 89/6
Square [1] 4/12
stage [6] 25/8 25/10 26/9
27/15 59/23 61/7
stand [1] 31/16
stands [2] 22/25 37/11
start [8] 7/10 16/12 28/6
30/18 32/7 33/13 34/21
69/17
started [2] 21/25 46/11
starting [2] 44/20 88/2
state [60] 12/1 23/24 24/2
24/5 25/14 29/16 33/6 33/20
34/1 34/2 34/6 34/7 35/19
35/23 43/20 45/23 46/12
56/16 57/8 58/1 58/12 58/19
61/18 69/1 69/12 69/18
70/25 72/6 72/9 73/2 73/7
73/16 75/7 75/12 76/22 77/1
77/8 77/10 77/12 77/20 78/9
78/18 82/7 83/8 83/12 83/24
85/11 85/22 86/8 86/15
86/18 86/21 87/4 87/16 88/7
88/10 89/23 90/15 90/19
90/22
state's [1] 75/20
state-maintained [1] 86/15
statement [5] 27/4 31/17
31/18 31/18 31/19
states [10] 1/1 1/21 7/2
37/15 58/5 58/7 68/18 74/10
79/23 81/16
status [2] 90/2 91/16
statute [39] 12/16 17/13
17/15 19/22 20/1 20/18 24/1
24/10 34/1 34/2 34/4 37/15
42/3 42/18 43/4 44/16 46/14
54/3 57/16 58/3 58/9 58/10
58/14 58/19 67/13 69/4
70/22 73/4 73/7 73/7 76/3
80/21 82/6 82/11 83/12 83/14
83/16 84/7 85/8
statutes [4] 23/24 74/1
74/1 85/3
statutory [1] 45/21
stenography [1] 1/24
step [3] 37/13 57/7 90/18
stepped [1] 74/19
still [12] 24/14 24/15 32/3
40/7 42/12 50/14 51/18
51/22 67/8 82/5 87/21 88/9
STIO [10] 3/22 6/9 34/21
38/23 38/25 39/13 53/10
61/11 67/1 67/18
Stio's [1] 63/12
story [1] 14/17
straightforward [1] 15/24
street [13] 3/14 4/19 4/24
5/3 11/3 11/25 12/3 24/22
50/7 53/12 63/13 63/14
87/12

Streets [1] 1/18
strike [1] 89/2
struck [2] 70/22 74/4
student [1] 53/17
stuff [4] 28/22 32/14 79/25
80/10
subject [12] 11/14 13/7
13/10 34/13 43/21 43/22
45/24 57/13 58/11 58/18
58/20 58/21
submitted [1] 45/19
subsection [8] 43/20 45/22
45/25 57/5 64/1 64/5 74/15
74/17
subsections [1] 74/8
subsequent [3] 69/24 71/8
75/3
subsequently [6] 50/23
68/20 70/17 71/3 76/7 76/10
subset [4] 75/9 87/8 87/9
87/15
substance [1] 35/4
such [9] 28/16 45/10 50/7
50/7 50/12 52/7 52/7 79/24
82/5
sued [6] 9/14 16/20 16/23
16/25 68/11 78/15
suffers [1] 23/11
suit [3] 13/11 14/8 14/12
Suite [7] 3/17 3/20 3/23 4/6
4/9 4/16 4/19
summary [1] 15/9
superset [1] 69/21
supplied [1] 52/5
supplying [1] 40/20
supported [2] 64/24 85/7
supports [1] 57/1
supposedly [1] 8/2
supremacy [1] 72/24
Supreme [1] 87/10
sure [21] 13/9 16/9 18/25
19/25 27/14 29/7 39/13
39/15 40/8 40/9 49/3 50/1
51/14 61/12 68/25 69/3 69/7
70/5 70/7 72/4 80/17
survives [1] 34/8
Sweet [1] 62/9
SYNAPTIX [2] 3/4 4/7
system [2] 17/20 45/13
SZYBA [5] 4/2 6/5 7/13
28/17 28/19

**T**

tailored [1] 85/6
take [14] 17/18 23/3 37/13
42/2 45/17 55/24 65/20
65/22 69/17 73/14 73/17
81/20 90/18 91/13
takedown [1] 50/23
taken [5] 17/2 17/8 18/2
66/8 81/22
taking [8] 10/11 11/17
20/16 31/19 35/13 39/7
52/20 57/7
talk [4] 30/22 44/15 51/15
58/4
talked [3] 44/10 45/17
58/17
talking [9] 29/7 30/18 33/13
40/17 79/8 83/6 83/11 84/16
85/5
talks [3] 10/6 23/23 76/3
TARAZ [1] 4/24
TECHNOLOGY [2] 3/4 4/7
telephone [2] 22/13 22/14
24/23 35/15 48/18 48/25
88/20 88/24 89/15
tell [4] 50/2 56/12 76/22

77/8
telling [1] 47/15
tellingly [1] 75/5
tells [1] 71/12
ten [5] 11/16 11/17 29/9
70/7 81/20
ten-minute [1] 81/20
tenths [2] 83/7 85/5
terms [11] 12/18 19/14
37/2 39/12 40/6 40/10 46/18
85/2 85/23 88/3 90/13
test [1] 7/17
text [2] 76/2 82/16
Thank [30] 16/11 20/23
26/15 26/16 26/18 27/17
27/19 27/20 34/14 34/18
34/22 47/4 47/6 59/5 61/9
61/10 65/23 67/17 67/22
67/23 81/19 86/7 86/11
87/25 91/10 91/11 91/13
92/9 92/10 92/11
Thanks [1] 86/6
theft [2] 63/18 63/23
theirs [1] 17/23
them [21] 11/18 14/25 16/5
20/15 28/12 33/10 40/9 47/5
47/15 50/22 62/21 67/14
72/7 75/3 77/16 77/16 83/24
83/24 83/25 85/9 90/4
themselves [2] 29/14 78/12
theory [3] 9/15 79/17 80/7
therefore [1] 55/19
these [28] 12/18 18/11
18/11 19/14 22/16 26/20
30/21 32/6 35/6 46/1 53/7
53/12 55/17 59/1 60/11
67/14 68/13 71/11 73/24
74/6 79/18 86/18 86/23
86/24 89/7 90/4 91/16 92/8
they'll [1] 53/5
they're [28] 9/8 19/7 19/10
22/13 22/15 22/18 35/6
43/14 44/24 47/1 47/12 54/7
54/8 54/24 55/3 55/6 56/14
58/15 60/8 60/9 67/7 68/14
77/18 78/11 86/4 88/6 88/6
89/7
they've [10] 17/8 50/22
50/24 50/25 56/20 56/21 56/25
57/15 62/6 68/11 77/17
thing [13] 11/14 13/3 16/17
29/23 34/5 39/25 40/2 44/2
48/9 55/8 60/15 63/6 85/15
things [23] 12/9 32/14 34/5
38/11 41/16 43/8 47/13
50/10 50/13 56/20 57/11
57/11 57/12 57/13 57/22
57/24 58/6 66/24 67/13
78/25 85/21 86/12 91/20
think [73] 7/9 15/11 16/16
18/11 18/21 19/1 19/9 19/12
25/4 29/12 30/1 30/19 35/22
36/25 37/3 40/6 41/1 42/3
45/11 46/2 46/7 46/17 47/18
47/24 48/5 48/8 48/11 51/20
51/22 52/24 52/25 54/7 54/8
54/11 56/2 56/19 57/4 58/8
58/23 58/25 59/11 59/15
59/22 59/25 60/5 64/24 65/2
66/10 66/17 67/1 68/18
68/23 72/5 72/12 73/10 76/5
76/17 76/20 79/17 81/14
82/6 83/9 83/19 84/6 84/25
84/25 85/6 86/12 87/5 87/14
87/17 88/23 91/8
thinking [1] 78/10
thinks [1] 65/3
third [36] 8/9 8/14 8/16

**T**

**third... [33]** 8/19 9/2 9/17
10/2 10/5 10/10 10/14 14/10
14/12 14/13 15/2 15/23
16/17 16/22 17/12 18/10
18/14 19/8 20/3 21/16 21/22
22/1 25/16 26/5 26/7 29/3
30/8 32/21 32/23 40/19
45/20 49/9 71/21
**third-party [4]** 15/23 19/8
21/22 71/21
**this [120]**
**thou [1]** 31/2
**though [2]** 52/18 71/16
**thought [1]** 53/7
**thousands [2]** 40/9 49/3
**threats [1]** 84/24
**three [6]** 7/14 7/16 21/5
26/21 26/21 37/19
**three-element [1]** 7/16
**through [7]** 14/22 38/2
46/10 58/8 58/24 76/25
86/21
**tied [1]** 89/7
**TikTok [12]** 16/18 19/3
21/10 21/21 21/23 22/1
24/15 27/22 28/1 28/1 28/5
28/10
**TikTok's [1]** 28/6
**time [8]** 21/19 41/10 65/23
67/4 81/20 86/19 86/20
89/11
**times [4]** 4/12 9/15 32/6
34/11
**today [3]** 21/7 67/2 67/20
**together [4]** 24/17 75/22
88/12 91/21
**tolerated [1]** 32/9
**too [7]** 19/14 34/4 45/23
47/13 54/8 81/14 92/5
**took [3]** 44/4 49/2 52/16
**Torrez [3]** 70/12 74/4 75/14
**touch [2]** 21/5 24/20
**trade [2]** 30/25 31/1
**tradelines [1]** 48/15
**tradeoff [1]** 19/4
**transaction [1]** 32/24
**transactions [1]** 48/16
**Transcriber [1]** 92/21
**transcript [2]** 1/24 92/16
**transcription [1]** 1/25
**transparency [8]** 75/17
81/12 81/13 84/5 84/10
87/20 89/3 89/8
**treat [1]** 7/24
**treated [1]** 13/20
**Trenton [1]** 5/4
**tries [1]** 58/1
**troubling [1]** 32/6
**TROUTMAN [1]** 3/22
**true [3]** 13/6 23/25 45/3
**truly [1]** 89/18
**try [8]** 34/24 35/5 36/16
36/17 47/13 59/10 65/4
91/14
**trying [11]** 14/24 19/20
21/24 35/7 36/7 58/2 60/8
66/10 71/10 79/3 84/13
**turn [1]** 34/19
**two [24]** 12/6 13/16 27/23
27/24 37/12 41/15 45/18
47/13 50/10 62/8 64/10
66/11 69/22 70/10 71/13
74/7 74/8 75/3 78/25 83/7
85/5 86/12 86/13 88/13
**two-tenths [2]** 83/7 85/5
**type [5]** 18/4 31/2 31/10

31/18 79/13
**types [2]** 49/17 57/22

**U**

**U.S [2]** 1/17 62/11
**U.S.C [3]** 57/20 63/10 63/16
**ultimately [1]** 89/17
**unaware [1]** 77/10
**unclear [1]** 66/20
**under [50]** 8/22 9/13 9/15
10/2 10/21 17/15 23/14
35/16 38/11 41/11 41/23
41/25 43/3 43/21 43/23
45/25 46/2 54/3 55/6 55/13
57/20 63/20 66/9 69/14
70/15 71/9 71/21 71/22 72/6
72/22 73/12 73/18 74/7
75/10 75/12 75/23 76/9 77/1
77/2 78/9 78/9 78/12 80/10
82/8 83/21 86/5 88/16 89/13
91/6 91/13
**understand [20]** 12/15 13/1
13/7 33/16 39/12 40/6 47/3
49/8 54/5 60/21 66/13 67/11
67/16 67/16 78/4 79/15
81/19 90/6 90/14 91/7
**understanding [3]** 25/7
27/13 72/6
**understood [2]** 24/13
66/13
**uniquely [4]** 68/12 82/17
89/10 89/18
**UNITED [4]** 1/1 1/21 7/2
37/15
**unless [8]** 20/20 34/15 42/1
51/23 51/23 59/3 66/2 91/8
**unlisted [1]** 29/21
**unpublished [5]** 24/22
35/14 38/17 39/6 62/3
**unredacted [1]** 86/17
**unrelated [1]** 54/17
**until [3]** 67/4 81/15 81/22
**up [14]** 9/11 17/20 18/2
20/8 25/22 29/15 30/10
58/13 65/15 67/12 74/22
78/25 85/19 89/11
**update [1]** 75/1
**upon [7]** 21/5 24/20 32/24
37/13 41/24 44/6 64/18
**us [12]** 25/19 27/8 35/8
36/19 36/19 50/17 62/21
65/2 67/2 71/12 76/22 77/23
**use [12]** 10/5 23/5 40/7
42/12 48/4 49/5 49/17 53/8
63/8 64/12 67/13 86/15
**useable [1]** 90/5
**user [2]** 7/20 28/13
**users [2]** 22/6 33/2
**users' [1]** 22/5
**uses [1]** 31/7
**using [3]** 67/15 80/8 80/11
**utilize [1]** 38/22
**utilizing [1]** 83/25

**V**

**valid [1]** 29/13
**varies [1]** 18/4
**various [8]** 8/21 11/11
11/17 14/16 22/10 29/24
67/9 68/13
**vein [2]** 22/24 26/8
**verify [1]** 53/8
**versus [1]** 19/11
**very [25]** 15/24 20/23 23/18
27/17 27/21 29/5 30/8 30/20
34/14 34/17 46/8 55/12
57/10 57/11 58/7 61/9 67/17
71/10 79/12 84/22 87/25

89/19 91/13 91/19 92/10
**via [1]** 71/3
**vice [2]** 4/15 4/19
**video [1]** 21/23
**videos [9]** 22/2 22/4 22/7
28/6 28/7 28/8 28/8 28/9
28/9
**view [2]** 24/19 81/10
**viewed [1]** 71/17
**violated [1]** 55/19
**violation [1]** 78/15
**vote [5]** 73/6 75/2 78/25
85/20 89/5
**voter [50]** 4/17 4/20 9/5
67/25 68/5 68/19 69/12
69/13 69/17 69/20 70/13
70/23 71/2 71/14 71/15 72/6
72/7 73/1 73/1 73/8 73/17
74/21 75/20 75/25 76/14
76/18 76/21 77/7 77/8 77/14
78/13 79/4 80/8 82/5 82/8
82/10 82/17 83/21 83/22
85/19 85/23 86/5 86/15 87/8
87/20 87/22 88/3 88/17 89/3
89/8
**voter's [1]** 88/5
**VoteRef [2]** 75/24 90/4
**VoteRef.com [1]** 68/20
**voters [6]** 72/22 77/14 83/6
83/8 85/5 85/23
**voting [1]** 88/6
**VRF [10]** 68/6 68/7 68/12
68/18 69/11 70/11 70/12
77/22 78/7 88/14
**VRF's [1]** 68/7
**vs [17]** 1/4 1/9 1/13 2/3 2/8
2/13 2/17 2/22 3/3 3/8 9/20
15/12 16/18 18/6 19/3 62/9
62/11

**W**

**waived [1]** 60/7
**want [26]** 13/16 20/15
22/11 22/11 22/12 22/19
27/7 27/21 28/17 29/18
34/23 35/5 37/13 39/15 46/3
48/3 53/13 67/19 69/9 69/16
75/16 78/11 79/16 88/20
90/11 90/12
**wanted [10]** 14/14 19/17
20/10 27/14 29/18 36/21
59/11 75/17 75/19 79/24
**wants [7]** 25/22 29/15
38/23 45/13 51/12 84/5
88/16
**warrants [1]** 60/12
**washing [1]** 80/12
**wasn't [2]** 13/14 71/25
**watch [3]** 14/11 30/10
31/11
**way [15]** 4/9 7/9 9/10 11/22
13/19 39/16 44/18 44/24
46/21 58/14 66/8 76/23
76/24 77/23 82/19
**ways [5]** 17/4 45/14 50/12
65/10 74/19
**we'd [2]** 66/17 87/23
**we'll [12]** 16/5 16/7 20/24
34/19 34/21 47/7 67/21
81/20 81/25 88/1 91/15
91/20
**we've [6]** 33/7 33/14 37/22
38/19 44/5 84/25
**website [29]** 9/3 10/1 10/8
10/12 15/19 18/3 20/17 22/7
26/7 27/25 28/16 29/11 30/10
31/11 32/16 32/24 33/2
36/15 37/23 42/4 54/17

65/11 65/12 65/13 65/16
68/8 68/20 90/4 90/24
**websites [5]** 7/22 9/9 14/11
22/12 22/19
**weekend [1]** 7/13
**weighed [5]** 78/23 78/24
81/2 81/11 88/25
**welfare [1]** 68/16
**went [5]** 13/12 26/7 28/20
28/20 58/8
**weren't [2]** 81/8 86/19
**West [1]** 3/20
**Westlaw [1]** 62/10
**whatever [9]** 20/7 33/22
49/10 50/8 72/8 77/19 90/6
90/12 91/3
**whatnot [1]** 90/13
**whatsoever [1]** 74/6
**whether [33]** 9/25 22/4
25/8 25/11 30/18 30/22
31/10 32/17 40/3 42/13
54/15 56/10 56/11 60/3 60/4
60/6 60/13 63/2 69/5 70/2
73/12 76/13 77/17 80/13
80/22 82/7 82/9 82/12 84/12
89/25 90/1 90/9 90/10
**while [1]** 85/25
**Whitepages [1]** 18/6
**who's [5]** 9/14 26/22 49/14
71/5 84/16
**whoever [1]** 11/23
**whole [5]** 7/25 19/21 55/8
67/12 78/3
**whom [2]** 42/14 49/22
**why [10]** 19/22 25/24 59/20
60/1 60/4 75/15 75/15 77/2
79/7 79/17
**wildly [1]** 14/23
**will [9]** 20/11 28/6 28/8
28/9 33/19 72/9 77/13 77/17
91/21
**win [1]** 81/14
**wipe [4]** 39/5 41/17 42/9
42/11
**wish [1]** 90/7
**within [10]** 23/13 33/24
35/20 57/5 61/24 84/22
84/25 85/15 87/9 89/6
**without [13]** 12/11 12/12
12/12 37/4 39/22 50/11 53/3
53/16 53/16 63/3 69/18 79/5
88/18
**wondering [1]** 56/10
**word [7]** 10/5 26/17 31/19
47/7 61/11 72/25 88/1
**word's [1]** 53/12
**words [11]** 9/4 29/16 30/25
31/16 33/5 37/3 39/19 40/14
41/24 71/24 72/5
**work [3]** 20/14 65/3 88/15
**workforce [1]** 53/11
**works [2]** 28/21 33/23
**world [5]** 14/24 17/14 17/19
18/16 19/7
**wouldn't [4]** 56/11 56/16
57/4 63/21
**write [3]** 53/19 72/7 73/8
**writing [1]** 51/24
**written [4]** 32/3 51/11
53/22 72/11
**wrong [4]** 30/20 55/19 56/4
56/23

**Y**

**yeah [13]** 24/11 36/6 42/16
43/23 44/7 46/16 60/19
60/20 65/21 65/24 74/1 74/2
80/13

**years [3]** 9/21 20/13 63/3
**yes [30]** 8/16 14/9 20/4
20/5 20/6 21/4 25/3 27/14
27/16 44/20 47/10 48/24
50/20 66/19 66/25 68/2 68/3
69/9 70/21 72/11 72/20
74/20 75/1 76/16 77/25 80/3
86/9 90/11 91/1 91/23
**yet [2]** 9/23 36/23
**York [5]** 3/14 4/3 4/3 4/13
4/13 25/6
**you [277]**
**you'd [1]** 60/2
**you'll [2]** 65/16 87/18
**you've [1]** 42/4
**yourself [4]** 13/4 14/4
20/17 84/6
**yourselves [1]** 21/24
**YUDELSON [1]** 4/15

**Z**

**ZIP [1]** 12/2